1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  TAMAR PACHTER, State Bar No. 146083
   Supervising Deputy Attorney General
3  PAUL STEIN, State Bar No. 184956
   ALEXANDRA ROBERT GORDON, State Bar No. 207650
4  DANIEL POWELL, State Bar No. 230304
   Deputy Attorney General
5    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
6    Telephone:  (415) 703-5740
     Fax:  (415) 703-1234
7    E-mail:  Paul.Stein@doj.ca.gov
   *Attorneys for All Defendants*

8

9                IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11                     SACRAMENTO DIVISION

12

13  **DONALD WELCH ET AL.,**          2:12-cv-02484

14                     Plaintiffs,   **DEFENDANTS' OPPOSITION TO**
                                     **PLAINTIFFS' MOTION FOR**
15        v.                         **PRELIMINARY INJUNCTION**

16                                   Date:        Dec. 3, 2012
                                     Time:        2:00 p.m.
17  **EDMUND BROWN JR., GOVERNOR OF** Dept:        5
    **THE STATE OF CALIFORNIA, IN HIS** Judge:     The Honorable William B.
18  **OFFICIAL CAPACITY, ET AL.,**               Shubb

19                     Defendants.   Trial Date:  None Set
                                     Action Filed:  Oct. 1, 2012
20

21

22

23

24

25

26

27

28

---

Defendants' Opposition to Motion for Preliminary Injunction (2:12-cv-02484)

1

**TABLE OF CONTENTS**

2

Page

3 INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

4 BACKGROUND ................................................................................................................ 3

I. The Statute .......................................................................................................... 3

5 II. Regulation of Mental Health Providers in California ............................................ 6

6 APPLICABLE LEGAL STANDARD.................................................................................... 7

7 ARGUMENT ...................................................................................................................... 8

I. Plaintiffs Have No Likelihood of Success on the Merits. ...................................... 8

8

9 A. The Right of Privacy Does Not Encompass a Right to Obtain
   Mental Health Treatments Deemed Unproven and Unsafe by the
   Mental Health Profession and the State. ...................................................... 9

10 B. SB 1172 Does Not Violate the First Amendment's Religion
   Clauses. .................................................................................................... 14

11 1. Plaintiffs' Establishment Clause claim fails. .............................. 15

12 2. Plaintiffs' Free Exercise Clause claim fails. .............................. 16

13 C. SB 11172 Does Not Ban Any Particular Viewpoint About SOCE,
   Nor Does It Regulate Based on the Content of Protected Speech. ........... 18

14 1. SB 1172 regulates conduct, i.e., a course of treatment, and
   not speech. ................................................................................. 18

15 2. SB 1172 only prohibits efforts by state-licensed mental
   health providers to change a patient's sexual orientation

16 through psychological treatment; it does not prevent
   therapists from discussing SOCE's existence with patients

17 or their families, or from expressing the (discredited) view
   that sexual orientation can be changed......................................... 20

18 D. Plaintiffs' Vagueness Challenge Fails. ..................................................... 23

19 E. Plaintiffs' Overbreadth Challenge Merely Recasts Otherwise
   Meritless Claims. ..................................................................................... 26

20 F. SB 1172 is Constitutional Because the Legislature Rationally
   Determined, Based on Consensus in the Mental Health Profession,

21 That SOCE is Ineffective, Unnecessary, and Potentially Harmful. .......... 28

22 II. Plaintiffs Fail to Meet their Burden to Demonstrate Irreparable Harm. .............. 30

23 III. The Balance of Hardships and the Public Interest Weigh against Granting
   Preliminary Relief. ............................................................................................. 30

24 CONCLUSION ................................................................................................................. 31

25

26

27

28

# TABLE OF AUTHORITIES

Page

CASES

*Accountant's Soc'y of Va. v. Bowman*
    860 F.2d 602 (4th Cir. 1988)...........................................................................19

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011)......................................................................8, 30

*American Family Ass'n, Inc. v. City and County of San Francisco*
    277 F.3d 1114 (9th Cir. 2002)....................................................................15, 17

*Arizona State Bd. for Charter Sch. v. U.S. Dept. of Educ.*
    464 F.3d 1003 (9th Cir. 2006)........................................................................21

*Broadrick v. Oklahoma*
    413 U.S. 601 (1973)........................................................................................24

*Brown v. Entertainment Merchants Ass'n*
    131 S. Ct. 2729 (2011)....................................................................................19

*Cal. Teachers Ass'n v. State Bd. of Educ.*
    271 F.3d 1141 (9th Cir. 2001)............................................................23, 24, 25

*Carnohan v. U.S.*
    616 F.2d 1120 (9th Cir. 1980)........................................................................10

*Christian Legal Soc'y v. Wu*
    626 F.3d 483 (9th Cir. 2010)......................................................................9, 10

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*
    508 U.S. 520 (1993)..................................................................................17, 18

*Coalition for Econ. Equity v. Wilson*
    122 F.3d 718 (9th Cir. 1997)............................................................................8

*Coggeshall v. Mass. Bd. of Registration of Psychologists*
    604 F.3d 658 (1st Cir. 2010)..........................................................................19

*Corp. of Presiding Bishop v. Amos*
    483 U.S. 327 (1987)........................................................................................16

*County of Santa Cruz, Ca. v. Ashcroft*
    279 F. Supp. 2d 1192 (N.D. Cal. 2003..........................................................10

*Cupolo v. Bay Area Rapid Transit*
    5 F. Supp. 2d 1078 (N.D. Cal. 1997)...............................................................8

## TABLE OF AUTHORITIES
### (continued)

Page

*Daly v. Sprague*
  742 F.2d 896 (5th Cir. 1984)..................................................................................... 19

*Dex Media West, Inc. v. City of Seattle*
  790 F. Supp. 2d 1276 (W.D. Wash. 2011)................................................................. 30

*Duncan v. United States*
  590 F. Supp. 39 (W.D. Okla. 1984) .......................................................................... 11

*Employment Div., Dept. of Human Resources of Ore. v. Smith*
  494 U.S. 872 (1990)............................................................................................. 15, 16

*Fields v. Palmdale Sch. Dist.*
  427 F.3d 1197 (9th Cir. 2005)........................................................................ 12, 13, 28

*Garlic v. United States F.D.A.*
  783 F. Supp. 4 (D.D.C. 1992) ................................................................................... 11

*Goldie's Bookstore, Inc. v. Superior Ct.*
  739 F.2d 466 (9th Cir. 1984)..................................................................................... 30

*Grayned v. City of Rockford*
  408 U.S. 104 (1972)............................................................................................. 23, 26

*Heller v. Doe*
  509 U.S. 312 (1993)................................................................................................... 29

*Hill v. Colorado*
  530 U.S. 703 (2000)............................................................................................. 23, 25

*Holder v. Humanitarian Law Project*
  130 S. Ct. 2705 (2010) .............................................................................................. 24

*Hosana-Tabor Evangelical Lutheran Church & School v. EEOC*
  132 S. Ct. 694 (2012) ................................................................................................ 16

*In re Mark Anthony Const., Inc.*
  886 F.2d 1101 (9th Cir. 1989).................................................................................... 21

*Jacobs v. Clark County. School Dist.*
  526 F.3d 419 (9th Cir. 2008)..................................................................................... 15

*Jacqueline R. v. Household of Faith Family Church, Inc.*
  97 Cal.App.4th 198 (2002) ........................................................................................ 14

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Kedroff v. St. Nicholas Cathedral*
   344 U.S. 94 (1952) ................................................................................................ 16

*Lawrence v. Texas*
   539 U.S. 558 (2003) .............................................................................................. 21

*Lemon v. Kurtzman*
   403 U.S. 602 (1971) .............................................................................................. 15

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992) ................................................................................................ 9

*Maryland v. King*
   --- S. Ct. ---, No. 12A48, 2012 WL 3064878 (U.S. July 30, 2012) ...................... 31

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*
   466 U.S. 789 (1984) .............................................................................................. 27

*Meyer v. Nebraska*
   262 U.S. 390 (1923) .............................................................................................. 12

*Miller v. Reed*
   176 F.3d 1202 (9th Cir. 1999) .............................................................................. 17

*N.Y. State Club Ass'n v. City of New York*
   487 U.S. 1 (1988) .................................................................................................. 27

*Nally v. Grace Community Church*
   47 Cal.3d 278 (1988) ............................................................................................ 14

*National Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*
   228 F.3d 1043 (9th Cir. 2000) ........................................................................ passim

*New York State Ophthalmological Soc'y v. Bowen*
   854 F.2d 1379 (D.C. Cir. 1987) ........................................................................... 29

*New York v. Ferber*
   458 U.S. 747 (1982) .............................................................................................. 26

*Ohralik v. Ohio State Bar Ass'n*
   436 U.S. 447 (1978) .............................................................................................. 19

*Oklahoma Chapter of the Amer. Acad. of Pediatrics v. Fogarty*
   366 F. Supp. 2d 1050 (N.D. Okla. 2005) ............................................................ 11

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Parham v. J.R.*
   442 U.S. 584 (1979) ............................................................................................. 12

*Perry v. Schwarzenegger*
   704 F. Supp. 2d 921 (N.D. Cal. 2010) ........................................................... 28, 29

*Pierce v. Soc'y of the Sisters of the Holy Names*
   268 U.S. 510 (1925) ............................................................................................. 12

*Putzer v. Donnelly*
   No. 07–00620, 2009 WL 3271315 (D. Nev. Aug. 17, 2009) ................................ 30

*Reynolds v. United States*
   98 U.S. 145 (1878) ............................................................................................... 16

*Roe v. Wade*
   410 U.S. 113 (1973) ............................................................................................. 10

*Rutherford v. United States*
   616 F.2d 455 (10th Cir. 1980) ........................................................................ 10, 11

*Sable Commc'n of Cal. v. FCC*
   492 U.S. 115 (1989) ............................................................................................. 28

*Sammartano v. First Judicial Dist. Court*
   303 F.3d 959 (9th Cir. 2003) ............................................................................... 30

*Shea v. Bd. of Med. Exam'r*
   81 Cal.App.3d 564 (1978) .................................................................................... 19

*Stormans, Inc. v. Selecky*
   586 F.3d 1109 (9th Cir. 2012) ........................................................... 16, 17, 18, 31

*United States v. Lee*
   455 U.S. 252 (1982) ............................................................................................. 17

*United States v. Raines*
   362 U.S. 17 (1960) ................................................................................................. 9

*United States v. Weitzenhoff*
   35 F.3d 1275 (9th Cir. 1993) ............................................................................... 25

*Vacco v. Quill*
   521 U.S. 793 (1997) ............................................................................................. 10

# TABLE OF AUTHORITIES
### (continued)

Page

*Vernon v. City of Los Angeles*
    27 F.3d 1385 (9th Cir. 1994) ........................................................................... 16, 18

*Virginia v. Hicks*
    539 U.S. 113 (2003) ............................................................................................ 26

*Ward v. Rock Against Racism*
    491 U.S. 781 (1989) ............................................................................................ 23

*West v. Bailey*
    No. 11-1760, 2012 WL 993301 (S.D. Cal. March 23, 2012) ............................... 28

