1   DAVID C. DINIELLI (SB No. 177904)            SHANNON MINTER (SB No. 168907)
    David.Dinielli@mto.com                       SMinter@nclrights.org
2   LIKA C. MIYAKE (SB No. 231653)               CHRISTOPHER STOLL (SB No. 179046)
    Lika.Miyake@mto.com                          cstoll@nclrights.org
3   BRAM ALDEN (SB No. 272858)                   NATIONAL CENTER FOR LESBIAN
    Bram.Alden@mto.com                           RIGHTS
4   MUNGER, TOLLES & OLSON LLP                   870 Market Street, Suite 360
    355 South Grand Avenue, Thirty-Fifth Floor   San Francisco, CA 94102
5   Los Angeles, CA  90071-1560                  Telephone:     (415) 392-6257
    Telephone:    (213) 683-9100                 Facsimile:     (415) 392-8442
6   Facsimile:    (213) 687-3702

7   MICHELLE FRIEDLAND (SB No. 234124)
    Michelle.Friedland@mto.com
8   MUNGER, TOLLES & OLSON LLP
    560 Mission Street, Twenty-Seventh Floor
9   San Francisco, CA  94105-2907
    Telephone:    (415) 512-4000
10  Facsimile:    (415) 512-4077

11  Attorneys for EQUALITY CALIFORNIA
    Amicus Curiae and Proposed Intervenor
12

13                  UNITED STATES DISTRICT COURT

14                  EASTERN DISTRICT OF CALIFORNIA

15                      SACRAMENTO DIVISION

16

17  DONALD WELCH, ANTHONY DUK,          CASE NO.  2:12-CV-02484-WBS-KJN
    AARON BITZER,
18                                       **MEMORANDUM OF AMICUS CURIAE
                  Plaintiffs,            AND PROPOSED INTERVENOR
19                                       EQUALITY CALIFORNIA IN
          vs.                            OPPOSITION TO PLAINTIFFS' MOTION
20                                       FOR PRELIMINARY INJUNCTION**
    EDMUND G. BROWN, JR., Governor of
21  the State of California, in his official
    capacity, et al.,
22                                       Judge:     Hon. William B. Shubb
                  Defendants.
23                                       Date:      December 3, 2012

24                                       Time:      2:00 p.m.

25                                       Location:  Courtroom #5

26

27

28

1

# TABLE OF CONTENTS

2

Page

3    I.      INTRODUCTION ......................................................................................... 1

4    II.     ARGUMENT ............................................................................................... 1

5            A.    Plaintiffs Misstate The Purpose And Scope Of SB 1172, Which Was
                   Enacted To Prevent Harmful Conduct By State-Licensed Professionals ............. 1

6                  1.    SB 1172 Was Enacted To Prevent Harmful Practices By State-
7                        Licensed Mental Health Professionals ....................................................... 1

8                  2.    Plaintiffs Misstate The Scope Of SB 1172 ................................................. 4

             B.    SB 1172 Does Not Violate Plaintiffs' Privacy Rights ........................................... 5

9            C.    SB 1172 Does Not Violate The Free Exercise Clause ........................................... 8

10                 1.    Plaintiffs' Arguments About The Ministerial Exception Are
                         Inapposite .................................................................................................... 8
11
12                 2.    SB 1172 Is A Neutral Law Of General Applicability And Is Clearly
                         Rational ...................................................................................................... 10

13           D.    SB 1172 Does Not Violate Plaintiffs' Free Speech Rights................................... 12

14                 1.    SB 1172 Is A Valid Regulation Of Professional, Licensed Mental
                         Health Practice .......................................................................................... 12

15                 2.    SB 1172 Does Not Restrict Speech Based On Its Viewpoint .................... 16

16                 3.    Even If SB 1172 Has Some Incidental Impact On Protected Speech,
                         It Easily Satisfies The O'Brien Standard ................................................. 20

17                 4.    SB 1172 Survives Any Level Of Scrutiny ................................................. 21

18                       a.    SB 1172 Furthers A Compelling Government Interest................. 21

19                       b.    SB 1172 Is Narrowly Drawn....................................................... 23

             E.    SB 1172 Is Not Vague ......................................................................................... 23
20
21                 1.    SB 1172 Both Clearly Defines "Sexual Orientation Change Efforts"
                         In The Text Of The Statute And Also Draws On The Clear
22                       Understanding Of That Term Within The Relevant Mental Health
                         Professions ................................................................................................ 24

23                 2.    SB 1172 Provides Ready Answers To Plaintiffs' Hypotheticals.............. 27

24           F.    SB 1172 Is Not Overbroad.................................................................................. 28

25           G.    Plaintiffs Have Failed To Demonstrate The Elements Required For A
                   Preliminary Injunction ....................................................................................... 29

26   III.    CONCLUSION........................................................................................... 30

27

28

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach,*
495 F.3d 695 (D.C. Cir. 2007) ............................................................................... 5, 6

*Accountant's Soc. of Virginia v. Bowman,*
860 F.2d 602 (4th Cir. 1988).................................................................................... 13

*Ark. Educ. Television Comm'n v. Forbes,*
523 U.S. 666 (1998) .................................................................................................. 19

*Association of Christian Schools Int'l v. Stearns,*
679 F. Supp. 2d 1083 (C.D. Cal. 2008) ................................................................... 19

*Berger v. Seattle,*
569 F.3d 1029 (9th Cir. 2009).............................................................................. 28, 29

*Brown v. Entertainment Merchants Ass'n,*
131 S. Ct. 2729 (2011) ................................................................................. 17, 21, 22

*Caesar v. Mountanos,*
542 F.2d 1064 (9th Cir. 1976).................................................................................... 8

*California Teachers Ass'n v. State Bd. of Educ.,*
271 F.3d 1141 (9th Cir. 2001).................................................................................... 24

*Carnohan v. United States,*
616 F.2d 1120 (9th Cir. 1980)..................................................................................... 6

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ...................................................................................... 10, 11, 12

*Coates v. Cincinnati,*
402 U.S. 611 (1971) .................................................................................................. 27

*Coggeshall v. Mass. Bd. of Registration of Psychologists,*
604 F.3d 658 (1st Cir. 2010) ....................................................................... 13, 15, 21

*Conant v. Walters,*
309 F.3d 629 (9th Cir. 2002)....................................................................... 15, 16, 26

*Connecticut v. Menillo,*
423 U.S. 9 (1975) ........................................................................................................ 5

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Employment Div., Dept. of Human Resources of Ore. v. Smith,*
    494 U.S. 872 (1990) ........................................................................................... 9, 10

4

5

*Florida Bar v. Went For It, Inc.,*
    515 U.S. 618 (1995) ................................................................................................. 16

6

*Giboney v. Empire Storage & Ice Co.,*
    336 U.S. 490 (1949) ................................................................................................. 13

7

8

*Goldfarb v. Virginia State Bar,*
    421 U.S. 773 (1975) ................................................................................................. 13

9

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ................................................................................................. 14

10

11

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ................................................................................................. 24

12

13

*Griswold v. Connecticut,*
    381 U.S. 479 (1965) ................................................................................................... 5

14

*Hernandez v. C.I.R.,*
    490 U.S. 680 (1989) ................................................................................................. 10

15

16

*Hishon v. King & Spaulding,*
    467 U.S. 69 (1984) ................................................................................................... 14

17

*Holder v. Humanitarian Law Project,*
    130 S. Ct. 2705 (2010) ............................................................................................ 24

18

19

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.,*
    132 S. Ct. 694 (2012) ................................................................................................ 9

20

21

*Humanitarian Law Project v. U.S. Treasury Dept.,*
    578 F.3d 1133 (9th Cir. 2009) ................................................................................. 28

22

23

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Group of Boston,*
    515 U.S. 557 (1995) ................................................................................................. 14

24

*In re Mark Anthony Const., Inc.,*
    886 F.2d 1101 (9th Cir. 1989) ................................................................................. 17

25

26

*Jarman v. City of Northlake,*
    950 F. Supp. 1375 (N.D. Ill. 1997) ......................................................................... 14

27

28

# TABLE OF AUTHORITIES
### (continued)

Page

*Keeton v. Anderson-Wiley,*
    664 F.3d 865 (11th Cir. 2011) ................................................................................ 18

*Lawline v. American Bar Ass'n,*
    956 F.2d 1378 (7th Cir. 1992) ................................................................................ 13

*Lawrence v. Texas,*
    539 U.S. 558 (2003) ................................................................................................. 6

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) ............................................................................................... 20

*Lowe v. SEC,*
    472 U.S. 181 (1985) ............................................................................................... 13

*Maryland v. King,*
    --- S. Ct. --- , 2012 WL 3064878 (July 30, 2012) ................................................. 30

*Mitchell v. Clayton,*
    995 F.2d 772 (7th Cir. 1993) .................................................................................... 6

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ............................................................................................... 19

*National Ass'n. for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology,*
    228 F.3d 1043 (9th Cir. 2000) ........................................................................ passim

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) ............................................................................................. 30

*Ohralik v. Ohio State Bar Ass'n,*
    436 U.S. 447 (1978) ............................................................................................... 13

*Osborne v. Ohio,*
    495 U.S. 103 (1990) ............................................................................................... 28

*Pitcherskaia v. I.N.S.,*
    118 F.3d 641 (9th Cir. 1997) .................................................................................... 2

*Planned Parenthood v. Casey,*
    505 U.S. 833 (1992) ............................................................................................... 14

*Roe v. Wade,*
    410 U.S. 113 (1973) ................................................................................................. 5

**TABLE OF AUTHORITIES**
(continued)

Page

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)..................................................................................................... 18

*Rumsfeld v. Forum for Academic and Inst. Rights, Inc.*,
547 U.S. 47 (2006) ...................................................................................................... 13

*Sable Commc'ns of Cal., Inc. v. F.C.C.*,
492 U.S. 115 (1989) ..................................................................................................... 21

*Schware v. Board of Bar Examiners*,
353 U.S. 232 (1957) ..................................................................................................... 13

*Shultz v. Wells*,
2010 WL 1141452 (M.D. Ala. Mar. 3, 2010), adopted by 2010 WL 1141444 (M.D.
Ala. Mar. 22, 2010) ..................................................................................................... 14

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009)........................................................................ 10, 11, 12

*Stormans Inc. v. Selecky*,
844 F. Supp. 2d 1172 (W.D. Wash. 2012) ................................................................. 12

*United States v. Alvarez*,
617 F.3d 1198 (9th Cir. 2010)..................................................................................... 14

*United States v. Am. Library Ass'n*,
539 U.S. 194 (2003) ..................................................................................................... 19

*United States v. Elias*,
269 F.3d 1003 (9th Cir. 2001) ..................................................................................... 26

*United States v. Fitzgerald*,
882 F.2d 397 (9th Cir. 1989).................................................................................. 24, 26

*United States v. O'Brien*,
391 U.S. 367 (1968) ..................................................................................................... 20

*United States v. Rutherford*,
442 U.S. 544 (1979) ....................................................................................................... 5

*United States v. Weitzenhoff*,
35 F.3d 1275 (9th Cir.1993)......................................................................................... 26

*Video Software Dealers Ass'n v. Schwarzenegger*,
556 F.3d 950 (9th Cir. 2009)....................................................................................... 17

# TABLE OF AUTHORITIES
## (continued)

Page

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ................................................................................... 23

*Virginia v. Hicks*,
   539 U.S. 113 (2003) ................................................................................... 28