*Whalen v. Roe*
    429 U.S. 589 (1977) ..................................................................................... 14, 29

*Windsor v. United States*
    --- F.3d ---, Nos. 12–2335 & 12–2435(Con), 2012 WL 4937310 (2d Cir. October 18,
    2012) ............................................................................................................ 11, 21

*Winter v. Natural Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ..................................................................................... 7, 8, 30

STATUTES

California Business & Professions Code
    § 25 ..................................................................................................................... 7
    § 728 ................................................................................................................... 7
    § 729 ................................................................................................................... 7
    § 865.1 .............................................................................................................. 21
    § 2063 ....................................................................................................... 7, 14, 15
    § 2903 ......................................................................................................... 7, 20
    § 2908 ......................................................................................................... 7, 14
    § 2914 ................................................................................................................. 7
    § 2914.1 .............................................................................................................. 7
    § 2914.2 .............................................................................................................. 7
    § 2915.5 .............................................................................................................. 7
    §§ 2915-2915.7 .................................................................................................. 7
    § 2936 ................................................................................................................. 7
    §§ 2941-2948 ...................................................................................................... 7
    § 2960.5 .............................................................................................................. 7
    §§ 2960-2960.1 ................................................................................................... 7
    §§ 2961-2965 ...................................................................................................... 7
    § 4980.01 ..................................................................................................... 7, 14, 15
    § 4996.13 ..................................................................................................... 7, 14

Defendants' Opposition to Motion for Preliminary Injunction (2:12-cv-02484)

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3   California Evidence Code §§ 1014-1016 ....................................................................... 13

4   California Stats. 2012, Chapter 835, § 1 ............................................................... passim

5   California Stats. 2012, Chapter 835, § 2 ............................................................... passim

6   **CONSTITUTIONAL PROVISIONS**

7
United States Constitution First Amendment ...................................................... passim

8   **OTHER AUTHORITIES**

9
Joseph R. Nicolosi, *Reparative Therapy of Male Homosexuality* 149-168 (1997) ..................... 24

10

*Webster's New Collegiate Dictionary* (1981) ............................................................. 20

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Opposition to Motion for Preliminary Injunction (2:12-cv-02484)

1  Defendants Governor Edmund G. Brown Jr., in his official capacity, et al.[1] oppose

2  plaintiffs' motion for a preliminary injunction.  Pursuant to Eastern District Rule 231, defendants

3  request oral argument and estimate that each side will require twenty (20) minutes to make their

4  presentation to the Court.

5  **INTRODUCTION AND SUMMARY OF ARGUMENT**

6  SB 1172 regulates conduct, not speech or religion:  it prohibits state-licensed mental health

7  providers in California from attempting to change the sexual orientation of any patient younger

8  than 18 years old.  The statute is based on a broad consensus in the scientific community dating

9  back to the early 1970's that homosexuality is not a disease, condition, or disorder in need of a

10  "cure."  The Legislature first canvassed reports by major professional organizations in the mental

11  health field; these reports indicate that sexual orientation change efforts (SOCE) are not only

12  ineffective but also pose potentially serious risks of harm to patients.  The Legislature then took

13  action to protect the public health and safety.  It declared that attempting SOCE on a minor shall

14  be deemed unprofessional conduct, and shall subject a mental health provider to discipline by the

15  relevant licensing authority.  In doing so, the Legislature followed the lead of the American

16  Psychological Association, the American Psychiatric Association, and the American

17  Psychoanalytic Association, among others.  Each of these organizations has warned young people

18  and their families to avoid SOCE and/or warned their constituent practitioners that attempting

19  SOCE on a minor is unnecessary, potentially dangerous, and/or contrary to basic tenets of

20  psychological practice.

21  Plaintiffs include two licensed therapists who practice SOCE (Welch and Duk), and a

22  therapist-in-training who has undergone SOCE (Bitzer).  Plaintiffs brought this challenge to SB

23

24  [1] In addition to Governor Brown, defendants include: Anna M. Caballero, in her official capacity as Secretary of the California State and Consumer Services Agency; Denise Brown, in her official capacity as Director of Consumer Affairs; Christine Wietlisbach, Patricia Dawson,

25  Samara Ashley, Harry Douglas, Julia Johnson, Sarita Kohli, Renee Lonner, Karen Pines, and Christina Wong, in their official capacities as members of the California Board of Behavioral

26  Sciences; and Sharon Levine, Michael Bishop, Silvia Diego, Dev Gnanadev, Reginald Low, Denise Pines, Janet Salomonson, Gerrie Schipske, David Serrano Sewell, and Barbara

27  Yaroslavsky, in their official capacities as members of the California Medical Board.

28

1

1172 a few days after it became law. They now seek a preliminary injunction that would effectively nullify the statute on constitutional grounds. The injunction should be denied because plaintiffs cannot meet their burden to show a likelihood of success on the merits. While plaintiffs catalogue a number of constitutional rights, such as privacy, free speech, and the free exercise of religion, they have not demonstrated how any of these is implicated, let alone violated, by SB 1172. Indeed, plaintiffs' claims rest on outlandish distortions of the law. They are entirely divorced from the text of SB 1172 and devoid of factual and legal support.

Plaintiffs' "right to privacy" claims reduce to the notion that minors and their parents have a fundamental right to obtain mental health treatments of their choice, even treatments deemed unproven and/or risky by the mental health profession and the state. The Ninth Circuit Court of Appeals, however, has rejected claims that individuals have a fundamental right to select a particular mental health treatment or provider.

Plaintiffs also argue that SB 1172 violates the First Amendment's Religion Clauses because it does not contain exceptions for "interdisciplinary mental health professionals" focused on religious ministry. However, SB 1172 does not apply to duly ordained members of the clergy or other religious practitioners. It only applies to persons "designated as a mental health professional under California law or regulation," Cal. Stats. 2012, ch. 835, § 2 (to be codified at Cal. Bus. & Prof. Code § 865(a)), and that does not include religious practitioners, provided they are not holding themselves out as licensed mental health providers. Accordingly, and because SB 1172 is a valid and neutral law of general applicability, it does not violate the Establishment and Free Exercise Clauses.

Plaintiffs further contend that SB 1172 bans an entire "category of speech called SOCE," and that it discriminates against a particular viewpoint, i.e., that homosexuality is objectionable on religious, moral, or other grounds and should be suppressed. However, SB 1172 does not regulate SOCE as speech, but as *conduct*, i.e., psychological treatment that professes to change a minor's sexual orientation. Moreover, SB 1172 regulates neutrally and even-handedly, and in no way prohibits mental health providers from discussing SOCE's existence, or the morality or changeability of sexual orientation, with their patients (or anyone else). Nor does it prevent

2

1   anyone from obtaining therapeutic interventions aimed at resolving conflicts between religious or

2   personal beliefs, on the one hand, and sexual orientation, on the other.

3        Finally, plaintiffs argue that SB 1172 is "hopelessly vague," and therefore violates the First

4   Amendment.  Given that plaintiffs admit that they practice and/or have received SOCE, and that

5   SB 1172's prohibition on SOCE is clear, straightforward, and articulated through terms of

6   common understanding that are readily comprehensible to a person of ordinary intelligence,

7   plaintiffs' vagueness challenge fails.

8        The motion for a preliminary injunction should be denied because plaintiffs have no

9   likelihood of success on the merits and have not shown, and cannot show, any irreparable injury.

10  Plaintiffs cannot demonstrate a violation of any constitutional right, or that SB 1172 lacks any

11  conceivable rational basis.  By contrast, the irreparable harm to the state and the public interest

12  would be substantial if this Court were to enjoin the law.  SOCE can and has caused great

13  psychological pain to young people who are already struggling with their sexuality and the stigma

14  of being gay.  The risks to minors include severe depression, alienation from family, problems

15  with intimacy, and suicidality.  An injunction would expose some of society's most vulnerable

16  members to treatment that the state and every major mental health organization in the country

17  have condemned as an outmoded, ineffective, and potentially dangerous relic from an era when

18  homosexuality was pathologized and criminalized.

**BACKGROUND**

20  **I.   THE STATUTE**

21       Senate Bill (SB) 1172 was signed by the Governor on September 29, 2012, and takes effect

22  January 1, 2013.  *See* Cal. Stats. 2012, ch. 835, p. 91.  SB 1172 prohibits any "mental health

23  provider" from engaging in "sexual orientation change efforts" (SOCE) with patients under 18

24  years of age.  *Id*. § 2 (to be codified at Cal. Bus. & Prof. Code §§ 865.1, 865(a)).[2]  Further, "[a]ny

25       [2] The term "mental health provider" means a "physician and surgeon specializing in the
    practice of psychiatry, a psychologist, a psychological assistant, intern, or trainee, a licensed
26  marriage and family therapist, a registered marriage and family therapist, intern, or trainee, a
    licensed educational psychologist, a credentialed school psychologist, a licensed clinical social
27  worker, an associate clinical social worker, a licensed professional clinical counselor, a registered
    clinical counselor, intern, trainee, or any other person designated as a mental health professional
28                                                                                      (continued…)

3

1   sexual orientation change efforts attempted on a patient under 18 years of age by a mental health

2   provider shall be considered unprofessional conduct and shall subject a mental health provider to

3   discipline by the licensing entity for that mental health provider." *Id.* (to be codified at Cal. Bus.

4   & Prof. Code § 865.2).

5        SB 1172 defines "[s]exual orientation change efforts" as "any practices by mental health

6   providers that seek to change an individual's sexual orientation.  This includes efforts to change

7   behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or

8   feelings toward individuals of the same sex."  Cal. Stats. 2012, ch. 835, § 2 (to be codified at Cal.

9   Bus. & Prof. Code § 865(b)(1)).  SOCE does not include "psychotherapies that: (A) provide

10  acceptance, support, and understanding of clients or the facilitation of clients' coping, social

11  support, and identity exploration and development, including sexual orientation-neutral

12  interventions to prevent or address unlawful conduct or unsafe sexual practices; and (B) do not

13  seek to change sexual orientation."  *Id.* (to be codified at Cal. Bus. & Prof. Code § 856(b)(2)).

14       The Legislature based SB 1172 on findings that "[b]eing lesbian, gay, or bisexual is not a

15  disease, disorder, illness, deficiency, or shortcoming.  The major professional associations of

16  mental health practitioners and researchers in the United States have recognized this fact for

17  nearly 40 years."  Cal. Stats. 2012, ch. 835, § 1(a).  The Legislature further determined, based on

18  extensive research and study by the American Psychological Association, the American

19  Psychiatric Association, and other respected professional psychological and counseling

20  associations, that: (1) there is little or no empirical evidence that SOCE works; and (2) SOCE

21  poses potentially severe risks of harm to patients, including but not limited to depression; anxiety;

22  problems in sexual and emotional intimacy; loss of faith; self-destructive behavior; alienation

23  from family; and suicidality.  *Id.* § 1(b)-(m).