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ................................................................................... 24

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ..................................................................................... 5

*Watson v. Maryland*,
   218 U.S. 173 (1910) ................................................................................... 17

*Wilson v. State Bar*,
   132 F.3d 1422 (11th Cir. 1998) ................................................................. 13

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................................................... 29

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993) ................................................................................... 14

STATE CASES

*Rand v. Bd. of Psych.*,
   206 Cal. App. 4th 565 (2012) ....................................................................... 8

*Shea v. Bd. of Medical Examiners*,
   81 Cal. App. 3d 564 (1978) ................................................................... 14, 19

STATUTES AND RULES

Cal. Bus. & Prof. Code § 2052 ...................................................................... 26

Cal. Bus. & Prof. Code § 2053.5 ................................................................... 26

Cal. Bus. & Prof. Code § 2063 ........................................................................ 4

Cal. Bus. & Prof. Code § 2903 ...................................................................... 25

Cal. Bus. & Prof. Code § 2908 ........................................................................ 4

Cal. Bus. & Prof. Code § 4980 ...................................................................... 25

**TABLE OF AUTHORITIES**
(continued)

Page

Cal. Bus. & Prof. Code § 4980.01 ............................................................. 4, 9

Cal. Bus. & Prof. Code § 4980.02 ............................................................. 25

Cal. Bus. & Prof. Code § 4980.10 ............................................................. 25

Cal. Bus. & Prof. Code § 4982 ............................................................. 15

Cal. Bus. & Prof. Code § 4989.13 ............................................................. 25

Cal. Bus. & Prof. Code § 4989.14 ............................................................. 25

Cal. Bus. & Prof. Code § 4989.50 ............................................................. 25

Cal. Bus. & Prof. Code § 4991.1 ............................................................. 25

Cal. Bus. & Prof. Code § 4996 ............................................................. 25

Cal. Bus. & Prof. Code § 4996.9 ............................................................. 25

Cal. Bus. & Prof. Code § 4996.13 ............................................................. 4

Cal. Bus. & Prof. Code § 4999.13 ............................................................. 26

Cal. Bus. & Prof. Code § 4999.20 ............................................................. 26

Cal. Bus. & Prof. Code § 4999.22 ............................................................. 4

Cal. Bus. & Prof. Code § 4999.30 ............................................................. 26

Cal. Stats. 1955, ch. 757 ............................................................. 4

**OTHER AUTHORITIES**

A. Lee Beckstead, *Can We Change Sexual Orientation?* Archives of Sexual Behavior 121 (2012) ............................................................. 2

American Counseling Ass'n, ACA Code of Ethics, § A.4.b (2005) ............................................................. 18

American Psychological Ass'n, Ethical Principles of Psychologists and Code of Conduct, Principle E (2010) ............................................................. 18

American Psychological Ass'n, *Report of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation* ............................................................. 2, 7, 22, 23, 30

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

Ann P. Haas, PhD, et al., *Suicide and Suicide Risk in Lesbian, Gay, Bisexual and*
4     *Transgender Populations: Review and Recommendations*, Journal of Homosexuality,
    58:1 (2010) .................................................................................................................... 2

5

Ashley Porter, *Ending the "Gay Cure": Chapter 379 Deletes Discriminatory Language*
6     *from the Law*, 42 McGeorge L. Rev. 725 (2011) ...................................................... 3

7

Bonnie Lowenthal, *'Cure' Gays? No, Fix the Law*, L.A. Times, Apr. 4, 2010 ............................. 3

8

Caitlin Ryan, et al., *Family Rejection as a Predictor of Negative Health Outcomes in*
    *White and Latino Lesbian, Gay, and Bisexual Young Adults* Pediatrics 346 (2009) ............... 3

9

Cal. A.B. 2199 (2010) ....................................................................................................... 3

10

Jennifer Medicus, *Practice Parameter on Gay, Lesbian, or Bisexual Sexual Orientation,*
11     *Gender Nonconformity, and Gender Discordance in Children and Adolescents* Journal
    of the American Academy of Child & Adolescent Psychiatry Issue 9, 957-74 (2012) ............ 3

12

William N. Eskridge, *Foreword: The Marriage Cases--Reversing the Burden of Inertia in*
13     *a Pluralist Constitutional Democracy*, 97 Calif. L. Rev. 1785, 1792-1795 (2009) ................. 3

14

Senate Bill ("SB") 1172 ....................................................................................... *passim*

15

Senate Bill ("SB") 1575 ....................................................................................................... 4

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.    <u>INTRODUCTION</u>

2       Plaintiffs' motion should be denied because Plaintiffs cannot show a likelihood of success

3  on the merits.  SB 1172 narrowly prohibits state-licensed mental health providers from subjecting

4  minors to "sexual orientation change efforts" ("SOCE").  The statute does not invade therapist-

5  patient privacy or impede client self-determination.  Nor does the neutral and generally applicable

6  prohibition burden anyone's exercise of religion.  Restrictions preventing licensed professionals

7  from providing ineffective and unsafe treatments to patients are not subject to heightened scrutiny

8  under the free speech clause of the First Amendment, but need only be reasonable.  Moreover,

9  even were the Court to conclude that strict scrutiny applies, the State has a compelling interest in

10 protecting minors from the serious harms caused by SOCE, and SB 1172 is narrowly tailored to

11 do just that.  Plaintiffs also have failed to show that SB 1172 is unconstitutionally vague, as the

12 statute sets forth a clear, straightforward prohibition using common terms that are readily

13 understandable to a person of ordinary intelligence.  Nor is the statute overbroad, but rather

14 prohibits only state-licensed therapists from conducting a narrowly defined practice and nothing

15 more.  Finally, Plaintiffs have failed to show that enjoining SB 1172 is necessary to prevent

16 irreparable harm.  The motion should be denied.[1]

17      Pursuant to Eastern District Local Rule 231, Equality California requests 10 minutes of

18 oral argument time.

19 ## II.    <u>ARGUMENT</u>

20 ## A.    <u>Plaintiffs Misstate The Purpose And Scope Of SB 1172, Which Was Enacted To Prevent Harmful Conduct By State-Licensed Professionals</u>

21
22      ### 1.    <u>SB 1172 Was Enacted To Prevent Harmful Practices By State-Licensed Mental Health Professionals</u>

23      SB 1172 was enacted solely to prevent state-licensed mental health professionals from

24 subjecting minor patients to scientifically discredited and unsafe practices known as SOCE.  As

25 the leading organization sponsoring SB 1172 and the leading statewide group representing

26 lesbian, gay, bisexual, and transgender ("LGBT") Californians, amicus (and proposed intervenor)

27 _____
[1] In the interests of judicial efficiency, Equality California incorporates and adopts herein the
28 arguments presented by the State defendants in their Opposition to Plaintiffs' Motion, and the
State's objections to Plaintiffs' declarations.

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1    Equality California is deeply familiar with the harms that prompted the statute's enactment.

2    Historically, SOCE included barbaric practices such as castration, electroshock, and the use of

3    nausea-inducing drugs to eradicate same-sex desire.  Today SOCE includes a variety of

4    behavioral, cognitive, psychoanalytic, and other practices that aim to eliminate a same-sex sexual

5    orientation.  *See* A. Lee Beckstead, *Can We Change Sexual Orientation?*, 41 Archives of Sexual

6    Behavior 121, 122-23 (2012).  While these contemporary versions of SOCE are less shocking and

7    extreme than some of those used in the past, they are equally devoid of scientific validity and

8    pose significant dangers to patients—especially to minors.  The Legislature was impelled to act

9    by the consensus of mainstream medical and mental health organizations that these practices are

10   ineffective, do not constitute competent care, and put patients at risk of serious harm.[2]  The Pan

11   American Health Organization, a regional office of the World Health Organization, has also

12   concluded that these practices "lack medical justification and represent a serious threat to the

13   health and well-being of affected people."[3]

14         The Legislature recognized that these practices are especially dangerous for youth, who

15   often are compelled to undergo them by their parents or legal guardians, and who may suffer

16   long-term harm as a result of being traumatized by SOCE at a particularly critical time in their

17   development.[4]  LGBT youth are already at high risk of suicide and other serious health issues

18   caused by stress from suffering discrimination and rejection.[5]  The American Academy of Child

19   _____

     [2] *See* SB 1172 §§ 1(c)-(l) (citing statements).  *See also* link to statements by many major medical
20   and mental health organizations at http://www.hrc.org/resources/entry/the-lies-and-dangers-of-
     reparative-therapy.  In 2009, the American Psychological Association published the results of a
21   comprehensive review of the literature on SOCE, which concluded that there is no reliable
     evidence that SOCE works, that it is inconsistent with providing culturally competent care and
22   respecting patient autonomy, and that there were many reported harms from SOCE, including
     depression, feelings of hopelessness, and suicidality.  *See, e.g., Report of the APA Task Force on*
23   *Appropriate Therapeutic Responses to Sexual Orientation* (available at
     http://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf) ("APA Report").
24   [3] Link to full report available at http://new.paho.org/hq/index.php?option=com_content&task=
     %20%20view&id=6803&Itemid=1926.  *See also Pitcherskaia v. I.N.S.*, 118 F.3d 641 (9th Cir.
25   1997) (holding that involuntary psychiatric treatment to "cure" a person's homosexuality may
     constitute persecution, even where the treatment is intended to benefit rather than punish).
26   [4] Declaration of Caitlin Ryan ("Ryan Decl.") ¶¶ 13-16; 20-21; Declaration of Douglas C.
     Haldeman ("Haldeman Decl.") ¶¶ 13-14.
27   [5] Students who identify as lesbian, gay, or bisexual are 2 to 7 times more likely to attempt suicide.
     *See* Ann P. Haas, PhD, et al., *Suicide and Suicide Risk in Lesbian, Gay, Bisexual and*
28   *Transgender Populations: Review and Recommendations*, Journal of Homosexuality, 58:1, 10-51
     (2010).

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1    and Adolescent Psychiatry, for example, has warned that efforts by a therapist to change a

2    minor's sexual orientation "may encourage family rejection and undermine self-esteem,

3    connectedness and caring, important protective factors against suicidal ideation and attempts."[6]

4    In fact, research shows that youth who face high levels of family rejection are more than 8 times

5    more likely to report having attempted suicide.[7]  Youth who have undergone SOCE are even

6    more likely to consider and attempt suicide.  (*See*, *e.g.*, Ryan Decl. ¶ 15.)  The Legislature also

7    heard testimony from Equality California members including Ryan Kendall, who testified that as

8    a teenager, he was driven to the brink of suicide after undergoing these practices.  (*See*

9    Declaration of Clarissa Filgioun, Ex. 1 (Dkt # 20-02).)

10          The enactment of SB 1172 was also necessary to correct the past harms caused by the

11   State of California's history of *promoting* sexual orientation change efforts, thereby contributing

12   to the very problem the statute now seeks to address.  In 1950, Governor Earl Warren signed a

13   law that ordered the Department of Mental Hygiene to study the "causes and cures of

14   homosexuality."  *See* Bonnie Lowenthal, *'Cure' Gays? No, Fix the Law*, L.A. Times, Apr. 4,

15   2010.  That law remained on the books until 2010.  Cal. A.B. 2199 (2010); *see generally* Ashley

16   Porter, *Ending the "Gay Cure": Chapter 379 Deletes Discriminatory Language from the Law*, 42

17   McGeorge L. Rev. 725 (2011).  In the middle of the twentieth century, the State was regularly

18   sending so-called "inverts" convicted of consensual same-sex activities to mental hospitals where

19   they were subjected to sexual orientation change efforts that included lobotomies, electrical and

20   pharmacological shocks, and experimental drugs.  William N. Eskridge, *Foreword: The Marriage*

21   *Cases--Reversing the Burden of Inertia in a Pluralist Constitutional Democracy*, 97 Calif. L.