24       With regard to SOCE's efficacy, a task force convened by the American Psychological

25  Association (APA) conducted a "systematic review of peer-reviewed journal literature on

26  _____

    (…continued)
27  under California law or regulation."  Cal. Stats. 2012, ch. 835, § 2 (to be codified at Cal. Bus. &
    Prof. Code § 865(a)).
28

4

SOCE." Cal. Stats. 2012, ch. 835, § 1(b).  The APA task force reviewed studies of SOCE aimed

at: (1) decreasing interest in, sexual attraction to, and sexual behavior with same-sex partners; (2)

increasing interest in, sexual attraction to, and sexual behavior with other-sex sexual partners; (3)

increasing healthy relationships and marriages with other-sex partners; and (4) improving quality

of life and mental health.  Report of the American Psychological Association Task Force on

Appropriate Therapeutic Responses to Sexual Orientation (2009) ("APA Task Force Report") at

35.[3]  Overall, the APA task force determined that "the peer-refereed empirical research provides

little evidence of efficacy . . . ."  *Id.*  The only rigorous studies of SOCE—those involving

aversion techniques such as electric shock—show that "enduring change to an individual's sexual

orientation is uncommon"; that a "very small minority of people in these studies showed any

credible evidence of reduced same-sex sexual attraction"; and there is a dearth of "strong

evidence that any changes produced in laboratory conditions translated to daily life."  *Id.* at 43;

*see also* Declaration of Gregory M. Herek (Herek Decl.) ¶¶ 29-38, 45; Declaration of A. Lee

Beckstead (Beckstead Decl.) ¶¶ 17-18, 26, 38 (both filed concurrently herewith).

More recent studies examined by the APA task force, including studies about the benefits

of "reparative therapy," which plaintiffs admittedly practice, "have investigated whether people

who have participated in efforts to change their sexual orientation report decreased same-sex

sexual attractions . . . or how people evaluate their overall experiences of SOCE."  APA Task

Force Report at 37.  The APA found these studies used designs "that do not permit cause-and-

effect attributions to be made," and were incapable of addressing "the efficacy of SOCE or its

promise as an intervention."  *Id.* at 37; *see also id.* at 39, 40, 41.  These findings are consistent

with assessments by every other mainstream association of mental health providers in the

country, including the American Psychiatric Association, which has determined that "reparative

therapists have not produced any rigorous scientific research to substantiate their claims of cure."

Cal. Stats. 2012, ch. 835, § 1(d); *see also id.* § 1(h) (National Association of Social Workers

---

[3] The APA Task Force Report is attached as Exhibit 1 to the Declaration of Paul Stein (Stein Decl.), filed concurrently herewith.

1   found that "[n]o data demonstrates that reparative or conversion therapies are effective"); *see also*

2   Herek Decl. ¶¶ 29-38, 45; Beckstead Decl. ¶¶ 11, 13, 16-18, 38.

3        With respect to SOCE's risks, the APA task force concluded that "attempts to change

4   sexual orientation may cause or exacerbate distress and poor mental health in some individuals,

5   including depression and suicidal thoughts.  The lack of rigorous research on the safety of SOCE

6   represents a serious concern, as do studies that report perceptions of harm."  APA Task Force

7   Report at 42.  This, again, is bolstered by a broad consensus in the mental health field, including

8   the American Psychiatric Association's finding that "the potential risks of reparative therapy are

9   great," and the American Psychoanalytic Association's finding that "purposeful attempts to

10  'convert,' 'repair,' 'change,' or shift an individual's sexual orientation . . . often result in

11  substantial psychological pain by reinforcing damaging internalized attitudes."  Cal. Stats. 2012,

12  ch. 835, § 1(d) & (j); *see also* Herek Decl. ¶¶ 39-45; Beckstead Decl. ¶¶ 16, 22-28, 24-38.

13       Due to these risks, the APA advises "parents, guardians, young people, and their families to

14  avoid sexual orientation change efforts that portray homosexuality as a mental illness or

15  developmental disorder."  Cal. Stats. 2012, ch. 835, § 1(c).  The American Psychiatric

16  Association goes further, recommending that "ethical practitioners refrain from attempts to

17  change individuals' sexual orientation," *id*. § 1(d), and the American Psychoanalytic Association

18  has declared that SOCE goes "against fundamental principles of psychoanalytic treatment," *id*.

19  § 1(j).

20       In light of this broad professional consensus against the use of SOCE, the Legislature

21  declared that "California has a compelling interest in protecting the physical and psychological

22  well-being of minors, including lesbian, gay, bisexual, and transgender youth, and in protecting

23  its minors against exposure to serious harms caused by sexual orientation change efforts."  Cal.

24  Stats. 2012, ch. 835, § 1(n).

25  **II.  REGULATION OF MENTAL HEALTH PROVIDERS IN CALIFORNIA**

26       SB 1172 amends a comprehensive regulatory scheme governing state-licensed

27  psychologists and other licensed mental health providers, including psychiatrists, clinical social

28  workers, marriage and family therapists, and educational psychologists.  As explained by the

1  Ninth Circuit, California has long regulated the profession of psychology based on legislative

2  recognition of the "actual and potential consumer harm that can result from the unlicensed or

3  incompetent practice of psychology." *National Ass'n for the Advancement of Psychoanalysis v.*

4  *Cal. Bd. of Psychology*, 228 F.3d 1043, 1047 (9th Cir. 2000) ("*NAAP*") (quoting Executive

5  Summary, California Board of Psychology, *Sunset Review Report* at 1 (October 1, 1997); internal

6  quotations omitted).  State licensure and regulation of professional psychologists rests on a

7  legislative determination that "the practice of psychology in California affects the public health,

8  safety, and welfare."  *Id*. (citing Cal. Bus. & Prof. Code § 2900); *see also id*. § 2920.1 (public

9  protection shall be the California Board of Psychology's "highest priority"); *id*. §§ 4990.16,

10  4990.18 (same for California Board of Behavioral Sciences and Medical Board of California).

11  To protect the public, the Legislature prescribes minimum educational and training

12  requirements for licensure, Cal. Bus. & Prof. Code §§ 25, 2903, 2914, 2941-2948, 2915.5;

13  continuing education requirements, *id*. §§ 2914.1, 2914.2, 2915-2915.7; and detailed rules and

14  procedures governing denial, revocation, and suspension of licenses, *id*. §§ 2960-2960.1, 2960.5,

15  2960.5, 2961-2965.  *See also NAAP*, 228 F.3d at 1047.  The Legislature also prescribes

16  professional standards for licensed mental health providers, *e.g*., Cal. Bus. & Prof. Code § 2936,

17  and has explicitly banned certain practices that, in its judgment, constitute unprofessional or

18  criminal conduct, *see id*. §§ 728, 729.  Similarly, SB 1172 makes it unprofessional conduct *per se*

19  for a mental health provider to engage in SOCE with a patient who is under 18.

20  On its face, SB 1172 does not apply to duly ordained members of the clergy or other

21  religious practitioners.  Moreover, the California licensing scheme for mental health providers

22  broadly exempts from regulation religious-based counseling services, provided these counselors

23  do not hold themselves out to the public as licensed mental health providers.  Cal. Bus. & Prof.

24  Code §§ 2063, 2908, 4980.01(b), 4996.13(f).  *See infra* pp. 14-16.

25  ## APPLICABLE LEGAL STANDARD

26  In order to prevail on a motion for a preliminary injunction, a plaintiff "must establish that

27  he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

28  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

7

1   public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Alternatively,

2   "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions

3   going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."

4   *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal

5   quotations omitted).  Plaintiffs must make a showing of all four *Winter* factors even under the

6   alternative sliding scale test.  *Id.* at 1135.

7         "A preliminary injunction is an extraordinary remedy never awarded as a matter of right.  In

8   each case, courts must balance the competing claims of injury and must consider the effect on

9   each party of the granting or withholding of the requested relief.  In exercising their sound

10  discretion, courts of equity should pay particular regard for the public consequences in employing

11  the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (internal quotations and citations

12  omitted).  Because a preliminary injunction is an extraordinary remedy, the moving party must

13  establish the elements necessary to obtain injunctive relief by a "clear showing."  *Winter*, 555

14  U.S. at 22.  A plaintiff's burden is particularly heavy when, as here, it seeks to enjoin operation of

15  a statute because "it is clear that a state suffers irreparable injury whenever an enactment of its

16  people or their representatives is enjoined."  *Coalition for Econ. Equity v. Wilson*, 122 F.3d 718,

17  719 (9th Cir. 1997).  "A strong factual record is therefore necessary before a federal district court

18  may enjoin a State agency."  *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1085 (N.D.

19  Cal. 1997).  In this case, plaintiffs cannot meet their burden and the motion for a preliminary

20  injunction should therefore be denied.

21                       **ARGUMENT**

22  **I.**   **PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS.**

23        As shown in more detail below, plaintiffs have no likelihood of success on the merits.  For

24  purposes of this motion, plaintiffs' claims reduce to alleged violations of: (1) the fundamental

25  rights of minors to "define their own existence" by obtaining SOCE treatment; (2) the

26  fundamental rights of parents to direct the care and upbringing of their children; (3) the First

27  Amendment rights of minors, parents, and therapists to speak freely about SOCE; (4) the First

28  Amendment rights of minors and parents to free exercise of their religious beliefs; and (5) the

8

1  First Amendment rights of therapists to fair notice of what conduct is prohibited by SB 1172.

2  Plaintiffs do not (and cannot) establish a constitutional violation on any of these theories.

3     **A.     The Right of Privacy Does Not Encompass a Right to Obtain Mental
          Health Treatments Deemed Unproven and Unsafe by the Mental Health
4         Profession and the State.**

5        Plaintiffs contend that SB 1172 violates the right to privacy in that it: (1) "prohibits minors

6  from defining their own existence" by preventing them from obtaining SOCE treatment; (2)

7  "deprives parents of the ability to seek reparative therapy" for their children; and (3) "ignores" the

8  patient-psychotherapist privilege and "creates the equivalent of government bureaucrats

9  eavesdropping on highly sensitive and private counseling or therapeutic sessions." Mtn. at 6.

10  Plaintiffs cite numerous cases for the (undisputed) proposition that there is a federal constitutional

11  right of privacy, and that it extends to intimate matters of family, child rearing, sexuality, and

12  self-determination.  Plaintiffs, however, utterly fail to explain how any of these cases compel the

13  conclusion that SB 1172 violates their privacy rights, or anyone else's.  The only authorities cited

14  on the effect, intent, and constitutionality of SB 1172 are declarations submitted by the plaintiffs

15  themselves. Mtn. at 6:5-23; 7:7-16.  Plaintiffs' failure to support their contentions with legal

16  authority is sufficient by itself to deny their motion.  *Cf. Christian Legal Soc'y v. Wu*, 626 F.3d

17  483, 487-88 (9th Cir. 2010) (noting that court may decline to address bare assertions unsupported

18  by argument).  Regardless, they have no likelihood of succeeding on these claims.  As a threshold

19  matter, it is not clear that plaintiffs even have standing to bring these claims because none of them

20  is a minor who wishes to receive SOCE counseling, or the parent of such a minor.[4]  But even

21  assuming that plaintiffs could establish standing, their privacy claims lack merit.