22   Rev. 1785, 1792-1795 (2009) (describing history of state-sponsored efforts to "cure" gay people

23   in California).  When such "cures" did not work, the Legislature provided that a "sexual

24

25   ───────────────
     [6] SB 1172 § 1(k) (citing Jennifer Medicus, *Practice Parameter on Gay, Lesbian, or Bisexual
     Sexual Orientation, Gender Nonconformity, and Gender Discordance in Children and
26   Adolescents*, 51 Journal of the American Academy of Child & Adolescent Psychiatry Issue 9,
     957-74 (2012)).
27   [7] SB 1172 § 1(m) (citing Caitlin Ryan, et al., *Family Rejection as a Predictor of Negative Health
     Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346
28   (2009)); Ryan Decl. ¶ 13.

EQUALITY CALIFORNIA'S OPPOSITION TO
                                                      MOTION FOR PRELIMINARY INJUNCTION
                                                      CASE NO. 2:12-CV-02484-WBS-KJN

1  psychopath" found not amenable to "treatment" could still be held indefinitely by the State.  Cal.

2  Stats. 1955, ch. 757.

3  **2.    Plaintiffs Misstate The Scope Of SB 1172**

4  Plaintiffs misstate the scope of 1172 in two important respects.  First, SB 1172 does not

5  apply to religious counseling.  SB 1172 applies only to licensed mental health providers, and it

6  establishes that SOCE constitutes unprofessional conduct subject to discipline by the professional

7  licensing boards governing such providers.  The licensing statutes applicable to California

8  therapists explicitly exempt ministers and religious counselors from the jurisdiction of state

9  licensing boards.  Even licensed therapists are exempt from regulation when performing such

10  religious duties, provided they do not hold themselves out as state-licensed professionals

11  practicing therapy when performing these functions.[8]

12  Second, as explained in more detail below, even as applied to state-licensed therapists, SB

13  1172 does not prohibit therapists from holding, expressing, or advocating for any viewpoint—

14  professional, religious, or otherwise—about sexual orientation or SOCE.  The gravamen of a

15  violation of SB 1172 is a licensed therapist's conduct in attempting to "treat" or change a client's

16  sexual orientation in therapy, not the therapist's speaking or writing about his or her personal or

17  professional views on these subjects.  Indeed, nothing in the statute prevents a therapist from

18  discussing SOCE with patients or sharing his or her views about it.  The only thing prohibited by

19  the statute is to actually perform SOCE on a minor patient under the auspices of a state license,

20  _____

21  [8] *See* Cal. Bus. & Prof. Code § 2063 (statutes governing physicians shall not "regulate, prohibit, or apply to any kind of treatment by prayer, nor interfere in any way with the practice of religion"); § 2908 (statutes governing psychologists shall not "be construed to prevent qualified

22  members of other recognized professional groups . . . such as . . . duly ordained members of the recognized clergy, or duly ordained religious practitioners from doing work of a psychological

23  nature consistent with the laws governing their respective professions, provided they do not hold themselves out to the public by any title or description of services incorporating the words

24  'psychological,' 'psychologist,' 'psychology,' 'psychometrist,' 'psychometrics,' or 'psychometry,' or that they do not state or imply that they are licensed to practice psychology"); §

25  4980.01(b) (exempting from laws governing licensed marriage and family therapists a "priest, rabbi, or minister of the gospel of any religious denomination when performing counseling

26  services as part of his or her pastoral or professional duties"); § 4999.22(c), *amended by* SB 1575 (2012) (same, for licensed clinical counselors); § 4996.13 (statutes governing licensed clinical

27  social workers do not "prevent qualified members of other professional groups from doing work of a psychosocial nature consistent with the standards and ethics of their respective professions"

28  including "[a] priest, rabbi, or minister of the gospel of any religious denomination").

- 4 -

1  and those practices are proscribed regardless of whether they involve talk therapy or non-verbal

2  methods such as aversion therapy.

3  **B.**   **SB 1172 Does Not Violate Plaintiffs' Privacy Rights**

4         SB 1172 does not violate the privacy rights of patients, therapists, or parents.  States have

5  wide latitude to require health care professionals to adhere to medical standards, and those

6  regulations are generally permissible so long as they are reasonable.  *See*, *e.g.*, *Washington v.*

7  *Glucksberg*, 521 U.S. 702, 731 (1997) (states may act to safeguard "the integrity and ethics of the

8  medical profession" and to protect "vulnerable groups . . . from abuse, neglect, and mistakes" at

9  the hands of medical practitioners); *National Ass'n for the Advancement of Psychoanalysis v. Cal.*

10 *Bd. of Psychology*, 228 F.3d 1043, 1054 (9th Cir. 2000) ("*NAAP*") ("It is properly within the

11 state's police power to regulate and license professions, especially when public health concerns

12 are affected.").  SB 1172 is just such a reasonable professional regulation.  Patients do not have a

13 privacy right to medically unsound treatment offered as a commercial service, and state-licensed

14 therapists do not have a privacy right to offer practices that are ineffective and unsafe.  Further,

15 while parents have a right to direct their children's upbringing, they do not have a right to enlist

16 the services of a state-licensed therapist in dangerous efforts to change a child's sexual

17 orientation, nor do they have a right to compel the state to permit licensed therapists to engage in

18 such practices.

19        The Ninth Circuit and other courts have uniformly held that there is no privacy right to

20 particular medical treatments reasonably prohibited by the government.[9]  *E.g.*, *NAAP*, 228 F.3d at

21 ───────────────────

22 [9] Of course, the government's restriction of access to a particular medical treatment might well
raise constitutional concerns if the restriction substantially burdened a constitutionally protected
liberty or right, such as the right to reproductive autonomy.  *See*, *e.g.*, *Griswold v. Connecticut*,
23 381 U.S. 479 (1965) (invalidating law barring access to birth control); *Roe v. Wade*, 410 U.S. 113
(1973) (invalidating law barring access to abortion).  In this case, however, SB 1172 does not
24 burden any constitutionally protected right.  Moreover, even when medical care implicates a
fundamental right, there is no right to a treatment that is ineffective or dangerous.  *See*, *e.g.*,
25 *Connecticut v. Menillo*, 423 U.S. 9, 11 (1975) (no constitutional right to abortion by a
nonphysician); *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*,
26 495 F.3d 695, 711 n.19 (D.C. Cir. 2007) (no constitutionally protected right of "affirmative
*access* to a potentially harmful, and even fatal, commercial good"); *cf. United States v.*
27 *Rutherford*, 442 U.S. 544, 555-56 (1979) (even for terminally ill patients the government may bar
access to a drug when the potential to cause injury "is not offset by the possibility of therapeutic
28 benefit").

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1    1050 ("[S]ubstantive due process rights do not extend to the choice of type of treatment or of a

2    particular health care provider."); *Carnohan v. United States*, 616 F.2d 1120, 1122 (9th Cir. 1980)

3    (holding that there is no privacy or personal liberty right to obtain alternative cancer treatment

4    absent showing that government regulation bore "no reasonable relation to the legitimate state

5    purpose of protecting public health"); *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993)

6    ("[A] patient does not have a constitutional right to obtain a particular type of treatment or to

7    obtain treatment from a particular provider if the government has reasonably prohibited that type

8    of treatment or provider."); *Abigail Alliance*, 495 F.3d at 711 (holding that there is no privacy

9    right for terminally ill patients to access treatments whose safety had not yet been tested).  As the

10    D.C. Circuit Court of Appeals has noted, "[n]o circuit court has acceded to an affirmative access

11    claim."  *Abigail Alliance,* 495 F.3d at 710 n.18.

12        SB 1172 is also fully consistent with—and in fact may be required by—the holding in

13    *Lawrence v. Texas*, 539 U.S. 558 (2003), which held that individuals have a constitutionally

14    protected right to enter into consensual same-sex relationships.  SB 1172 does not prevent minors

15    from making their own choices about their relationships and identities; to the contrary, it prohibits

16    therapists from *interfering with* a patient's autonomy and imposing on a patient a preconceived

17    determination that the patient should not be gay.  SB 1172 also safeguards minors' autonomy by

18    ensuring that they are not forced into sexual orientation change efforts against their will, as is

19    often the case with SOCE.  (*See* Ryan Decl. ¶ 14 (more than a third of LGBT young adults aged

20    21-25 reported having been sent outside the home to a therapist or religious leader to "cure, treat,

21    or change [their] sexual orientation" during their teenage years); Haldeman Decl. ¶ 26.)

22    Moreover, even in the rare case in which a minor seeks out SOCE, respecting patient autonomy

23    does not entail accepting at face value any goal the client articulates at the beginning of treatment,

24    but instead entails helping patients understand context, meaning, prejudice, and stigma so that

25    clients can make informed choices about their lives.  (Haldeman Decl. ¶¶ 20-26.)  By seeking a

26    predetermined sexual orientation change outcome, SOCE short-circuits competent therapeutic

27    practice and thwarts client autonomy, rather than advancing it.  Under SB 1172, therapists remain

28    free to help a patient explore the patient's own values, feelings, and beliefs and to help patients

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1   determine who they are and how they wish to live their lives.[10]  The only prohibition is that

2   therapists may not engage in ineffective and harmful efforts to change a patient's sexual

3   orientation.  Moreover, even if SOCE did not undermine, rather than protect, autonomy, the right

4   to determine one's own identity does not include a right to access practices that do not work and

5   put oneself at risk of serious harms, including suicide.

6           Plaintiffs are also wrong to suggest that SB 1172 limits parents' ability to seek "spiritual

7   counsel from their licensed religious leaders."  (Mot. at 7.)  As explained above, California law

8   specifically exempts religious counseling from laws and regulations that apply to therapy

9   provided under the auspices of a state license.  Similarly, SB 1172 does not interfere in any way

10  with "the inculcation of parents' beliefs about sexuality to their children."  (Id.)  SB 1172 applies

11  exclusively to licensed "mental health providers."  SB 1172 § 2.  Parents' actions are not

12  regulated in any way—parents remain free to communicate their values to their children; to bring

13  them up, care for them, nurture them, and control their education; to seek out pastoral or religious

14  counseling for them; and to discuss issues of sexual orientation with them.  But parental rights do

15  not extend to controlling how the State regulates the practices of state-licensed mental health

16  providers, or to demanding that licensed mental health professionals provide treatments that the

17  Legislature has reasonably found to be unsafe or ineffective.  See NAAP, 228 F.3d at 1050 ("a

18  patient does not have a constitutional right to obtain a particular type of treatment or to obtain

19

20  _____

21  [10] SB 1172 requires that a mental health professional provide counseling services in a manner that
    does not attempt to change the patient's sexual orientation.  Providing such therapy does not
22  mean that the therapist is "affirming" any particular behavior, but rather that he or she is assisting
    the client with legitimate therapies such as those that "provide acceptance, support, and
    understanding of clients or the facilitation of clients' coping, social support, and identity
23  exploration and development."  SB 1172 § 2.  The APA Report explains that a "competent and
    affirmative approach" safeguards and promotes patient autonomy, including the autonomy of
24  patients who do not wish to identify as gay: "Given that there is diversity in how individuals
    define and express their sexual orientation identity, an affirmative approach is supportive of
25  clients' identity development without an a priori treatment goal concerning how clients identify or
    live out their sexual orientation or spiritual beliefs. This type of therapy can provide a safe space
26  where the different aspects of the evolving self can be acknowledged, explored, and respected and
    potentially rewoven into a more coherent sense of self that feels authentic to the client, and it can
27  be helpful to those who accept, reject, or are ambivalent about their same-sex attractions. The
    treatment does not differ, although the outcome of the client's pathway to a sexual orientation
28  identity does."  See APA Report at 14, 4 (citations omitted).