22        Plaintiffs contend that SB 1172 violates minors' privacy rights by preventing them from

23  "accessing mental health services and treatment that would assist them in diminishing same-sex

24  _____
          [4] Generally, plaintiffs may only bring claims on their own behalf, and may not raise
25  claims based on the rights of other parties not before the court.  A litigant may only assert "his
   own constitutional rights or immunities." *United States v. Raines*, 362 U.S. 17, 22 (1960).  More
26  specifically, to establish Article III standing a plaintiff must demonstrate, at a minimum, an actual
   or imminent invasion of a legally protected interest, i.e., "injury in fact." *Lujan v. Defenders of*
27  *Wildlife*, 504 U.S. 555, 560 (1992).  That standard is not met in this case because plaintiffs seek to
   vindicate not their own privacy interests, but the privacy interests of minors and their parents
28  none of whom are plaintiffs.  *See* Mtn. at 6-7.

1  attraction in accordance with self-defined religious, moral, cultural, and philosophical beliefs."

2  Mtn. at 6.  Similarly, they contend that SB 1172 violates the privacy rights of parents by

3  preventing them from obtaining SOCE treatment for their children, and substituting "the state's

4  judgment for the judgment of a child's parents in an area that is intensely personal and highly

5  sensitive."  *Id*. at 7.  Contrary to these contentions, a long line of cases in the Ninth Circuit and

6  throughout the country firmly establishes that there is no privacy interest or fundamental right of

7  any kind in choosing a particular type of medical treatment or medical provider, either on one's

8  own behalf or on behalf of one's children.

9       In *Rutherford v. United States*, 616 F.2d 455 (10th Cir. 1980) ("*Rutherford*"), terminally ill

10  cancer patients brought suit to enjoin the federal government from interfering with the shipment

11  and sale of laetrile.  The Tenth Circuit rejected the plaintiffs' alleged privacy interest in taking

12  whatever treatment they wished regardless of whether the FDA regarded the medication as

13  effective or safe.  *Id*. at 456.  It held that "the decision by the patient whether to have a treatment

14  or not is a protected right, but his selection of a particular treatment, or at least a medication, is

15  within the area of government interest in protecting public health."  *Id*. at 457.  Congress's

16  authority to limit a patient's choice of medication was clear in light of the Supreme Court's

17  pronouncements on the scope and extent of the right of privacy.  *Id*.; *see also Vacco v. Quill*, 521

18  U.S. 793, 799-800 (1997) (no fundamental right to physician-assisted suicide).[5]

19       The Ninth Circuit follows *Rutherford's* reasoning and holding.  *See Carnohan v. U.S*., 616

20  F.2d 1120, 1122 (9th Cir. 1980) (citing *Rutherford* and holding that "[c]onstitutional rights of

21  privacy and personal liberty do not give individuals the right to obtain laetrile free of the lawful

22  exercise of government police power"); *see also County of Santa Cruz, Ca. v. Ashcroft*, 279 F.

23  Supp. 2d 1192, 1204 (N.D. Cal. 2003) (holding, in light of *Carnohan* and *Rutherford*, that

24  terminally ill cancer patients have no fundamental right to obtain medical marijuana), *modified on*

25

26

27       [5] Accordingly, plaintiffs' ostensible reliance on cases such as *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Southeast Pa. v. Casey*, 505 U.S. 833 (1992), is misplaced. Unlike the statutes in those cases, no fundamental privacy right is implicated by SB 1172.

28

1   *other grounds*, 314 F. Supp. 2d 1000 (N.D. Cal. 2004); *Garlic v. United States F.D.A.*, 783 F.

2   Supp. 4, 5 (D.D.C. 1992) (same as to unapproved medication for Alzheimer's disease).

3          Moreover, *Rutherford's* holding applies outside the context of unapproved drugs and

4   extends to, among other things, state regulation of mental health treatments and providers.  As the

5   Ninth Circuit held in *NAAP*, 228 F.3d at 1054, states have a compelling interest in regulating

6   mental health treatments and providers, and such laws do not violate substantive due process

7   rights or other fundamental constitutional rights.  State laws limiting access to or banning mental

8   health treatments will be upheld so long as they are rationally related to a legitimate governmental

9   purpose.  *Id.* at 1050; *see infra* pp. 28-30.  And, finally, these same authorities establish that

10  parents have no fundamental right to choose unsafe or unproven medical treatments for their

11  children.  Thus, for example, in *Duncan v. United States*, 590 F. Supp. 39, 40-41 (W.D. Okla.

12  1984), parents of a child with Down's Syndrome argued their daughter "cannot fully develop and

13  be educated without treatment with the 'U' Series drug," and that the government's refusal to

14  approve it violated their liberty interest in choosing their daughter's treatment.  The court, relying

15  on *Rutherford* and *Carnohan*, granted summary judgment for the government.  *Id.* at 42-44; *see*

16  *also, e.g., Oklahoma Chapter of the Amer. Acad. of Pediatrics v. Fogarty*, 366 F. Supp. 2d 1050,

17  1116-17 (N.D. Okla. 2005) (holding that parents have no fundamental right to obtain

18  experimental asthma drug for their children).

19         In any event, because SOCE purports to "treat" something that is not an illness or disorder

20  of any kind, it is difficult to identify any cognizable interest that minors or their parents have in

21  obtaining SOCE from a state-licensed mental health professional.  Since the late 1940's,

22  psychological research has established that "there [is] nothing unnatural about same-sex

23  behaviors or homosexual sexual orientation."  APA Task Force Report at 22.  Thus, in 1973, the

24  American Psychiatric Association voted to remove homosexuality as a listed disorder in the

25  Diagnostic and Statistical Manual (DSM), and the American Psychological Association affirmed

26  that decision in 1974.  *Id.* at 23.  And, in 1992, the World Health Organization removed

27  homosexuality per se from the International Classification of Diseases.  *Id.* at 24; *see also* Herek

28  Decl. ¶¶ 11-15; Beckstead Decl. ¶¶ 11-15; *Windsor v. United States*, --- F.3d ---, Nos. 12–2335 &

11

12–2435(Con), 2012 WL 4937310 (2d Cir. October 18, 2012) at *7 ("There are some distinguishing characteristics, such as age or mental handicap, that may arguably inhibit an individual's ability to contribute to society, at least in some respects.  But homosexuality is not one of them.")  More specifically, the theory advanced by the plaintiffs in this case, that homosexuality is a developmental disorder caused by trauma and/or a childhood failure of healthy, non-sexual attachments to other males, especially fathers, *see, e.g.,* Bitzer Decl. ¶¶ 11-20, Mtn. at 18 (admitting that plaintiffs Duk and Welch practice "reparative therapy"), is "based on older discredited psychoanalytic theories" and "ideas that have been directly discredited through evidence or rendered obsolete."  APA Task Force Report at 82; Beckstead Decl. ¶¶ 11-15. Because terminally ill cancer patients, AIDS patients, and others suffering from life-threatening, debilitating diseases have no fundamental right to obtain unapproved treatments, teenagers struggling with same-sex attractions, who are not sick, can have no fundamental right to obtain SOCE from licensed mental health providers.

By extension, parents also have no right to obtain SOCE treatment on behalf of their children.  The Supreme Court has made clear that, although parents have a fundamental right to direct the upbringing and care of their children, "a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J.R.*, 442 U.S. 584, 603 (1979).  Although parents retain "plenary authority to seek" mental health care for their children, that authority is "subject to a physician's independent examination and medical judgment." *Id.* at 604.  And, as discussed above, the state has a legitimate interest in regulating those medical judgments to protect public health and safety.

In *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204 (9th Cir. 2005), the Ninth Circuit held that the right of parents to make decisions concerning the care, custody, and control of their children does not reside exclusively in the parents, and is "not beyond regulation by the state." Canvassing *Meyer v. Nebraska*, 262 U.S. 390 (1923), *Pierce v. Soc'y of the Sisters of the Holy Names*, 268 U.S. 510 (1925), and other authorities, the Ninth Circuit held that, although the state cannot prevent parents from choosing a specific educational program, parents have no right to dictate the curriculum in public schools.  *Fields*, 427 F.3d at 1205.  The so-called *Meyer-Pierce*

12

1   right does not "afford parents a right to compel public schools to follow their own idiosyncratic

2   views as to what information the schools may dispense." *Id.* at 1206.  Here, this principle means

3   that parents have a right to seek mental health care for their children, but cannot dictate what

4   treatments may lawfully be provided by state-licensed mental health providers.  *See id.*

5       Plaintiffs' further contention that SB 1172 somehow invades the psychotherapist-patient

6   privilege also lacks merit, and is legally irrelevant.  Mtn. at 6.  This statutory evidentiary

7   privilege, *see* Cal. Evid. Code §§ 1014-1016, is rooted, in part, in constitutional privacy rights,

8   but does not provide a higher level of protection than mandated by the Constitution, and in no

9   way limits the state's power to regulate access to mental health treatments deemed ineffective

10  and/or a threat to public health and safety.  Moreover, plaintiffs' assertion that SB 1172 somehow

11  authorizes eavesdropping by government bureaucrats on private communications between

12  patients and their therapists is totally unfounded.  Nothing in SB 1172, on its face or otherwise,

13  permits or provides for government surveillance of therapy or purports to alter or limit the

14  application of the psychotherapist-patient privilege as a defense to disclosure of private

15  communications.

16      Finally, even apart from the fatal lack of case support for their claimed constitutional right

17  to obtain SOCE treatment from state-licensed providers, SB 1172 simply does not sweep nearly

18  as broadly as plaintiffs claim.  SB 1172 does not, on its face or otherwise, limit access to

19  counseling services, including from licensed mental health providers, aimed at helping minors

20  resolve conflicts between their sexual orientation and their religious or personal beliefs, *see*

21  Beckstead Decl. ¶¶ 19-21, 33.  Nor does SB 1172 prevent ordained clergy or other religious

22  practitioners from providing SOCE counseling to minors, so long as they do not hold themselves

23  out as licensed mental health providers.  *See infra* pp. 14-18.  SB 1172 also does not prevent

24  minors or their parents from seeking SOCE counseling from psychologists or other licensed

25  practitioners in other states.  State-regulated providers may also refer their patients to other

26  practitioners, licensed or otherwise, and may discuss SOCE's availability, as well as the morality

27  and changeability of sexual orientation with their patients, so long as they do not engage in

28  *treatment* aimed at changing a minor's sexual orientation.  Because the statute is narrowly drawn,

1    any invasion of minors' private decision-making regarding their sexual orientation is de minimis.

2    This case is thus wholly "unlike those in which the [Supreme] Court held that a total prohibition

3    of certain conduct was an impermissible deprivation of liberty." *Whalen v. Roe*, 429 U.S. 589,

4    603 (1977).