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1  treatment from a particular provider if the government has reasonably prohibited that type of

2  treatment or provider") (citations and internal quotation marks omitted).

3      Plaintiffs' attempted reliance on *Caesar v. Mountanos,* 542 F.2d 1064 (9th Cir. 1976), is

4  inapposite because that case addressed the question of when the state may require therapists to

5  disclose confidential communications, not what regulations a state may place on therapists'

6  practices.  *Id.* at 1069-70 (upholding state law compelling therapists to disclose the contents of

7  therapy sessions when a patient puts her mental state at issue in litigation).  SB 1172 has nothing

8  to do with patient-therapist confidentiality—it does not require any disclosure of patient-therapist

9  communications.  Plaintiffs' argument that the enforcement of SB 1172 will require intrusion into

10 the patient-therapist relationship similarly has no merit.  That argument would apply equally to

11 any of the myriad laws and regulations that apply to state-licensed therapists and that require

12 therapists to adhere to medical and ethical standards of care, which have consistently been upheld

13 by the courts.  *See generally NAAP*, 228 F.3d at 1050 (upholding mental health licensing laws);

14 *Rand v. Bd. of Psych.*, 206 Cal. App. 4th 565 (2012) (disciplining psychologist for violation of

15 APA ethical standards and rules).[11]

16 **C.**     **SB 1172 Does Not Violate The Free Exercise Clause**

17     **1.**     **Plaintiffs' Arguments About The Ministerial Exception Are Inapposite**

18     Plaintiffs argue that the "ministerial exception" permits therapists associated with or

19 employed by churches to practice SOCE, because the doctrine purportedly renders ministers

20 "largely immune from statutory regulation."  (Mot. at 8-9.)  Even if Plaintiffs properly construed

21 the ministerial exception, this argument would be irrelevant, as California law expressly exempts

22 therapists from disciplinary action by state licensing authorities when performing their duties as

23 religious counselors not under the auspices of a state license.  But Plaintiffs' argument also rests

24 on a plain misinterpretation of the "ministerial exception."

25

26 _____

   [11] Even if plaintiffs could identify some way that SB 1172 interferes with a protected privacy

27 right, which they cannot do, the state's interests in requiring mental health care providers to
   comply with accepted medical standards and to refrain from causing harm to minors are clearly

28 compelling, and the statute is narrowly tailored to further those interests, as explained in Section
   D.4 below.

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1    Plaintiff Welch is the only plaintiff who also acts as a minister.  In addition to being a

2    licensed marriage and family therapist practicing at two counseling centers, he is employed as the

3    Counseling Pastor at a church.  (Declaration of Donald Welch ("Welch Decl.") ¶¶ 4-5.)  Under

4    California's licensing scheme, Welch is not subject to the disciplinary authority of the state Board

5    of Behavioral Sciences and is not required to comply with SB 1172 when he is "performing

6    counseling services as part of his or her pastoral or professional duties," and not as a state-

7    licensed professional.  Cal. Bus. & Prof. Code § 4980.01(b); *see also* n.8 *supra*.  When he is

8    practicing marriage and family therapy as a state-licensed therapist, whatever the setting,

9    however, he is subject to the same regulations as every other licensed marriage and family

10   therapist, and must comply with SB 1172.  Because Welch's purely ministerial functions are

11   already exempted from regulation under the statute, the Constitution's ministerial exception is not

12   even potentially implicated.

13       To the extent Plaintiffs are claiming that the ministerial exception requires something

14   more, and exempts licensed therapists who are also ministers from complying with neutral and

15   generally applicable regulations when practicing their profession under the auspices of a state

16   license but also as an employee of a church, they are plainly wrong.  In *Hosanna-Tabor*

17   *Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 132 S. Ct. 694 (2012), the Supreme Court

18   recognized that the "ministerial exception" "precludes application of [employment

19   discrimination] legislation to claims concerning the employment relationship between a religious

20   institution and its ministers."  *Id.* at 705.  Because the selection of a minister is paramount in

21   shaping a church's faith and mission, the Supreme Court explained that churches must have

22   complete freedom in making those decisions, free of any governmental interference.  *Id.* at 706.

23   While holding that the hiring and firing of ministers is "an internal church decision," the court

24   reaffirmed its previous ruling that the "right of free exercise does not relieve an individual of the

25   obligation to comply with a valid and neutral law of general applicability on the ground that the

26   law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  *See id.* at 706-

27   07 (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879

28   (1990)).  Thus, the ministerial exception protects religious institutions from employment

- 9 -

1    discrimination suits brought by ministers.  It is not a license granted to ministers to refuse to obey

2    a generally applicable law with which they disagree on religious grounds.

3        **2.    SB 1172 Is A Neutral Law Of General Applicability And Is Clearly Rational**

4        Plaintiffs claim that, because their religious beliefs lead them to engage in SOCE, SB

5    1172 violates their free exercise rights.[12]  Plaintiffs are wrong.  SB 1172 is a neutral law of

6    general applicability that need only be "rationally related to a legitimate governmental purpose."

7    *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1137 (9th Cir. 2009).

8        SB 1172 applies only to state-licensed mental health providers and not to any therapy or

9    counseling that may be provided by a religious official or by an individual who is not acting

10   under a state-issued license; therefore, Plaintiffs cannot show the type of substantial burden on the

11   practice of religion necessary to state a free exercise claim.  *See Hernandez v. C.I.R.*, 490 U.S.

12   680, 699 (1989) ("The free exercise inquiry asks whether government has placed a substantial

13   burden on the observation of a central religious belief or practice . . . .").  And, even if they could,

14   it is well established that the "right of free exercise does not relieve an individual of the obligation

15   to comply with a valid and neutral law of general applicability."  *Dept. of Human Resources of*

16   *Ore.*, 494 U.S. at 879 (citation and internal quotation marks omitted).  Moreover, "a law that is

17   neutral and of general applicability need not be justified by a compelling governmental interest

18   even if the law has the incidental effect of burdening a particular religious practice."  *Church of*

19   *the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

20       As Plaintiffs concede (Mot. at 10), SB 1172 is facially neutral—its text "make[s] no

21   reference to any religious practice, conduct, or motivation."  *Stormans,* 586 F.3d at 1130.  The

22   "effect of" SB 1172 is also neutral "in its real operation."  *Id.*  SB 1172 bans all SOCE on minors

23   by licensed mental health providers, not only SOCE motivated by certain religious beliefs.

24   Moreover, the law provides clear exemptions for ministers and religious counselors when acting

25   in those capacities.  This entirely differentiates SB 1172 from the ordinance banning animal

26   sacrifice invalidated in *Lukumi*, which "exclude[d] almost all killings of animals except for

27   ─────────────
     [12] Plaintiffs assert that SB 1172 is unconstitutional "under the Free Exercise and Establishment
28   Clauses," (Mot. at 11), but they offer no argument as to why they believe SB 1172 violates the
     Establishment Clause.

- 10 -                                    EQUALITY CALIFORNIA'S OPPOSITION TO
                                          MOTION FOR PRELIMINARY INJUNCTION
                                          CASE NO. 2:12-CV-02484-WBS-KJN

1  religious sacrifice," and contained further narrowing exemptions so that the "net result of the

2  [ordinance's] gerrymander [was] that few if any killings of animals are prohibited other than

3  Santeria sacrifice." 508 U.S. at 536.  SB 1172 contains no such religion-focused gerrymander or

4  exceptions.

5        Plaintiffs argue that the "debates and discussions" leading to adoption of SB 1172

6  included an "understanding and intent that SB 1172 will restrict religious speech." (Mot. at 10.)[13]

7  Contrary to Plaintiffs' assertions, there is no evidence of any such design here—the legislative

8  history and legislative findings reflect a consistent focus on protecting minors from an ineffective

9  and dangerous practice, regardless of the motivation for that practice.

10        Plaintiffs point to two instances in the entire legislative history in which religion was even

11  mentioned (Mot. at 10-11), but neither remotely suggests a legislative motive to target religion.

12  Plaintiffs cite a quote from the World Health Organization, which says only that an individual

13  may wish his or her sexual orientation "were different" because of "*intolerant attitudes of the*

14  *society* or a conflict between sexual urges and religious belief systems." (Plaintiffs' Req. for Jud.

15  Notice Ex. 12 at 4 (emphasis added).)  If anything, this quote suggests there are also significant

16  non-religious motivations for SOCE.  Plaintiffs also take issue with the Senate committee's

17  observation that "*[o]thers*, particularly conservative Christian transformational ministries, use the

18  term conversion therapy to refer to the utilization of prayer, religious conversion . . . to change a

19  person's sexual orientation" (*id.* at 5 (emphasis added)).  The committee's observation

20  immediately follows a discussion of therapists who *do not use* religious techniques, which shows

21  that the committee *did not* view SOCE as solely a religious practice.  And, of course, SB 1172

22  does not affect the conduct of religious ministries that use prayer or similar techniques.  Plaintiffs

23  therefore have offered no evidence that SB 1172 was "enacted because of, not merely in spite of,"

24  any impact on religious activities.  *Lukumi*, 508 U.S. at 540 (citation and internal quotation marks

25  omitted).  This entirely differentiates the legislative history here from that in *Lukumi*, which was

26  permeated by open bias and hostility toward practitioners of Santeria, including statements by

---

27  [13] It also is an "unsettled question of whether courts may examine legislative history in
determining whether a challenged law violates the Free Exercise Clause's neutrality requirement"

28  at all.  *Stormans*, 586 F.3d at 1132.

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1    legislators and city officials that Santeria adherents "are in violation of everything this country

2    stands for," Santeria is "an abomination to the Lord," and "[t]his community will not tolerate

3    religious practices which are abhorrent to its citizens." *Id.* at 541-42.

4          This case is similar to *Stormans*, in which the Ninth Circuit held that a Washington State

5    Board of Pharmacy rule that required pharmacies to dispense all lawfully prescribed FDA-

6    approved medications was a neutral law of general applicability subject to rational basis review.

7    586 F.3d at 1113.  The Ninth Circuit held that the rule in question was neutral because its object

8    "was to ensure safe and timely patient access to lawful and lawfully prescribed medications." *Id.*

9    at 1131.  The Ninth Circuit explained that the fact the rule "may affect pharmacists who object to

10   [the contraceptive medication] Plan B for religious reasons does not undermine [its] neutrality."

11   *Id.*[14]  Similarly, SB 1172 was adopted to ensure that licensed therapists provide minors with safe,

12   competent care; that it may affect therapists who wish to engage in the proscribed harmful

13   practices for religious reasons does not undermine its neutrality.