5              **B.      SB 1172 Does Not Violate the First Amendment's Religion Clauses.**

6              Plaintiffs allege that SB 1172 violates the Religion Clauses of the Constitution.

7    Specifically, plaintiffs maintain that because SB 1172 does not contain exceptions for

8    "interdisciplinary mental health professionals" focused on religious ministry, it violates the

9    Establishment and Free Exercise Clauses. Mtn. at 8-10.  As an initial matter, plaintiffs are

10   factually incorrect.  On its face, SB 1172 does not apply to duly ordained members of the clergy

11   or other religious practitioners.  It only applies to persons "designated as a mental health

12   professional under California law or regulation." Cal. Stats. 2012, ch. 835, § 2 (to be codified at

13   Cal. Bus. & Prof. Code § 865(a)).  Further, as noted above, the licensing scheme, of which SB

14   1172 is a part, expressly exempts religious-based counselors and counseling services. *See, e.g.*,

15   Cal. Bus. & Prof. Code § 2063 ("Nothing in this chapter shall be construed so as to . . . . regulate,

16   prohibit, or apply to any kind of treatment by prayer, nor interfere in any way with the practice of

17   religion"); *id.* § 4980.01(b) ("This chapter shall not apply to any priest, rabbi, or minister of the

18   gospel of any religious denomination when performing counseling services as part of his or her

19   pastoral or professional duties").  Accordingly, the California Supreme Court has held that "the

20   Legislature has exempted the clergy from the licensing requirements applicable to marriage,

21   family, child and domestic counselors and from the operation of statutes regulating

22   psychologists." *Nally v. Grace Community Church*, 47 Cal.3d 278, 298 (1988) (internal

23   quotation omitted); *see also, e.g., Jacqueline R. v. Household of Faith Family Church, Inc*., 97

24   Cal.App.4th 198, 206 (2002) ("the Legislature has chosen not to regulate pastoral counseling").

25   Thus, as long as members of the clergy and religious practitioners do not hold themselves out to

26   the public as licensed mental health providers, Cal. Bus. & Prof. Code §§ 2908, 4996.13(f), they

27   do not fall within the ambit of SB 1172 and they are free to offer SOCE.  Accordingly, and

28   because SB 1172 is a valid and neutral law of general applicability, plaintiffs cannot show that the

1   Establishment and Free Exercise Clauses are implicated, let alone violated, by it.  *Employment*

2   *Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879 (1990); *see also Jacobs v.*

3   *Clark County. School Dist.*, 526 F.3d 419, 439 (9th Cir. 2008).

4          **1.**     **Plaintiffs' Establishment Clause claim fails.**

5        The Establishment Clause of the First Amendment provides that "Congress shall make no

6   law respecting an establishment of religion . . . ."  U.S. Const. Amend. I.  In *Lemon v. Kurtzman*,

7   403 U.S. 602 (1971), the Supreme Court articulated a three-pronged test with which to evaluate

8   whether a statute violates the Establishment Clause.  To survive the *Lemon* test," the statute must

9   (1) have a secular legislative purpose; (2) not have as its principal or primary effect advancing or

10  inhibiting religion; and (3) not foster an excessive government entanglement with religion.  *Id*. at

11  612-13.  Although plaintiffs' have not clearly or fully articulated an Establishment Clause claim,

12  they appear to focus on the third prong of the *Lemon* test, contending that SB 1172 "impose[s]

13  legal duties on church counseling" and constitutes impermissible "entanglement" with religion.

14  Mtn. at 10.[6]  These contentions wholly lack merit.

15       As discussed above, SB 1172 does not apply to members of the clergy who are acting in

16  their roles as clergy or pastoral counselors and providing religious counseling to congregants.  *See*

17  Cal. Bus. & Prof. Code §§ 2063, 4980.01(b).  Thus, plaintiffs' argument that SB 1172 "dictat[es]

18  whether and how a church carries out counseling for congregants" is entirely unfounded.  So long

19  as their clergy do not hold themselves out as licensed mental health professionals, churches

20  remain free to determine what type of counseling, including SOCE, they will offer to

21          [6] Plaintiffs do not appear to make any arguments based on the first two prongs of the

22  *Lemon* test.  They do not (and could not) argue that the "actual purpose" of SB 1172 is "to
    endorse or disapprove of religion."  *American Family Ass'n, Inc. v. City and County of San*

23  *Francisco*, 277 F.3d 1114, 1121 (9th Cir. 2002) (quoting *Kreisner v. City of San Diego*, 1 F.3d
    775, 782 (9th Cir. 1993)).  The actual purpose of SB 1172 is to protect minors from harmful

24  conduct by state-licensed mental health professionals.  *See* Cal. Stats. 2012, ch. 835, § 1(n).
    Plaintiffs also make no showing, nor could they, that a reasonable observer who is "informed"

25  and familiar with the history of the government practice at issue would perceive SB 1172 as
    having a predominantly non-secular effect.  *American Family Ass'n, Inc.*, 277 F.3d at 1122.  The

26  primary effect of SB 1172 will be to proscribe secular mental health professionals from engaging

27  in SOCE with minors.  As such, SB 1172 neither advances nor inhibits religion.  *See id.* at 1122-
    23.

28

1   congregants.  Thus, unlike the statutes as issue in the cases relied upon by plaintiffs, SB 1172

2   does not impinge upon matters of church government, faith, or doctrine.  *See, e.g., Hosana-Tabor*

3   *Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694 (2012) (applying ministerial

4   exception to claims concerning the employment relationship between a religious institution and

5   its ministers); *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987) (exempting religious

6   organizations from Title VII's prohibition against religious discrimination in employment was

7   permissible and did not violate the Establishment Clause); *Kedroff v. St. Nicholas Cathedral*, 344

8   U.S. 94 (1952) (holding invalid New York legislation intended to transfer control of Russian

9   Orthodox Churches in New York from Moscow to church authority in the United States).

10   Accordingly, SB 1172 does not create an appreciable, let alone excessive, entanglement with

11   religion.  *See Vernon v. City of Los Angeles*, 27 F.3d 1385, 1399-1401 (9th Cir. 1994).

12           **2.     Plaintiffs' Free Exercise Clause claim fails.**

13         Plaintiffs' claim under the Free Exercise Clause is similarly unavailing.  While the Free

14   Exercise Clause immunizes religious beliefs from government interference, the Clause does not

15   bar regulation of all conduct related to the practice of religion.  *See Stormans, Inc. v. Selecky*, 586

16   F.3d 1109, 1128 (9th Cir. 2012) (citing *Cantwell v. State of Conn.*, 310 U.S. 296, 303-04 (1940)).

17   The right to freely exercise one's chosen religion "does not relieve an individual of the obligation

18   to comply with a valid and neutral law of general applicability on the ground that the law

19   proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  *Smith*, 494 U.S. at

20   879 (internal quotations omitted); *see also Reynolds v. United States*, 98 U.S. 145, 166–67 (1878)

21   (upholding state ban on polygamy even though practice was followed primarily by members of

22   Mormon church; "[l]aws are made for the government of actions, and while they cannot interfere

23   with mere religious belief and opinions, they may with practices").  Thus, where, as here, a statute

24   is a neutral and generally applicable regulation of conduct, it does not violate the Free Exercise

25   Clause even if it results in an incidental burden on a particular religious practice and/or a

26   particular religious group may be more likely to engage in the proscribed activity.  *See Smith*, 494

27   U.S. at 884-85, 886 n.3; *Selecky*, 586 F.3d at 1131.

28

1    Accordingly, to the extent that plaintiffs suggest that SB 1172 is unconstitutional because it

2    does not exempt licensed mental health professionals who are not clergy or religious counselors,

3    but whose religious beliefs dictate the practice of SOCE on minors, this argument is groundless.

4    As the Supreme Court has held, "When followers of a particular sect enter into commercial

5    activity as a matter of choice, the limits they accept on their own conduct as a matter of

6    conscience and faith are not to be superimposed on the statutory schemes which are binding on

7    others in that activity." *United States v. Lee*, 455 U.S. 252, 261 (1982).

8    Plaintiffs contend that SB 1172 is not neutral or generally applicable and is thus subject to

9    strict scrutiny.  Mtn. at 10.  However, a law is neutral and generally applicable so long as it does

10   not aim to "infringe upon or restrict practices because of their religious motivation," and does not

11   "in a selective manner impose burdens only on conduct motivated by religious belief" *Church of*

12   *the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533, 543 (1993) ("*Lukumi*").  SB 1172

13   meets these requirements.[7]  SB 1172's purpose is to protect a particularly vulnerable class of

14   people, minors, from the deleterious practice of SOCE.  It does not "suppress, target, or single out

15   the practice of any religion because of religious content." *Selecky*, 586 F.3d at 1131.  That SB

16   1172 will have an impact on therapists who believe they have a religious obligation to provide

17   SOCE to minors does not "undermine the neutrality of the rules." *Id*. ("that the rules may affect

18   pharmacists who object . . . for religious reasons" does not implicate the Free Exercise clause).

19   Similarly, SB 1172 does not impose burdens only on conduct motivated by religious belief; it

20   proscribes a practice by all state-licensed mental health providers that is based on the entirely

21   discredited notion that homosexuality is a disease or disorder.  Accordingly, SB 1172 is a neutral

22   law of general applicability that is subject to, and easily passes, rational basis review.  *See, e.g.,*

23   *id*. at 1137; *Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999).[8]

24   _____

     [7] Plaintiffs assert, without elaboration or any legal support, that "[t]he entanglement
25   created by SB 1172 places it outside the normal rubric for Free Exercise cases" and therefore "the
     court's traditional approach of assessing whether a law is neutral and generally applicable is
26   obviated in regards to SB 1172."  Plaintiffs are incorrect.  A free exercise violation "hinges on
     showing that the challenged law is either not neutral or not generally applicable." *American*
27   *Family Ass'n, Inc.*, 277 F.3d at 1123 (citing *Lukumi*, 508 U.S. at 531-34).

28   [8] Plaintiffs argue that because its "adoption was accompanied by direct, negative

     (continued…)

17

### C.   SB 11172 Does Not Ban Any Particular Viewpoint About SOCE, Nor Does It Regulate Based on the Content of Protected Speech.

Plaintiffs contend that SB 1172 violates the First Amendment because it targets "a particular category of speech called SOCE."  Mtn. at 13.  They further contend that SB 1172 only prohibits SOCE aimed at converting homosexuals to heterosexuals, and therefore discriminates based on a particular viewpoint.  *Id.*; *see also* Welch Decl. ¶ 15 (arguing that "there is an absolute prohibition from providing anything but the state's message on sexual orientation, regardless of the consequences"); Duk Decl. ¶ 18 (arguing that SB 1172 will force him to tell a teenager raised in a "traditional home" that "he or she must not resist must rather embrace these [same-sex attractions]").  According to plaintiffs, because SB 1172 is neither content- nor viewpoint-neutral, strict scrutiny applies.  They are wrong on all counts.

#### 1.   SB 1172 regulates conduct, i.e., a course of treatment, and not speech.

SB 1172 regulates *conduct*, i.e., forms of psychological treatment that seek to change a minor's sexual orientation, and not *speech*.  SOCE comprises a variety of psychological treatments and techniques that share the common goal of changing a patient's sexual orientation.  APA Task Force Report at 21-42; Herek Decl. ¶¶ 26-28; Beckstead Decl. ¶¶ 8-11.  These treatments and concomitant treatment objectives are carried out, in part, by speech; nonetheless, to the extent SB 1172 regulates speech, it does so only incidentally, and does not give rise to any heightened protection under the First Amendment, let alone strict scrutiny.  Thus, plaintiffs' contention that SB 1172 targets a "category of speech," Mtn. at 13, is flatly incorrect.