14   **D.      SB 1172 Does Not Violate Plaintiffs' Free Speech Rights**

15        **1.      SB 1172 Is A Valid Regulation Of Professional, Licensed Mental Health
                 Practice**
16

17        Plaintiffs erroneously contend that SB 1172 seeks to ban a new "category of protected

18   speech."  In fact, SB 1172 is focused solely on preventing state-licensed therapists from engaging

19   in certain discredited and unsafe practices when providing therapy to minors.  It does not prohibit

20   therapists from expressing any viewpoint about sexual orientation or SOCE.  As such, SB 1172

21   falls well within the boundaries of the state's long recognized authority to impose reasonable

22   regulations on the conduct of state-licensed professionals, even when the regulations affect

23   professional speech.  "States have a compelling interest in the practice of professions within their

24   boundaries, and . . . as part of their power to protect the public health, safety, and other valid

25   ───────────────
     [14] Despite this holding from the Ninth Circuit, the district court held on remand (in a decision
26   now on appeal) that the rule is not neutral because "the Board allows pharmacies to refuse to
     stock drugs for countless secular reasons," yet "the Board will investigate if a religious objector
27   refuses to stock Plan B for a religious reason."  *Stormans Inc. v. Selecky*, 844 F. Supp. 2d 1172,
     1190-91 (W.D. Wash. 2012).  Even assuming the district court's remand decision can be
28   reconciled with the Ninth Circuit's decision, the remand decision rested on the finding that there
     were many secular exceptions to the pharmacy rule.  SB 1172 contains no such exceptions.

                                                          EQUALITY CALIFORNIA'S OPPOSITION TO
                              - 12 -                       MOTION FOR PRELIMINARY INJUNCTION
                                                          CASE NO. 2:12-CV-02484-WBS-KJN

1    interests they have broad power to establish standards for licensing practitioners and regulating

2    the practice of professions."  *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975); *see also*

3    *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) ("the State bears a special

4    responsibility for maintaining standards among members of the licensed professions").

5            States may enact reasonable professional regulations even when the profession at issue

6    entails—or even largely consists of—speech.  *See, e.g., Lowe v. SEC*, 472 U.S. 181, 228 (1985)

7    (White, J., concurring in result) ("The power of government to regulate the professions is not lost

8    whenever the practice of a profession entails speech."); *Coggeshall v. Mass. Bd. of Registration*

9    *of Psychologists*, 604 F.3d 658, 667 (1st Cir. 2010) ("Simply because speech occurs does not

10   exempt those who practice a profession from state regulation[.]"); *Accountant's Soc. of Virginia*

11   *v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988) ("Professional regulation is not invalid, nor is it

12   subject to first amendment strict scrutiny, merely because it restricts some kinds of speech.").  For

13   example, although the practice of law consists almost entirely of speech, states may impose

14   reasonable regulations, such as requirements of good moral character for entering the bar or

15   prohibitions on counseling a client to violate the law or commit perjury.  Such regulations are

16   constitutional so long as they "'have a rational connection with the applicant's fitness or capacity

17   to practice' the profession."  *Lowe,* 472 U.S. at 228 (quoting *Schware v. Board of Bar Examiners,*

18   353 U.S. 232, 239 (1957)); *see also Wilson v. State Bar*, 132 F.3d 1422, 1429-30 (11th Cir. 1998)

19   (rejecting First Amendment challenge to rules prohibiting disbarred attorneys from having client

20   contact because the rules "govern occupational conduct, and not a substantial amount of protected

21   speech"); *Lawline v. American Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992) (rejecting First

22   Amendment challenge to prohibition against the unauthorized practice of law because "[a]ny

23   abridgment of the right to free speech is merely the incidental effect of observing an otherwise

24   legitimate regulation.").[15]

---

25   [15] The Supreme Court has long recognized that regulations forbidding harmful conduct do not
     trigger heightened First Amendment scrutiny simply because the unlawful conduct may involve
26   speech:  "[I]t has never been deemed an abridgement of freedom of speech or press to make a
     course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried
27   out by means of language, either spoken, written, or printed."  *Giboney v. Empire Storage & Ice*
     *Co.*, 336 U.S. 490, 498-502 (1949); *see also Rumsfeld v. Forum for Academic and Inst. Rights,*
28   *Inc.*, 547 U.S. 47, 53, 66 (2006).  In a wide variety of contexts, courts have upheld laws

1    Similarly, when speech is "part of the practice of medicine, [it is] subject to *reasonable*

2    licensing and regulation by the State." *Planned Parenthood v. Casey*, 505 U.S. 833, 884 (1992)

3    (plurality opinion) (emphasis added).  Thus, when a licensed professional speaks in the course of

4    providing medical services to a patient under a state-issued license, the professional is subject to

5    "the State's *reasonable* regulation as the licensing authority." *Shultz v. Wells*, 2010 WL 1141452,

6    at *9-*11 (M.D. Ala. Mar. 3, 2010) (holding that First Amendment did not protect licensed

7    chiropractor who advised patient to stop taking medications prescribed by a physician) (emphasis

8    added), *adopted by* 2010 WL 1141444 (M.D. Ala. Mar. 22, 2010); *Shea v. Bd. of Medical*

9    *Examiners*, 81 Cal. App. 3d 564, 577 (1978) (rejecting First Amendment defense of licensed

10   doctor subjected to professional discipline for inappropriately administering verbal sex therapy,

11   and stating that "the First Amendment is not an umbrella shielding . . . verbal conduct" of medical

12   professionals"); *see also Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (recognizing the state's

13   "significant role . . . in regulating the medical profession").

14        The Ninth Circuit and other courts have held that the same reasonableness standard

15   applies to regulations of licensed therapists, even though therapy, like the practice of law, consists

16   largely of speech.  As the Ninth Circuit has held, "the key component of psychoanalysis is the

17   treatment of emotional suffering and depression, not speech . . . .  That psychoanalysts employ

18   speech to treat their clients does not entitle them, or their profession, to special First Amendment

19   protection." *NAAP*, 228 F.3d at 1054 (upholding California's licensing scheme against challenge

20   by psychoanalysts who claimed that regulations forbidding them from practicing psychoanalysis

21   for a fee without completing requirements to become licensed psychologists infringed their right

22

23   prohibiting harmful conduct against First Amendment challenge, even though the conduct
     constituting a violation may involve speech.  *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993)
24   (holding that a statute imposing enhanced penalties for certain bias-related crimes regulated
     "conduct" rather than "expression"); *Hishon v. King & Spaulding*, 467 U.S. 69, 78 (1984)
25   (upholding Title VII); *United States v. Alvarez*, 617 F.3d 1198, 1213 (9th Cir. 2010), *aff'd*, 132 S.
     Ct. 2537 (2012) ("[L]aws focused on criminal conduct—like perjury or tax or administrative
26   fraud or impersonating an officer—raise no constitutional concerns even though they can be
     violated by means of speech."); *Jarman v. City of Northlake*, 950 F. Supp. 1375, 1379 (N.D. Ill.
27   1997) ("verbal acts of sexual harassment are not protected speech"); *see also Hurley v. Irish-Am.*
     *Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557, 572 (1995) (anti-discrimination laws
28   "do not, as a general matter, violate the First or Fourteenth Amendments," because the purpose of
     such laws is to prevent the harm caused by discriminatory conduct, not to "target speech").

- 14 -

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1   to speak); *see also Coggeshall*, 604 F.3d at 667 (finding no "cognizable First Amendment injury"

2   based on a state's disciplinary action against a psychologist for exceeding the scope of her

3   competence).  Indeed, many valid regulations *expressly* control therapists' speech by forbidding

4   therapists to speak, or requiring them to speak, about particular subjects.  *See*, *e.g.*, Cal. Bus. &

5   Prof. Code § 4982(m) (designating as "unprofessional conduct" a licensed marriage and family

6   therapist's failure to maintain confidentiality of client information); §§ 4982(w), (x) (defining as

7   "unprofessional conduct" a marriage and family therapist's failure to comply with child, elder,

8   and dependent adult abuse-reporting requirements).

9        Accordingly, Plaintiffs are wrong to contend that simply because the professional conduct

10   proscribed by SB 1172 includes speech, SB 1172 must be analyzed as a "content-based"

11   restriction on protected speech.  Under the applicable legal framework, SB 1172 is a reasonable

12   regulation designed to ensure adherence to professional standards of competence and safety, and

13   only incidentally encompasses some professional speech insofar as it is the vehicle for engaging

14   in dangerous SOCE for minors.  In this case, the reasonableness and validity of SB 1172 are

15   particularly clear because SB 1172 reaches only speech that *constitutes* a purported mental health

16   treatment—*i.e.*, speech that is part of practices by mental health providers that seek to change a

17   minor's sexual orientation.  Such practices, although incidentally accomplished through speech,

18   directly implicate the state's compelling interest in ensuring the safety and effectiveness of mental

19   health care in California.

20        *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), upon which Plaintiffs heavily rely,

21   underscores this conclusion.  Unlike this case, *Conant* involved federal policy that directly

22   restrained the speech of doctors in order to further federal criminal law enforcement goals—not a

23   state law regulating the practice of medicine to enforce professional standards and protect

24   patients.  *Id.* at 634 (describing federal policy that threatened to revoke physicians' licenses to

25   prescribe controlled substances if they "recommend[ed]" the use of medical marijuana).  Indeed,

26   rather than requiring doctors to adhere to professional standards of competence, the challenged

27   policy actually *prevented* doctors from doing so by preventing them even from sharing

28   information about a treatment option supported by substantial scientific evidence, *id.* at 641

- 15 -

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1   (Kozinski, J., concurring), based on the possibility that doing so might lead the patient to violate

2   federal law by procuring medical marijuana.  *Id*. at 636-37.  For these reasons—because the

3   policy directly regulated speech, was intended to further federal criminal enforcement goals and

4   not to regulate professional conduct, and prevented doctors from adhering to professional medical

5   standards of full and frank communication between doctors and patients—the Ninth Circuit

6   properly subjected the policy to a heightened standard of review as a restriction on protected

7   speech.  *Id*. at 638 ("[T]he government's policy here 'alter[s] the traditional role' of medical

8   professionals by 'prohibit[ing] speech necessary to the proper functioning of those systems.'")

9   (citations omitted).  By contrast, SB 1172 does not bar therapists from discussing or providing

10   information about SOCE; rather, it simply prohibits them from engaging in SOCE on minors.

11          Crucially, none of the parties in *Conant* disputed that the government could prohibit

12   doctors from actually prescribing or dispensing marijuana.  *Id.*  Thus, the policy enjoined in

13   *Conant* did not regulate a medical treatment, but directly restricted protected speech by

14   preventing doctors from offering information and opinions about medical treatment.  By contrast,

15   SB 1172 is an exercise of the state's traditional power to ensure that licensed therapists provide

16   competent care and do not endanger patients, and regulates speech only when it *constitutes* part of

17   a discredited treatment that provides no benefits but puts patients at risk of serious harms.[16]

18   Under SB 1172, mental health professionals remain free to discuss and share information about

19   SOCE with their patients.  What they cannot do is to *perform* SOCE on minors as a licensed

20   California professional.

21          **2.     SB 1172 Does Not Restrict Speech Based On Its Viewpoint**

22          In order to support their claim that SB 1172 discriminates based on viewpoint, Plaintiffs

23   argue that SB 1172 prohibits efforts to change only a minor patient's same-sex attractions, not

24   different-sex attractions.  (Mot. at 13.)  This is not accurate, as the plain language of the statute

---

[16] Plaintiffs cite a sentence from *Conant* stating that "professional speech may be entitled to 'the
strongest protection our Constitution has to offer.'" 309 F.3d at 637 (quoting *Florida Bar v. Went
For It, Inc.*, 515 U.S. 618, 634 (1995)).  However, *Florida Bar* noted that professional speech by
attorneys may merit heightened protection when it concerns "public issues and matters of legal
representation."  515 U.S. at 634.  SB 1172 does not regulate speech or advocacy by professionals
on issues of public concern, but prohibits certain ineffective and unsafe practices.