---

(…continued)
references to religious beliefs," SB 1172 is unconstitutional.  Mtn. at 10-11.  Even assuming that a consideration of legislative history is properly considered in assessing a Free Exercise claim, *see Selecky*, 586 F.3d at 1131-34, plaintiffs have failed to demonstrate that a majority of the Legislature was motivated, in whole or in part, by a desire to impose burdens on religious belief.  *See id.* at 1133; *see also Vernon*, 27 F.3d at 1398-99.  While plaintiffs have identified references to religious beliefs and terminology in the legislative record, these are not "negative references," let alone evidence that the Legislature intended to target religious activity.  Accordingly, *Lukumi*, 508 U.S. 520, on which plaintiffs rely, is inapposite.  *See id.* at 534-42 (although city's ordinance appeared neutral on its face, circumstances surrounding its enactment, statements of city councilors, and fact that exceptions to ordinance meant burden of ordinance fell only on particular religious practice established that ordinance was not in fact neutral but was aimed at suppressing that practice).

1    As the Ninth Circuit explained in *NAAP*, which upheld the constitutionality of California's

2    licensing scheme for psychoanalysts, "[i]t has never been deemed an abridgement of freedom of

3    speech or press to make a course of conduct illegal merely because the conduct was in part

4    initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  228

5    F.3d at 1053 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).

6    "Limitations on professional conduct necessarily affect the use of language and association;

7    accordingly, reasonable restraints on the practice of medicine and professional actions cannot be

8    defeated by pointing to the fact that communication is involved."  *Daly v. Sprague*, 742 F.2d 896,

9    898 (5th Cir. 1984); *accord Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir.

10   1988).  Thus, even psychoanalysis, known as the "talking cure," and ostensibly consisting of

11   "pure speech," is a "course of conduct" for First Amendment purposes.  *NAAP*, 228 F.3d at 1053-

12   54.  Its "key component . . . is the treatment of emotional suffering and depression, *not* speech."

13   *Id*. at 1054 (emphasis in original); *see also Shea v. Bd. of Med. Exam'r*, 81 Cal.App.3d 564, 577

14   (1978) (the First Amendment "does not insulate the verbal charlatan from responsibility for his

15   conduct; nor does it impede the State in the proper exercise of its regulatory functions").  Thus,

16   notwithstanding that speech may be incidentally affected, it is well-settled that medical

17   treatments, including mental health treatments, deemed unsafe or unproven may be regulated or

18   banned, provided the state has a rational basis for doing so.  *NAAP*, 228 F.3d at 1050.  "Simply

19   because speech occurs does not exempt those who practice a profession from state regulation

20   (including the imposition of disciplinary sanctions)."  *Coggeshall v. Mass. Bd. of Registration of*

21   *Psychologists*, 604 F.3d 658, 667 (1st Cir. 2010) (citing *NAAP*, 228 F.3d at 1053-55; *Ohralik v.*

22   *Ohio State Bar Ass'n,* 436 U.S. 447, 456, 459 (1978)).[9]

23   _____

24       [9] Contrary to plaintiffs' contentions, *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct.
     2729 (2011), does not call into question the Ninth Circuit's holding that psychoanalysis is a
     course of conduct, and not speech, for purposes of First Amendment analysis.  Nor does it
25   undermine *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978), or any other case involving
     state regulation of conduct by licensed professionals.  In *Brown*, 131 S. Ct. at 2733, violent video
26   games were held to be "speech" analogous to protected books, plays, and movies because they
     "communicate ideas—and even social messages—through many familiar literary devices . . . ."
27   Violent video games could not, for that matter, be distinguished even from political discourse.  *Id*.
     The same is not true, however, of SOCE provided by state-licensed mental health providers.

28                                                                        (continued…)

19

1
2
3
4

      **2.**     **SB 1172 only prohibits efforts by state-licensed mental health providers to change a patient's sexual orientation through psychological treatment; it does not prevent therapists from discussing SOCE's existence with patients or their families, or from expressing the (discredited) view that sexual orientation can be changed.**

5
6
7
8
9
10

      Although SB 1172 bars a well-defined course of psychological "treatment," as plaintiffs admit, Welch Decl. ¶ 11, plaintiffs insist it goes much further and bans an entire "category of speech called SOCE." Mtn. at 13. They further contend, somewhat inconsistently, that SB 1172 only prohibits changing "the patient's sexual orientation from homosexual to heterosexual," and therefore discriminates against a particular viewpoint. *Id.* However, an examination of SB 1172's provisions reveals that it regulates neutrally and even-handedly.

11
12
13
14
15
16
17
18
19
20
21
22
23
24

      To "change" has a commonly understood definition; it means to bring about a "reversal," "radical" change, or "shift" from one position to another. *Webster's New Collegiate Dictionary*, 184 (1981). In the context of psychological treatment, change requires concerted efforts to examine, break down, and remake deeply rooted patterns of feeling and behavior. Beckstead Decl. ¶ 10; *see also* Cal. Bus. & Prof. Code § 2903 (defining psychology, in part, as "the application of psychological principles, methods, and procedures of understanding, predicting, and influencing behavior, such as the principles pertaining to learning, perception, motivation, emotions, and interpersonal relationships"). Thus, SB 1172 cannot fairly be read to prohibit mental health professionals from speaking about SOCE's existence, or from telling their patients that same-sex attractions can be changed. A therapist who discusses with a client the idea that unwanted same sex-attractions can be changed does not run afoul of the statute unless and until s/he engages in a course of treatment designed to change a minor's sexual orientation. SB 1172 does not forbid the presentation of any viewpoint about the (im)morality, (un)desirability, or (in)tractability of same-sex attractions or homosexuality. It merely prohibits practices by state-

25
26
27
28

---

(…continued)
SOCE is a means of "treating" sexual orientation, not speech, notwithstanding the fact that SOCE therapy may involve the communication of ideas and social messages.

20

1  licensed mental health providers that seek to "change," i.e., bring about a reversal in, a minor's

2  sexual orientation.

3      Plaintiffs' contention that SB 1172 somehow forces therapists to encourage same-sex

4  attractions, and only prohibits SOCE aimed at gay minors, Mtn. at 13, is particularly weak and

5  inaccurate.  Plaintiffs provide no explanation whatsoever for this contention, and it is flatly

6  contradicted by the statute's plain text and meaning.  SB 1172 defines SOCE as attempts to

7  change "an *individual's* sexual orientation," Cal. Stats. 2012, Ch. 835, § 2 (to be codified at Cal.

8  Bus. & Prof. Code § 856(b)(1)) (italics added), without limitation.[10]  Similarly, the Legislature's

9  declared purpose in enacting SB 1172 was to protect the physical and psychological well-being of

10  minors generally, not just gay, lesbian, bisexual, or transgender minors.  Cal. Stats. 2012, ch. 835,

11  § 1(n).  The statute's operative provisions also make clear that it bans *all* SOCE on minors by

12  state-licensed mental health providers, not just SOCE aimed at converting homosexuals to

13  heterosexuals.  Specifically, it bans the practice of SOCE on "a patient under 18 years of age."

14  2012 Cal. Stats. 2012, § 2 (to be codified at Cal. Bus. & Prof. Code §865.1; *id*. (to be codified at

15  Cal. Bus. & Prof. Code § 865.2).  Contrary to plaintiffs' suggestion, "[a] patient under 18" cannot

16  be fairly read to mean only homosexual patients.[11]

17      [10] The next sentence—"[t]his includes efforts to . . . eliminate or reduce sexual or
18  romantic attractions or feelings towards individuals of the same sex"—is illustrative, not
   exclusive.  *Arizona State Bd. for Charter Sch. v. U.S. Dept. of Educ.*, 464 F.3d 1003, 1007-08 (9th
   Cir. 2006) ("In both legal and common usage, the word 'including' is ordinarily defined as a term
19  of illustration, signifying that what follows is an example of the preceding principle."); *In re
   Mark Anthony Const., Inc.*, 886 F.2d 1101, 1106 (9th Cir. 1989) (holding that "in construing a
20  statute, the use of a form of the word 'include' is significant, and generally thought to imply that
   terms listed immediately afterwards are an inexhaustive list of examples, rather than a bounded
21  set of applicable items").

22      [11] The Legislature could rationally have determined that no statutory protections are
   needed for minors other than gay, lesbian, bisexual, and transgender youth.  There is a long
23  history in this country of treating homosexuality as a disease or disorder, and of criminalizing
   homosexual behavior.  *See* APA Task Force Report at 21-25; *Lawrence v. Texas*, 539 U.S. 558,
24  581-83 (2003); *Windsor v. United States*, Nos. 12–2335 & 12–2435(Con), 2012 WL 4937310 at
   *6 ("It is easy to conclude that homosexuals have suffered a history of discrimination"); *see also*
25  Herek Decl. at ¶¶ 16-25.  The medical profession's attempts to "cure" homosexuals through
   SOCE reflect this societal stigma.  APA Task Force Report at 21-25.  Moreover, sexual
26  minorities are the only members of society to have been subjected to SOCE.  Thus, contrary to
   plaintiffs' assertions, the Legislature's findings encompass a wide body of professional research
27  regarding SOCE attempted on homosexuals, and not heterosexuals, because, historically, only
   homosexuals have been subjected to SOCE.  The Legislature's failure to mention explicitly
28                                                                                    (continued…)

Defendants' Opposition to Motion for Preliminary Injunction (2:12-cv-02484)

1    In sum, SB 1172 does not regulate based on favoritism or hostility toward any particular

2 viewpoint or idea, but a broad consensus in the mental health field as to: (1) the nature of

3 homosexuality—that it is "not a disease, disorder, illness, deficiency, or shortcoming" that

4 warrants treatment, Cal. Stats. § 2012, ch. 835, § 1(a); (2) SOCE's lack of proven efficacy; and

5 (3) SOCE's risk of harm.  *Id.* § 1(b)-(m).  As discussed above, SB 1172 does not prohibit state-

6 licensed mental health providers from discussing confused, guilty, or other negative feelings

7 expressed by minors struggling with same-sex attractions, or even from counseling minors that

8 such attractions are morally wrong.[12]  Nor does SB 1172 prohibit minors (and their families) from

9 obtaining SOCE when they reach 18 years of age.  Indeed, the Legislature might have banned

10 SOCE for adults, as well as minors, given SOCE's demonstrated lack of efficacy and harmful

11 side effects.  Instead, SB 1172 is narrowly tailored; it proscribes SOCE with minors, while

12 leaving patients, parents, and state-licensed mental health providers free to discuss the availability

13 of SOCE, as well as the morality of sexual attraction and behavior.  It also leaves patients and

14 parents free to obtain SOCE from pastoral counselors, so long as they do not hold themselves out

15 as licensed mental health professionals.[13]

16

17 (…continued)
practices aimed at changing opposite-sex attractions simply reflects historical reality.