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1  makes clear.  SB 1172 prohibits all SOCE on minor patients, defining SOCE as "*any* practices by

2  mental health providers that seek to change an individual's sexual orientation."  SB 1172 § 2

3  (emphasis added).  SB 1172 specifies that such efforts "include[]" "efforts to change behaviors or

4  gender expressions" and efforts to "eliminate or reduce sexual or romantic attractions or feelings

5  towards individuals of the same sex."  *Id.* § 2(b)(1).  It is well settled that the use of the word

6  "includes" in a statute indicates that what follows is a non-exhaustive list of examples and does

7  not limit the general language that precedes the examples.  *See In re Mark Anthony Const., Inc.,*

8  886 F.2d 1101, 1106 (9th Cir. 1989) ("In construing a statute, the use of a form of the word

9  "include" is significant, and generally thought to imply that terms listed immediately afterwards

10  are an inexhaustive list of examples, rather than a bounded set of applicable items.").  Read as a

11  whole, SB 1172 proscribes *all* SOCE, including efforts to change same-sex and different-sex

12  attractions.

13       Plaintiffs are wrong that *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729

14  (2011), precludes enactment of SB 1172.  In *Brown*, the U.S. Supreme Court found that that video

15  games, like movies, include inherently artistic and expressive elements and therefore qualify for

16  heightened protection under the First Amendment.  *Id*. at 2733; *see also Video Software Dealers*

17  *Ass'n v. Schwarzenegger*, 556 F.3d 950, 958 (9th Cir. 2009).  SB 1172, by contrast, is a

18  reasonable and viewpoint-neutral regulation of mental health care practices, not a restriction on

19  the sale and distribution of literature or other expressive media based on their content.  Moreover,

20  as Plaintiffs themselves note, the *Brown* Court found that the State had not shown a "longstanding

21  tradition" of barring minors from depictions of violence to support the state's program restricting

22  and labeling violent video games.  131 S. Ct. at 2736.  Here, the State has a longstanding and

23  critical prerogative to regulate professionals' provision of medical services to patients, including

24  prohibiting certain forms of conduct.  *See, e.g., Watson v. Maryland*, 218 U.S. 173, 176 (1910)

25  ("There is perhaps no profession more properly open to such regulation than that which embraces

26  the practitioners of medicine.").  To the extent speech is incidentally affected by SB 1172,

27  pursuant to the State's traditional role in regulating licensed professionals, SB 1172 does not run

28  afoul of *Brown*.

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1    For similar reasons, Plaintiffs' attempted reliance on *Rosenberger v. Rector & Visitors of*

2    *Univ. of Va.*, 515 U.S. 819 (1995), is also inapt.  The relevant framework for analyzing SB 1172's

3    validity is not forum analysis, but rather the framework long applied to laws that regulate

4    professional conduct.  The State licenses and regulates therapists to protect the public, not to

5    create an expressive forum for therapists.  *See NAAP*, 228 F.3d at 1054 (the state's power to

6    regulate and license professions is justified by public health concerns).  The State's licensing and

7    other regulations presume that the purpose of state-licensed therapy is the professional treatment

8    of patients, not the expression of therapists' personal views.  *See id.*[17]  That is why, unlike speech

9    in an expressive forum, professional speech that takes place as part of the delivery of professional

10   services is subject to reasonable regulation.  In addition, unlike the policy struck down in

11   *Rosenberger*, which expressly discriminated against religious student papers while funding all

12   others, SB 1172 does not regulate either conduct or speech based on "the specific motivating

13   ideology or the opinion or perspective of the speaker."  515 U.S. at 829.  Rather, SB 1172

14   prohibits SOCE on minors because it is ineffective and unsafe, regardless of the motivations,

15   opinions, or perspectives of either the therapist or the patient.

16   Plaintiffs' attempted reliance on *NAAP* to bolster their claim of viewpoint discrimination

17   is also misplaced.  *NAAP* stands for the proposition that even if speech is employed in providing

18   psychoanalysis, that fact does not "entitle [psychologists], or their profession, to special First

19   Amendment protection."  *NAAP,* 228 F.3d at 1054.  *NAAP* in no way exempts psychologists from

20   the rule that state regulation of licensed professionals and their treatment of their patients is

---

[17] Indeed, ethical guidelines caution therapists to refrain from imposing their personal views on patients in the course of treatment.  *See*, *e.g.*, American Psychological Ass'n, Ethical Principles of Psychologists and Code of Conduct, Principle E (2010) ("Psychologists are aware of and respect cultural, individual, and role differences, including those based on … gender identity … [and] sexual orientation . . . . Psychologists try to eliminate the effect on their work of biases based on those factors . . . .") (available at http://www.apa.org/ethics/code/principles.pdf); American Counseling Ass'n, ACA Code of Ethics, § A.4.b (2005) ("Counselors are aware of their own values, attitudes, beliefs, and behaviors and avoid imposing values that are inconsistent with counseling goals.") (available at http://www.counseling.org/ethics/feedback/aca2005code.pdf); *see also Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011) (affirming denial of preliminary injunction to graduate student enrolled in school counseling program who was required to complete remediation plan for violating ACA Code of Ethics after stating that "she intended [in counseling sessions] to attempt to convert students from being homosexual to heterosexual" and would tell students under her care that "it was not okay to be gay").

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1   permissible so long as it is "reasonable," regardless of whether that treatment involves speech.

2   Plaintiffs rely on the suggestion in dicta by the *NAAP* court that California's licensing scheme

3   could be subject to strict scrutiny if it was not content and viewpoint neutral.  (Mot. at 15, citing

4   *NAAP*, 228 F.3d at 1055.)  But SB 1172 is no less content and viewpoint neutral than the

5   regulation in *NAAP*, which, like SB 1172, prohibited a certain practice by mental health providers

6   in certain circumstances, regardless of the particular viewpoints or motivations of the therapists

7   who wished to engage in this practice.[18]

8       In any event, even if SB 1172 could be characterized as making content-based distinctions

9   merely because it addresses the topic of sexual orientation or SOCE, regulation of licensed mental

10  health providers would be impossible without the ability to inquire into the content of treatment.

11  Without this ability, for example, the State would be powerless to discipline professionals who

12  engage in inappropriate verbal sex therapy with patients.  *See Shea*, 81 Cal. App. 3d at 577.

13  When the government is providing a function that requires making distinctions based on the

14  content of speech, the Supreme Court has "repeatedly rejected a heightened standard" of review.

15  *Association of Christian Schools Int'l v. Stearns*, 679 F. Supp. 2d 1083, 1095 (C.D. Cal. 2008),

16  *aff'd,* 362 F. App'x 640 (9th Cir. 2010).  For example, the Supreme Court has held that "it is

17  entirely reasonable for public libraries to . . . exclude certain categories of content," *United States

18  v. Am. Library Ass'n*, 539 U.S. 194, 208 (2003); for the government to "make esthetic judgments"

19  in providing arts funding even though they are "inherently content-based," *Nat'l Endowment for

20  the Arts v. Finley*, 524 U.S. 569, 586 (1998); and for public television stations to make content-

21  based judgments in selecting programming, *Ark. Educ. Television Comm'n v. Forbe*s, 523 U.S.

22  666, 673-75 (1998).  In all of these cases, the Supreme Court has held that "regulations are

23  constitutional if they are reasonably related to the government's goal of providing the public

24  service and are not the product of government animus." *Association of Christian Schools Int'l*,

25  _____

26  [18] Plaintiffs' assertion that the law discriminates on the basis of viewpoint because it disfavors the view of therapists who believe in SOCE's effectiveness is facile.  It is akin to asserting that the licensing requirements in the *NAAP* case discriminate on the basis of viewpoint because they

27  disfavored the view of psychoanalysts who believed they should be permitted to practice without complying with the challenged licensing requirements, an assertion the Ninth Circuit squarely

28  rejected.  *See NAAP*, 228 F.3d at 1054.

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

679 F. Supp. 2d at 1095 (applying this standard to public university admission policies).  Here, SB 1172's prohibition of SOCE is reasonably related to the State's goal of ensuring that licensed medical professionals do not engage in dangerous practices, and there is no evidence that the law is a product of government animus.

### 3.     Even If SB 1172 Has Some Incidental Impact On Protected Speech, It Easily Satisfies The *O'Brien* Standard

On its face, SB 1172 restricts "practices"; it is not targeted at expressive speech and limits professional speech only insofar as it constitutes discredited "treatments" that purport to change sexual orientation.  Notably, even if Plaintiffs could show that SB 1172 somehow has some impact on protected expression, the law easily would satisfy the standard applied to regulations of conduct that incidentally affect some protected expression.  The Supreme Court "has long recognized the need to differentiate between legislation that targets expression and legislation that targets conduct for legitimate non-speech-related reasons but imposes an incidental burden on expression."  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 604 (2001) (Stevens, J., concurring in part).  The latter type of law is subject to the test in *United States v. O'Brien*, 391 U.S. 367 (1968):  "a government regulation is sufficiently justified if it . . . furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  *Id*. at 377.

SB 1172 easily meets this test.  First, as the Legislature recognized when it enacted the new law, California has not only a substantial but "a compelling interest in protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and in protecting its minors against exposure to serious harms caused by sexual orientation change efforts."  *See* SB 1172 § 1(n).  Second, California's interest in prohibiting SOCE lies in alleviating the harms caused by SOCE to minors and their families—not in suppressing free expression.  The statute prohibits SOCE for minors because those efforts are ineffective and unsafe—not because the state wishes to silence those who hold particular views about sexual orientation or SOCE.  The prohibition leaves therapists free to express any views on these

- 20 -

1    matters.  Under SB 1172, the only thing they may not do is engage in practices that seek to

2    change a minor's sexual orientation while engaged in the provision of therapy under the auspices

3    of a state license.  Therefore, any incidental impact on protected expression (which Plaintiffs have

4    not shown) is minimal and no greater than necessary to achieve the state's goal.[19]

5              **4.        SB 1172 Survives Any Level Of Scrutiny**

6              Even if Plaintiffs could establish that SB 1172 significantly restricts constitutionally

7    protected speech—which they cannot—SB 1172 would survive even strict scrutiny, because the

8    law "is justified by a compelling government interest and is narrowly drawn to serve that

9    interest."  *See Brown*, 131 S. Ct. at 2738.

10             **a.        SB 1172 Furthers A Compelling Government Interest**

11             Plaintiffs *concede* that "the state certainly has an interest in protecting children."  (Mot. at

12   22.)  *See Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989); *see also* SB 1172 §

13   1(o).  But Plaintiffs argue that there is no "compelling scientific evidence" supporting the ban and

14   that the harms the Legislature identified, which Plaintiffs dismiss as "generic harms [such] as

15   guilt, relationship problems, and even loss of faith," are insufficient to justify a ban on SOCE for

16   minors.  Plaintiffs' argument blatantly ignores the significant harms that the Legislature identified

17   and sought to prevent.