18    [12] To be clear, counseling minors that being gay is morally wrong and should be changed
may very well violate applicable ethical standards for mental health providers.  Similarly, given

19 the lack of empirical evidence that SOCE works, and the known risks of engaging in SOCE,
counseling minors and their families that they should pursue SOCE may violate a mental health

20 provider's basic duty of competency.  Such acts would not, however, violate SB 1172.

21    [13] Plaintiffs' reliance on *NAAP*, 228 F.3d 1043, is badly misplaced.  *NAAP* squarely holds
that: (1) as noted above, psychology is a course of conduct, and not speech, for purposes of First

22 Amendment analysis, *id.* at 1054; (2) given the health and safety implications, California has a
compelling interest in regulating mental health providers and treatments, *id.*; and (3) so long as

23 the government has reasonably prohibited a type of treatment or provider, there is no
constitutional problem, *id.* at 1050 (quoting *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir.

24 1993)).  The Ninth Circuit further held that "even if a speech interest is implicated, California's
licensing scheme passes First Amendment scrutiny," *id.* at 1053; California's licensing scheme

25 was "not adopted because of any disagreement with psychoanalytical theories," does not suppress
speech "based on its message," and "does not dictate the content of what is said in therapy."  *Id.*

26 at 1055, 1056.  The same is true of SB 1172.  SB 1172 does not suppress speech based on its
message or viewpoint, but regulates for the important purpose of protecting public health, safety,

27 and welfare.  *Id.* at 1056.  Nor does SB 1172 "dictate the content of what is said in therapy,"
except to the extent it prohibits *treatments* deemed ineffective and harmful, which the Ninth

28
(continued…)

Defendants' Opposition to Motion for Preliminary Injunction (2:12-cv-02484)

**D.     Plaintiffs' Vagueness Challenge Fails.**

Plaintiffs next argue that SB 1172 is unconstitutionally vague in that it fails to provide sufficient notice of the conduct it prohibits.  Specifically, plaintiffs assert that SB 1172 is "hopelessly vague on its face" because the term "sexual orientation change efforts" is not adequately defined and thus leaves "a reasonable mental health professional unable to determine exactly what conduct is prohibited."  Mtn. at 17, 2.  These contentions lack merit.  Not only does SB 1172 provide a simple, clear, and commonly understood definition of "[s]exual orientation change efforts," the plaintiffs admit they practice SOCE, and, by extension, that they understand what SB 1172 prohibits.  Therefore, their vagueness claim fails as a matter of law.

To survive a facial vagueness challenge, a statute ordinarily need only "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  Even assuming, arguendo, that a heightened standard applies here, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Ward v. Rock Against Racism*, 491 U.S. 781, 794, (1989); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language").  "Even when a law implicates First Amendment rights, the constitution must tolerate a certain amount of vagueness."  *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001).  As a result, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'"  *Id.* (quoting *Hill*, 530 U.S. at 733).  Indeed, the Supreme Court has made clear that declaring a statute facially invalid for vagueness is "manifestly, strong medicine" to be employed "sparingly and only as a last resort."  *Id.* at 1155 (9th Cir. 2001).  Statutory terms will be struck down for vagueness only if they require application of "wholly subjective judgments," such as, a statute that "tied criminal culpability to

_____

(…continued)
Circuit's holding makes clear is constitutionally permissible.  Indeed, in light of the American Psychoanalytic Association's declaration that "psychoanalytic technique does not encompass" SOCE at all, Cal. Stats. 2012, ch. 835, §1(j), there is no risk that SB 1172 will prohibit therapists from "utilizing psychoanalytic methods."

23

1  whether the defendant's conduct was 'annoying' or 'indecent.'" *Holder v. Humanitarian Law*

2  *Project*, 130 S. Ct. 2705, 2720 (2010).[14]

3          Here, the statute's "hard core" prohibits state-licensed mental health providers from

4  engaging in "sexual orientation change efforts" or SOCE with a minor.  Although plaintiffs claim

5  that SB 1172 does not adequately define SOCE, they cannot credibly maintain that they do not

6  understand what SOCE is, and thus, what conduct is prohibited.  Indeed, plaintiffs admit that they

7  "practice reparative therapy," Mtn. at 18; Bitzer Decl. ¶ 12, which is another term used to

8  describe SOCE.  *See* Joseph R. Nicolosi, *Reparative Therapy of Male Homosexuality* 149-168

9  (1997) (describing the manner in which reparative therapy seeks to change an individual's sexual

10  orientation).[15]  In addition, one of the plaintiffs has been "personally been involved in sexual

11  orientation change efforts" as a client.  Bitzer Decl. ¶ 1; *see also* Welch Decl. ¶ 8.  Because the

12  statutory terms are "clear in their application to plaintiffs' proposed conduct," plaintiffs cannot, as

13  a matter of law, prevail in a facial vagueness challenge.  *Holder*, 130 S. Ct. at 2720; *see also id*. at

14  2719 ("to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly

15  proscribed cannot raise a successful vagueness claim").  "Even if the outermost boundaries of [the

16  statute] may be imprecise," a facial vagueness challenge fails as a matter of law "where

17  appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions." *Broadrick*

18  *v. Oklahoma*, 413 U.S. 601, 608 (1973).

19          Moreover, as plaintiffs concede, the terms "sexual orientation change efforts" and "SOCE"

20  are widely used in the mental health field and in the academic literature on sexual orientation.

21  *See* Bitzer Decl. ¶ 1; *see also* APA Report at 21-42; *see generally* Herek Decl.; Beckstead Decl.

22  Where, as here, a statutory prohibition "involves conduct of a select group of persons having

23  specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class,"

24  ───────────────────
          [14] Even "amorphous" statutory terms have survived vagueness challenges, including an

25  ordinance that only applied to theaters presenting material "characterized by an emphasis" on
   specified sexual activities, and an ordinance prohibiting "any diversion which disturbs or tends to

26  disturb the peace or good order of such school session or class."  *Cal. Teachers Ass'n*, 271 F.3d at
   1153 (discussing vagueness challenges).  The term "sexual orientation change efforts" is more

27  "concrete, specific and objective" than any of these.  *Id*.

          [15] A copy of the referenced excerpt can be found at Stein Decl., Exh. 2.

28

24

1    it must be upheld so long as it uses "words or phrases having a technical or other special meaning,

2    well enough known to enable those within its reach to correctly apply them." *United States v.*

3    *Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993). Thus, because the term "sexual orientation

4    change efforts" has an established and accepted meaning within the professional community

5    regulated by SB 1172, it is not unconstitutionally vague. *Cal. Teachers Ass'n v. State Bd. of*

6    *Educ.*, 271 F.3d at 1151 (rejecting facial First Amendment vagueness challenge: "it is sufficient

7    to note that 'instruction' and 'curriculum' are words of common understanding, to which no

8    teacher is a stranger").

9          Unable to identify any genuine ambiguity in the statute's core prohibition against engaging

10   in SOCE with a minor, plaintiffs pose several hypotheticals in an attempt to create ambiguity at

11   the statute's margins. These hypotheticals all are easily answered by reference to the statute

12   itself. Plaintiffs argue, for example, that it is "unclear" whether the law prohibits SOCE aimed

13   only at same-sex attractions, or at both same-sex and opposite-sex attractions. Welch Decl. ¶ 13.

14   As discussed above, the statute on its face neutrally prohibits SOCE on any patient under 18,

15   regardless of sexual orientation. Plaintiffs also wonder whether providing therapy or a

16   prescription to dampen sexual libido for the purpose of treating a teenager's pornography

17   addiction would violate SB 1172. Mtn. at 18. The statute, on its face, only bars practices that

18   seek to change a minor's sexual orientation; treatments for addiction that do not seek to change

19   sexual orientation are not regulated by SB 1172.[16] Despite plaintiffs' attempts to create

20   vagueness where none exists, ultimately, "speculation about possible vagueness in hypothetical

21   situations not before the Court will not support a facial attack on a statute when it is surely valid

22   in the vast majority of its intended applications." *Hill*, 530 U.S. at 733. Accordingly, plaintiffs

23   have no likelihood of succeeding on their vagueness claim. *See, e.g., id.* (rejecting vagueness

24   challenge to ordinance making it a crime to "approach" another person without that person's

25

26   _____

     [16] Plaintiffs also play games with language, arguing that they do not believe that they are
     seeking to change anyone's orientation, but rather "merely assist[ing] patients who are already
27   seeking this change." Mtn. at 18. Even crediting this assertion as more than mere sophistry, SB
     1172 clearly proscribes such "assistance" in changing the sexual orientation of a minor. *See, e.g.*,
     2012 Cal. Stats., ch. 835, § 2 (to be codified at Cal. Bus. & Prof. Code § 865(b)(1)).

28

1  "consent," and to engage in "oral protest, education, or counseling" within specified distance of

2  health care facility).

3      **E.    Plaintiffs' Overbreadth Challenge Merely Recasts Otherwise Meritless**
        **Claims.**

4

5          Finally, plaintiffs contend that SB 1172 is facially overbroad in violation of the First

6  Amendment.  They argue it sweeps too broadly because it contains no exceptions for religious-

7  based counseling services, and would therefore interfere with "those practicing under the auspices

8  of religious institutions with strong doctrinal beliefs against same-sex attractions."  Mtn. at 20.

9  They further contend that SB 1172 "extends a flat ban on parents' ability to parent their children

10 in a manner of their choosing," in violation of the "First Amendment right to privacy" and the

11 Free Exercise Clause.  *Id.*  Put simply, their overbreadth challenge just repackages claims that, for

12 reasons already discussed above, have no merit.  Whether couched in terms of overbreadth,

13 privacy, or the free exercise of religion, plaintiffs' claims have no likelihood of succeeding.

14         "A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits

15 constitutionally protected conduct."  *Grayned*, 408 U.S. 104, 114 (1972).  However, the Supreme

16 Court has made clear that the First Amendment overbreadth doctrine is "strong medicine" only to

17 be used as a "last resort" where a statute implicates a "substantial" amount of protected

18 expression.  *New York v. Ferber*, 458 U.S. 747, 769 (1982).[17]  Where, as here, "conduct and not

19 merely speech is involved . . . the overbreadth of a statute must not only be real, but substantial as

20 well, judged in relation to the statute's plainly legitimate sweep."  *Id.* at 770; *see also Virginia v.*

21 *Hicks*, 539 U.S. 113, 124 (2003) ("[T]he overbreadth doctrine's concern with 'chilling' protected

22 speech attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves

23 from 'pure speech' toward conduct.' " (citation omitted).  "[T]he mere fact that one can conceive

24 of some impermissible applications of a statute is not sufficient to render it susceptible to an

25 overbreadth challenge. . . .  [T]here must be a realistic danger that the statute itself will

26

       [17] In deciding whether a statute is overbroad, a court must construe the statute to avoid
27 constitutional problems if the statute is subject to a limiting construction.  *Ferber*, 458 U.S. at 769
   n.24 (citing *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

28

significantly compromise recognized First Amendment protections ... for it to be facially challenged on overbreadth grounds." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984); *see also N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988) ("To succeed in its [facial-overbreadth] challenge, [the plaintiff] must demonstrate from the text of [the statute] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally").