18             The Legislature relied on the conclusions of every leading mental health association in the

19   United States that SOCE provides no documented benefits and presents a risk of serious harm.

20   *See* SB 1172 § 1 (citing health organizations' reports or statements warning against SOCE).

21   These organizations have strongly cautioned professionals and patients against the use of SOCE

22   because it does not work, because it conflicts with the professional requirement to provide

23   competent and affirmative care, and because of the risk of serious harms, including harms that

24   follow from the impact of SOCE on youth, who experience it as a type of family rejection.  The

---

25   [19] Plaintiffs' contention that SB 1172 violates minors' right to "receive" information has no merit.
     (*See* Mot. at 22-25.)  As explained above, SB 1172 does not limit a patient's right to "receive"
26   information" about SOCE or any other topic.  In addition, the speech rights of the patient and
     therapist are co-extensive and analyzed according to the same principles; patient "listeners" have
27   no greater rights than therapist "speakers."  *See NAAP*, 228 F.3d at 1054 n.7; *see also Coggeshall*,
     604 F.3d at 667 ("A patient . . . does not hold a First Amendment trump card that may be played
28   to rescue a licensed practitioner" from regulation of his professional speech.).

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1   Legislature also relied on peer-reviewed research finding that adolescents who experience high

2   levels of family rejection of their sexual orientation were 8.4 times more likely to report having

3   attempted suicide, 5.9 times more likely to report high levels of depression, 3.4 times more likely

4   to use illegal drugs, and 3.4 times more likely to report having engaged in unprotected sexual

5   intercourse.  *See* SB 1172 § 1(m).

6          The State has amplified these findings by submitting the expert declarations of Drs. Lee

7   Beckstead and Gregory Herek; Equality California lends further support with the declarations of

8   Drs. Haldeman and Ryan.  Collectively, these findings and declarations establish conclusively

9   and unanimously that (1) there is no valid evidence that SOCE can help a person change his

10  sexual orientation; (2) there is significant and valid evidence that SOCE presents significant risk

11  of serious harm; and (3) these risks are magnified for LGBT minors, for whom family rejection

12  increases the risk of suicide by as much as eight times.  (*See* Declaration of A. Lee Beckstead ¶¶

13  11-28, 34-37; Declaration of Gregory M. Herek ¶¶ 27-45; Haldeman Decl. ¶¶ 7-19; Ryan Decl.

14  ¶¶ 12-21.)[20]

15         The consensus of mainstream mental health organizations and the cumulative and widely

16  accepted evidence of harm here entirely differentiate this case from *Brown v. Entertainment*

17  *Merchants*, on which Plaintiffs rely.  In *Brown*, the studies cited in support of the violent video

18  game law had "been rejected by every court to consider them" and at most showed "minuscule

19  real-world effects, such as children's feeling more aggressive or making louder noises in the few

20  minutes after playing a violent game."  131 S. Ct. at 2739.  The harms reported by survivors of

21  SOCE, by contrast, are long-term, severe, and widely accepted within the mental health

22  professions based on more than 40 years of research, investigation, and clinical reports, and as

23  noted above, the potential harms are particularly great for youth.  *See, e.g.,* APA Report at 50-51.

24  As explained above, SB 1172 is a reasonable regulation of professional conduct and should be

---

25  [20] Plaintiffs also dispute the state's finding of a compelling interest because, they say, it is
    "premised on the hotly disputed notion of sexual orientation immutability."  (Mot. at 22.)  But
26  half a century of study has failed to establish that sexual orientation can be changed through any
    form of conscious effort, whether attempted through overtly abusive techniques such as aversion
27  therapy or through subtler but no less damaging methods such as training patients to resist same-
    sex desire.

28

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1   assessed under rational basis review; nonetheless, in light of the extraordinary degree of

2   professional consensus regarding the ineffectiveness and dangers of SOCE, especially for minors,

3   it is plain that SB 1172 would be valid under any standard of review.

4                    **b.    SB 1172 Is Narrowly Drawn**

5            The restriction imposed by SB 1172 is narrowly drawn to protect youth from these harms.

6   Plaintiffs themselves recognize that the law does *not* bar patients from learning about SOCE on

7   their own through the internet, books, religious counselors, or other sources.  (Mot. at 23.)  This

8   only emphasizes how limited SB 1172 is—it bans only the provision of SOCE treatment to

9   minors by licensed professionals in a professional setting, and does not otherwise affect

10  therapists' or others' ability to express opinions about SOCE.[21]

11           Plaintiffs also argue that SB 1172 should provide for exceptions where minors give

12  consent.  An informed consent requirement is not sufficient, however, where a health care

13  practice is not only ineffective but purports to "treat" something that is not an illness, and where

14  the purported "treatment" poses grave risks to health, including severe depression and even

15  suicide.  (Haldeman Decl. ¶ 16.)[22]

16  **E.    SB 1172 Is Not Vague**

17           Where a statute does not significantly implicate constitutionally protected expression—

18  which, as explained above, SB 1172 does not—a facial challenge such as Plaintiffs assert here

19  can succeed "only if the enactment is impermissibly vague in all of its applications."  *Village of*

20

21  [21] Plaintiffs argue that SB 1172's purported vagueness means that the statute is not narrowly
    tailored.  As demonstrated below, however, *see infra* at Section E, SB 1172 is not vague.

22  [22] Plaintiffs also note that there is no exception for SOCE to be provided "for the health and
    safety of the minor."  (Mot. at 23.)  Such an exception is not warranted for a discredited practice

23  that provides no documented benefits, is premised on a scientifically discredited view that being
    gay is a mental illness that can be "cured," often includes techniques (such as blaming minors for

24  their inability to change their sexual orientation or encouraging parents to punish children for
    being gender nonconforming) that in themselves constitute serious emotional abuse, and puts

25  minors at risk of significant harms including depression, suicide, and suicide attempts.  As the
    APA Report explained, it is always more beneficial for the patient to be provided with competent,

26  affirmative care:  "[T]he factors that are identified as benefits are not unique to SOCE and can be
    provided within an affirmative and multiculturally competent framework that can mitigate the

27  harmful aspects of SOCE by addressing sexual stigma while understanding the importance of
    religion and social needs."  APA Report at 53.

28

- 23 -

1     *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982).  Moreover,

2     "perfect clarity" is not required even when a law regulates expression.  *Ward v. Rock Against*

3     *Racism*, 491 U.S. 781, 794 (1989).  "[W]e can never expect mathematical certainty from our

4     language."  *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972); *see also California Teachers*

5     *Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001).

6        Plaintiffs' own affirmative admissions that they engage in conduct SB 1172 prohibits

7     defeat their vagueness challenge.  A plaintiff who engages in "conduct that is clearly proscribed"

8     by a law cannot challenge the law on vagueness grounds.  *Holder v. Humanitarian Law Project*,

9     130 S. Ct. 2705, 2719 (2010); *see also id.* ("even to the extent a heightened vagueness standard

10    applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness

11    claim").  Plaintiffs themselves use the term "sexual orientation change efforts" in their

12    declarations to describe the services they either offer patients or have sought.  (*See, e.g.*,

13    Declaration of Aaron Bitzer ("Bitzer Decl.") ¶ 1 ("I have personally been involved in sexual

14    orientation change efforts commonly called 'SOCE.'  This declaration is given to describe my

15    personal journey regarding SOCE."); Declaration of Anthony Duk ("Duk Decl.") ¶ 6 (describing

16    therapy he provides as "a 'sexual orientation change effort' under the statute"); Welch Decl. ¶ 17

17    ("[C]ompliance with SB 1172 will jeopardize my employment at the Church.").)  "If a reasonable

18    person of ordinary intelligence would understand that his or her conduct is prohibited by the law

19    in question," then the statute is not unconstitutionally vague.  *United States v. Fitzgerald*, 882

20    F.2d 397, 398 (9th Cir. 1989).  Here, Plaintiffs' declarations show that they understand what

21    SOCE is and realize SB 1172 prohibits activity they conduct (or, in the case of Bitzer, wish to

22    conduct).  This defeats their vagueness challenge at the threshold.

23       **1.**     **SB 1172 Both Clearly Defines "Sexual Orientation Change Efforts" In The**
              **Text Of The Statute And Also Draws On The Clear Understanding Of That**

24               **Term Within The Relevant Mental Health Professions**

25        In any event, Plaintiffs are wrong to claim that the term "sexual orientation change

26    efforts" is vague.  SB 1172 gives a simple, clear definition of "[s]exual orientation change

27    efforts":  "any practices by mental health providers that seek to change an individual's sexual

28    orientation."  SB 1172 § 2.  The statute then elaborates that "[t]his includes efforts to change

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1    behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or

2    feelings toward individuals of the same sex." *Id.* It further provides that "'[s]exual orientation

3    change efforts' does *not* include psychotherapies that: (A) provide acceptance, support, and

4    understanding of clients or the facilitation of clients' coping, social support, and identity

5    exploration and development, including sexual orientation-neutral interventions to prevent or

6    address unlawful conduct or unsafe sexual practices; and (B) do not seek to change sexual

7    orientation." *Id.* (emphasis added). The statute prohibits "sexual orientation change efforts"

8    only when engaged in by a mental health provider "with a patient under 18 years of age." *Id.*

9    Further, SB 1172 provides that violation of its prohibition will "be considered unprofessional

10   conduct and shall subject a mental health provider to discipline by the licensing entity for that

11   mental health provider." *Id.*

12          By limiting its application to sexual orientation change efforts "with *a patient* under 18

13   years of age" and by giving enforcement to licensing entities, SB 1172 makes clear that its scope

14   is limited to conduct undertaken as part of the therapist-patient relationship, within the

15   jurisdiction of the state licensing entities that regulate the specific categories of mental health

16   providers set forth in the statute. Those entities regulate the provision of mental health services in

17   California, and their jurisdiction typically is limited to instances in which the professional offers

18   services for a fee. *See, e.g.*, Cal. Bus. & Prof. Code § 2903 ("No person may engage in the

19   practice of psychology, or represent himself or herself to be a psychologist, without a license

20   granted under this chapter . . . . The practice of psychology is defined as rendering or offering to

21   render *for a fee* . . . any psychological service involving the application of psychological

22   principles, methods, and procedures . . . .") (emphasis added).[23] Read as a whole and in

_____

23   [23] *See also* Cal. Bus. & Prof. Code § 4980 (requiring a license to practice marriage and family
     therapy in California); *id.* § 4980.02 (defining the practice of marriage and family therapy); *id.*
24   § 4980.10 ("A person engages in the practice of marriage and family therapy when he or she
     performs or offers to perform or holds himself or herself out as able to perform this service *for*
25   *remuneration* in any form, including donations.") (emphasis added); *id.* § 4989.50 (requiring a
     license to practice educational psychology); *id.* § 4989.14 (defining the practice of educational
26   psychology); *id.* § 4989.13 ("A person engages in the practice of educational psychology when he
     or she performs or offers to perform or holds himself or herself out as able to perform this service
27   *for remuneration* in any form, including donations.) (emphasis added); *id.* § 4996 (requiring a
     license to practice clinical social work); *id.* § 4996.9 (defining the practice of clinical social
28   work); *id.* § 4991.1 ("A person engages in the practice of clinical social work when he or she

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

conjunction with the statutory licensing scheme for mental health professionals, SB 1172 thus

makes clear that what it prohibits is efforts by a mental health provider to change a minor

patient's sexual orientation, in the context of providing mental health services for which a license

is required.[24]

  While SB 1172's terms are clear enough for any "reasonable person of ordinary

intelligence" to understand, *Fitzgerald*, 882 F.2d at 398, to survive Plaintiffs' vagueness

challenge, SB 1172 merely needs to be understandable to the mental health professionals that it

regulates.  As the Ninth Circuit has explained:

> [I]f [a] statutory prohibition involves conduct of a select group of persons having
> specialized knowledge, and the challenged phraseology is indigenous to the idiom
> of that class, the [vagueness] standard is lowered and a court may uphold a statute
> which uses words or phrases having a technical or other special meaning, well
> enough known to enable those within its reach to correctly apply them.