Plaintiffs cannot meet this standard.  They have not identified any way in which SB 1172 prohibits constitutionally protected conduct.  As explained above, plaintiffs' claim that SB 1172 contains no "exceptions" for SOCE provided by clergy or other religious counselors is irrelevant because the statute does not apply on its face to such practitioners, and the licensing scheme of which SB 1172 is a part expressly provides that they are not subject to regulation by the state, provided they do not hold themselves out as licensed practitioners.  It is axiomatic that SB 1172 need not make an explicit exception for a category of practitioners that is beyond its application.

Further, as discussed above, the constitutional right of privacy does not encompass a right to obtain a particular mental health treatment, including but not limited to SOCE provided by state-licensed professionals.  Plaintiffs complain that SB 1172 does not permit parents or children to "consent" to SOCE, Mtn. at 20, but individuals cannot legally "consent" to treatments that are prohibited as ineffective and unsafe by the state and the mental health profession.  Moreover, the fact that minors and their parents will not be able to obtain SOCE from state-licensed providers will not, contrary to plaintiffs' claims, "chill" the exercise of any fundamental rights by parents. *Id.*  Nothing in SB 1172 prevents parents from "convey[ing] values to their children," including teaching their children that homosexuality is sinful or objectionable for any other reason and should be changed.  And nothing prevents minors and their families from obtaining SOCE counseling from non-regulated providers.  Plaintiffs' lawsuit boils down to the notion that individuals (not before the Court) have a constitutional right to obtain SOCE from state-licensed mental health providers.  They do not.  The state has a legitimate, indeed compelling, interest in preventing mental health providers from using the imprimatur of a state license to sell fictitious and potentially harmful treatments. *See NAAP*, 228 F.3d at 1054.

27

1       **F.** **SB 1172 Is Constitutional Because the Legislature Rationally Determined,**
2             **Based on Consensus in the Mental Health Profession, That SOCE Is**
          **Ineffective, Unnecessary, and Potentially Harmful.**

3       Because SB 1172 does not interfere with any fundamental right, it must be upheld so long

4   as it is "rationally related to a legitimate state interest." *NAAP*, 228 F.3d at 1050; *Fields*, 427

5   F.3d at 1208.  This review is deferential; courts do not sit in review of the wisdom of legislative

6   policy judgments.  Indeed, SB 1172 is strongly presumed to be constitutional.  *NAAP*, 228 F.3d at

7   1050.  "We do not require that the government's action actually advance its stated purposes, but

8   merely look to see whether the government could have had a legitimate reason for acting as it

9   did."  *Id.* (quoting *Dittman v. Cal.*, 191 F.3d 1020, 1031 (9th Cir. 2005)).  Put another way, a

10  legislative determination that a particular law or regulation is necessary will not be overturned

11  provided it has a conceivable rational basis.  *Id.*

12      Measured against this deferential standard, SB 1172 is constitutional.  The State of

13  California has legitimate, indeed compelling, interests in: (1) protecting the psychological well-

14  being of minors, *e.g., Sable Commc'n of Cal. v. FCC*, 492 U.S. 115, 126 (1989); and (2)

15  protecting all of society from harmful, risky, or unproven, mental health treatments.  *NAAP*, 228

16  F.3d at 1051-522 (state's interest in protecting health includes "psychological as well as physical

17  well-being"); *id.* at 1054 (California's interest in regulating mental health is compelling); *see*

18  *also, e.g.*, *West v. Bailey*, No. 11-1760, 2012 WL 993301 (S.D. Cal. March 23, 2012) *5 (noting

19  that the power of the states to regulate nursing and other professions which "closely concern the

20  public health" is "too well-settled to require discussion") (quoting *Watson v. Maryland*, 218 U.S.

21  173, 177 (1910)).  Here, the Legislature rationally determined that SB 1172 would promote these

22  interests based on findings by every major psychological association in the country that: (1)

23  SOCE is, at a minimum, unproven and potentially harmful; and (2) homosexuality is not a disease

24  or condition that warrants treatment.  Cal. Stats. 2012, ch. 835, §§ 1(a)-(m); *see also Perry v.*

25  *Schwarzenegger*, 704 F. Supp. 2d 921, 966 (N.D. Cal. 2010) ("No credible evidence supports a

26  finding that an individual may, through conscious decision, therapeutic intervention or any other

27  method, change his or her sexual orientation"); Herek Decl. ¶¶ 29-45; Beckstead Decl. ¶¶ 11-15,

28  17-18, 34-38.

1    Plaintiffs may disagree with the Legislature's findings and policy judgments, but they do

2  not (and cannot) demonstrate that SB 1172 lacks any conceivable rational basis.  *Heller v. Doe*,

3  509 U.S. 312, 320 (1993).  Plaintiffs contend the Legislature lacks "compelling scientific

4  evidence" that SOCE causes harm to minors.  Mtn. at 22.  This misstates the burden of proof.

5  The state need not offer "scientific or epidemiological 'hard data'" to support a law or regulation

6  affecting public health."  *New York State Ophthalmological Soc'y v. Bowen*, 854 F.2d 1379, 1391

7  (D.C. Cir. 1987); *Whalen*, 429 U.S. at 598 n.21 ("Nothing in the Constitution prohibits a State

8  from reaching . . . a conclusion and acting on it legislatively simply because there is no

9  conclusive evidence or empirical data").  Regardless, as reflected in the Legislature's findings,

10 SB 1172 is supported by hard data and expert opinion strongly indicating that SOCE has no

11 proven efficacy, that SOCE is potentially dangerous, and that homosexuality is not a disorder that

12 warrants professional treatment.  Although plaintiffs try to dismiss it as "anecdotal," Mtn. at 13,

13 the evidence that SOCE is harmful is both substantial and more than sufficient to support state

14 regulation.  *See, e.g*., Beckstead Decl. ¶¶ 16, 22-28, 34-38; Herek Decl. ¶¶ 39-45.

15    Plaintiffs further contend the statute is "premised on the hotly disputed notion of sexual

16 orientation immutability," Mtn. at 22, but that mischaracterizes the Legislature's findings.  The

17 Legislature found, based on a scientific consensus dating back to the 1970's—a consensus that

18 the plaintiffs categorically reject for personal and religious reasons—that "being lesbian, gay, or

19 bisexual is not a disease, disorder, illness, deficiency, or shortcoming" that necessitates or

20 warrants "treatment" by state-licensed mental health providers.  2012 Cal. Stats., ch. 835, § 1(a).

21 That finding adequately supports SB 1172, whether or not sexual orientation is "immutable."

22 Moreover, whether or not sexual orientation is "immutable," the fact remains that SOCE does not

23 work.  As the APA and every other mainstream psychological association in the country has

24 found, there is no empirical proof that sexual orientation can be changed through therapeutic

25 interventions.  *See also Perry*, 704 F. Supp. 2d at 966.  The state of California has a legitimate

26 interest in prohibiting licensees from seeking remuneration for fictitious "treatments" aimed at

27 "curing" non-existent problems.

28

**II.   PLAINTIFFS FAIL TO MEET THEIR BURDEN TO DEMONSTRATE IRREPARABLE HARM.**

In addition to failing to show a likelihood of success on the merits of their claims, plaintiffs also have not met their burden to demonstrate irreparable injury.  As shown above, plaintiffs have not established that they have suffered a cognizable injury, and certainly not one that is irreparable.  Plaintiffs argue that SB 1172 poses "imminent constitutional threats to patients, families, and professionals," Mtn. at 24, and that the "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 4.  However, as discussed above, SB 1172 does not implicate any fundamental rights of plaintiffs, including their First Amendment rights, and is rationally related to a legitimate governmental purpose. Accordingly, it does not violate the Constitution.  Where, as here, a constitutional claim is unsupported and fails as a matter of law, it is "too tenuous" to support the requested relief. *Goldie's Bookstore, Inc. v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984); *see also Dex Media West, Inc. v. City of Seattle*, 790 F. Supp. 2d 1276, 1289 (W.D. Wash. 2011) ("Because the court finds that Plaintiffs have failed to establish that they are likely to succeed on the merits of their First Amendment claim, the court cannot find that Plaintiffs have established that they are likely to suffer irreparable First Amendment injury in the absence of a preliminary injunction); *Putzer v. Donnelly*, No. 07–00620, 2009 WL 3271315 at *5 (D. Nev. Aug. 17, 2009) ("[P]laintiff has not demonstrated a likelihood of success on his First Amendment claim. Therefore, plaintiff has not presented evidence sufficient to show a likelihood of irreparable injury").[18]

**III.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH AGAINST GRANTING PRELIMINARY RELIEF.**

Plaintiffs cannot establish sufficient harm to outweigh the fact that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a

---

[18] Plaintiffs rely on *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2003) for the proposition that "the fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury," but this authority has been abrogated by subsequent law.  The mere potential of irreparable injury is no longer sufficient to support entry of a preliminary injunction.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 requires that plaintiffs demonstrate that irreparable injury is *likely* in the absence of an injunction. *See id.* at 22; *see also Cottrell*, 632 F.3d at 1135; *Dex Media West,* 790 F. Supp. 2d at 1289, n.8 (noting abrogation).

1   form of irreparable injury." *Maryland v. King*, --- S. Ct. ---, No. 12A48, 2012 WL 3064878 at *2

2   (U.S. July 30, 2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345,

3   1351 (1977)).  Moreover, allowing mental health providers to engage in SOCE with minors

4   pending trial could cause these minors irreparable harm, up to and including severe depression,

5   alienation from family, and suicidal thoughts.  Cal. Stats. 2012, ch. 835, § 1(b)-(m); APA Task

6   Force Report at 41-43; Herek Decl. ¶¶ 39-45; Beckstead Decl. ¶¶ 16, 22-28, 34-38.  Indeed,

7   minors are particularly vulnerable to harm from SOCE.  Beckstead Decl. ¶¶ 22-28.  None of this

8   damage could be undone if the injunction were subsequently vacated.  These harms to the state

9   and the public interest far outweigh the alleged harm to plaintiffs' First Amendment freedoms,

10  which, as shown above, is premised on a misreading of both SB 1172 and the applicable case law.

11  *See Selecky*, 586 F.3d at 1140 ("district court should give due weight to the serious consideration

12  of the public interest . . . that has already been undertaken by the responsible state officials in

13  Washington, who unanimously passed the rules").

14                                **CONCLUSION**

15          For the foregoing reasons, plaintiffs' motion for a preliminary injunction should be denied.

16  SB 1172 is a permissible exercise of the state's police power.  It regulates for the important

17  purpose of protecting health and safety, and does not violate any of plaintiffs' constitutional

18  rights.  Moreover, plaintiffs do not, and cannot, meet their burden of demonstrating they will

19  suffer irreparable harm in the absence of an injunction.

20

21  Dated:  November 19, 2012                          Respectfully Submitted,

22                                                     KAMALA D. HARRIS
                                                       Attorney General of California
23                                                     TAMAR PACHTER
                                                       Supervising Deputy Attorney General

24                                                     */s/ Paul Stein*
                                                       PAUL STEIN
25                                                     Deputy Attorney General
                                                       *Attorneys for All Defendants*

26

27

28