*United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993) (citations and internal quotation

marks omitted); *United States v. Elias*, 269 F.3d 1003, 1014 (9th Cir. 2001) (same).  That all the

leading, mainstream mental health organizations have issued reports or statements condemning

SOCE—which are cited in the statute's findings—shows that the professional community

understands what practices are banned.

---

performs or offers to perform or holds himself or herself out as able to perform this service *for
remuneration* in any form, including donations.") (emphasis added); *id.* § 4999.30 (requiring a
license for the practice of professional clinical counseling); *id.* § 4999.20 (defining the practice of
professional clinical counseling); *id.* § 4999.13 ("A person engages in the practice of professional
clinical counseling when he or she performs or offers to perform or holds himself or herself out as
able to perform this service *for remuneration* in any form, including donations.") (emphasis
added).  The practice of medicine requires a license even if not for remuneration, but the
definition of practicing medicine focuses on treatment of  "another person" by one who "[h]olds
out, states, indicates, advertises, or implies to a client or prospective client that he or she is a
physician, a surgeon, or a physician and surgeon."  *Id.* § 2053.5; *see also id.* § 2052 ("any person
who practices or attempts to practice, or who advertises or holds himself or herself out as
practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses,
treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement,
disorder, injury, or other physical or mental condition *of any person*") (emphasis added).
[24] Because SB 1172 explains both what "sexual orientation change efforts" means and in what
context it is prohibited, this case is easily distinguishable from *Conant*, where the court found
fault in the government's inability "to articulate exactly what speech is proscribed . . . ."  309 F.3d
at 639.

1

##### **2.     SB 1172 Provides Ready Answers To Plaintiffs' Hypotheticals**

2        Plaintiffs purport to be confused about whether SB 1172 would prohibit several

3   hypothetical examples of mental health provider conduct.  But SB 1172 provides answers to all of

4   Plaintiffs' hypotheticals.  It is thus nothing like the statute in *Coates v. Cincinnati*, 402 U.S. 611

5   (1971), upon which Plaintiffs rely, which made it a crime to assemble in a group on sidewalks

6   and act "in a manner annoying to persons passing by" but provided no guidance as to what

7   constituted "annoying" conduct.  *Id.* at 611 n.1, 614.

8        Plaintiffs question whether SB 1172 would allow them to "[p]rovide therapy or . . . a

9   prescription to dampen sexual libido for the purpose of fighting a pornography addiction."  (Mot.

10  at 18.)  Putting aside other reasons why such treatment might not be appropriate, as long as it was

11  aimed only at diminishing a pornography addiction and not changing the patient's sexual

12  orientation, nothing in SB 1172 would prohibit it.  The same would be true of recommending an

13  internet filter to block all pornography.  (*See id.*)

14       The statute also provides a ready answer for Plaintiffs' apparent confusion about whether

15  they are permitted to "assist patients who are already seeking this change."  (*Id.*)  The answer is

16  no.  As noted above, true respect for patient autonomy does not mean accepting any goal the

17  client articulates at the outset, but instead helping patients understand context, meaning,

18  prejudice, and stigma that may underlie patients' desire to change their sexual orientation.

19  (Haldeman Decl. ¶¶ 20-26.)  SB 1172 permits therapists to help patients explore their values,

20  feelings, and beliefs about sexuality, provided that the therapy does involve a predetermined goal

21  of changing sexual orientation.

22       Plaintiffs' questions about a hypothetical bisexual patient are also answered by the plain

23  language of SB 1172.  SB 1172 prohibits efforts that "seek to change a [minor patient's] sexual

24  orientation," whatever that sexual orientation may be.  Bisexuality is a sexual orientation, so a

25  therapist could not engage in efforts to change the fact that a patient experienced both same-sex

26  and different-sex attractions.  But a therapist clearly could counsel the patient concerning both

27  same-sex and different-sex attractions and relationships without running afoul of the statute.[25]

28  _____
[25] Plaintiffs also ask whether SB 1172 prohibits "aiding" a patient in "embracing his masculinity."

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN

1  Even if, however, Plaintiffs might be able to conjure a few hypotheticals that pose

2  interesting questions about SB 1172's outer boundaries, these outlying cases would not make the

3  statute facially invalid.  Even a statute that "clearly implicates free speech rights" will survive a

4  facial challenge so long as "it is clear what the statute proscribes in the vast majority of its

5  intended applications."  *Humanitarian Law Project v. U.S. Treasury Dept.*, 578 F.3d 1133,

6  1146 (9th Cir. 2009) (citations and internal quotation marks omitted).

7  **F.      SB 1172 Is Not Overbroad**

8  Plaintiffs have not shown that SB 1172 is overbroad.  The Supreme Court has recognized

9  that invalidating a law under the overbreadth doctrine imposes "substantial social costs," so has

10  insisted the overbreadth be "substantial, not only in an absolute sense, but also relative to the

11  scope of the law's plainly legitimate applications."  *Virginia v. Hicks*, 539 U.S. 113, 119-20

12  (2003) (citation and internal quotation marks omitted); *see also Osborne v. Ohio*, 495 U.S. 103,

13  112 n.9 (1990) (finding that while it is true that "one might imagine circumstances in which the

14  statute, by its terms, criminalizes constitutionally protected conduct," a ban on child pornography

15  was not overbroad given the plainly legitimate reach of the statute).

16  As demonstrated above, SB 1172 does not punish protected speech.  California has a

17  broadly recognized, compelling interest in "regulating mental health" practice.  *NAAP*, 228 F.3d

18  at 1054.  The statute operates only within this realm, *see supra* Section A; its full sweep is a

19  "plainly legitimate" one.

20  Plaintiffs point to the *large number* of licensed professionals covered by the statute.  But

21  the mere *number* of professionals affected by the statute is immaterial to an "overbreadth"

22  analysis, so long as all the affected professionals are capable of causing the harm that the statute

23  aims to prevent.  This entirely distinguishes SB 1172 from the regulations of "street performers"

24  considered in *Berger v. Seattle*, 569 F.3d 1029 (9th Cir. 2009).  In *Berger*, the Ninth Circuit held

---

26  (Mot. at 17.)  Neither Plaintiffs' brief nor the portions of Plaintiffs' declarations cited therein explain what practices would be involved in such "aid," so this hypothetical is so vague as to preclude a response.  To the extent "embracing masculinity" entails attempting to change the gender expression of a patient, however, the statute expressly precludes it.  Moreover, Plaintiff Duk is plainly wrong to suggest that SB 1172 bars even "start[ing] any discussion . . . addressing his sexual abuse, or how to overcome the abuse."  (Duk Decl. ¶ 7.)

- 28 -

1   that the regulations "applie[d] to street performers who pose no realistic coordination or traffic

2   flow concerns . . . . An individual strumming on a guitar at a family picnic surely poses no

3   problem to the safety and convenience of fellow park-goers.  Yet, that person, like many others,

4   would need to obtain a permit."  *Id.* at 1046.  In contrast, here, any licensed mental health

5   professional engaging in SOCE on a minor patient would be engaged in precisely the practice that

6   the Legislature has found is ineffective and dangerous.

7        Plaintiffs also contend that SB 1172 is overbroad because it offers no religious exceptions.

8   But SB 1172's prohibition does not extend to religious counselors or ministers, except if they

9   offer therapy pursuant a state-issued license.  Under well-established law, church officials

10  engaged in purely religious counseling do not need a license, and may offer whatever religious

11  counseling about sexuality they choose.  *See supra* Section C.

12       Plaintiffs' final argument that "SB 1172 extends a flat ban on parents' ability to parent

13  their children in a manner of their choosing," (Mot. at 20), completely ignores what the statute

14  actually does, as explained above in section B.

15  **G.    Plaintiffs Have Failed To Demonstrate The Elements Required For A Preliminary Injunction**

16
17       As demonstrated above, Plaintiffs are unlikely to succeed on the merits of their claims,

    and cannot come close to showing the "strong likelihood of success on the merits" required to
18
    obtain a preliminary injunction.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).
19
    Plaintiffs have not established any of the other required factors for a preliminary injunction,
20
    either.  *Id.* at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to
21
    succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary
22
    relief, that the balance of equities tips in his favor, and that an injunction is in the public
23
    interest.").  First, the only purported irreparable harm Plaintiffs assert is allegedly having their
24
    constitutional rights violated.  But, as explained above, SB 1172 does not violate Plaintiffs' or
25
    anyone else's constitutional rights.
26
         Second, the balance of equities and the interests of the public both weigh heavily against a
27
    preliminary injunction.  Allowing mental health professionals to continue providing SOCE to
28

- 29 -

1    minors subjects minors to the risk of serious and irreparable harms, including severe

2    depression and suicide, as the Legislature identified in passing SB 1172.  SB 1172 §§ 1(b)-(d);

3    *see also* APA Report at 41-43; Haldeman Decl. ¶¶ 10-15; Ryan Decl. ¶¶ 15-17.  Additionally,

4    "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of

5    its people, it suffers a form of irreparable injury."  *Maryland v. King*, --- S. Ct. --- , 2012 WL

6    3064878, at *2 (July 30, 2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434

7    U.S. 1345, 1351 (1977)).  On the other hand, as Plaintiffs themselves have admitted, minors who

8    wish to explore or learn about SOCE have alternative routes for doing so, even when SB 1172 is

9    in effect—they may access resources through the internet or books, seek religious counseling, or

10   find SOCE providers in other states.  (Mot. at 23; *see also* Bitzer Decl. ¶¶ 11-15 (describing

11   venues other than state-licensed therapy in which he receives counseling and support for his

12   desire not to identify as gay).)  In addition, Plaintiffs may provide counseling as religious

13   counselors, and even when performing services for a fee under the auspices of a state license,

14   they remain free to express their viewpoints about SOCE, including sharing information and their

15   opinions about SOCE with minor patients, so long as they do not undertake to perform SOCE on

16   minors.  Plaintiffs have failed to make the showing necessary to obtain a preliminary injunction,

17   so their motion must be denied.

18   **III.    <u>CONCLUSION</u>**

19          For all the foregoing reasons, the Court should deny the motion for preliminary injunction.

20

21   DATED: November 19, 2012                          Munger, Tolles & Olson LLP
                                                       DAVID C. DINIELLI
22                                                     MICHELLE FRIEDLAND
                                                       LIKA C. MIYAKE
23                                                     BRAM ALDEN

24
                                                       By:___*/s/ David C. Dinielli*_____
25                                                     Attorneys for EQUALITY CALIFORNIA
                                                       Amicus Curiae and Proposed Intervenor
26

27

28

EQUALITY CALIFORNIA'S OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:12-CV-02484-WBS-KJN