Kevin T. Snider, State Bar No. 170988
Michael J. Peffer, State Bar. No. 192265
Matthew B. McReynolds, State Bar No. 234797
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, CA 95827
Tel. (916) 857-6900
Fax (916) 857-6902
Email: ksnider@pji.org
       mpeffer@pji.org
       mmcreynolds@pji.org

*Attorneys for All Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

| | |
|---|---|
| DONALD WELCH, ET AL, | ) Case No.:   12-cv-02484 |
| | ) |
| Plaintiffs, | ) **PLAINTIFF'S REPLY IN SUPPORT OF** |
| | ) **MOTION FOR PRELIMINARY** |
| v. | ) **INJUNCTION** |
| | ) |
| EDMUND G. BROWN, JR., Governor of the | ) Date:        Dec. 3, 2012 |
| State of California, ET AL, | ) Time:        2:00 p.m. |
| | ) Dept:        5, 14th Floor |
| Defendants. | ) Judge:       The Honorable William B. Shubb |
| | ) Trial Date:   None set |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

I.   Fundamental Rights Demand Heightened Scrutiny, and These Plaintiffs Offer
     An Appropriate Avenue to Weigh Those Rights ................................................... 1

     a.  The Standard of Review Is Strict Scrutiny .................................................. 2

II.  Foremost Among the Fundamental Rights at Stake in this Motion Is Religious
     Freedom. ............................................................................................................... 3

     a.  There is no exception for clergy who are mental health professionals ........ 3

     b.  SB 1172 invites excessive entanglement ..................................................... 6

     c.  SB 1172 unlawfully burdens the free exercise of religion ........................... 8

III. The Fundamental Right to Privacy Further Demands Protection ....................... 10

     a.  Plaintiffs can raise the concomitant rights of persons not before the Court ...... 10

     b.  SB 1172 violates the privacy rights of minors .......................................... 10

     c.  Parents have a right to privacy regarding decisions about their children ......... 12

     d.  The medical treatment cases are distinguishable ...................................... 13

IV.  Freedom of Speech Does Not Fall Prey to Any and All Forms of Regulation ......... 14

V.   Vagueness and Overbreadth Are Not Defeated By a "You Know it When
     You See it" Standard ......................................................................................... 19

VI.  The State's Asserted Interests Simply Do Not Trump Religious Freedom,
     Privacy, and Speech .......................................................................................... 22

VII. The Injury to Fundamental Rights Occasioned by SB 1172 is Imminent,
     Irreparable, and Inescapable ............................................................................. 24

CONCLUSION ................................................................................................................ 25

---

## TABLE OF AUTHORITIES

CASES

*Accountants Soc'y of Va. v. Bowman*, 860 F.2d 602 (4th Cir. 1988) ...........................................19

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977)..........................................................10, 11

*Carnohan v. United States*, 616 F.2d 1120 (9th Cir. 1980) ..........................................................14

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ...........................................................16, 17, 20

*Cnty. of Santa Cruz v. Ashcroft*, 279 F. Supp. 2d 1192 (N.D. Cal. 2003) ....................................13

*Craig v. Boren*, 429 U.S. 190 (1976) ...........................................................................................10

*Daly v. Sprague*, 742 F.2d 896 (5th Cir.1984)..............................................................................18

*Duncan v. United States*, 590 F. Supp. 39 (W.D. Okla. 1984) .....................................................13

*Eisenstadt v. Baird*, 405 US 438 (1972) .......................................................................................11

*Elrod v. Burns*, 427 U.S. 347 (1976) ...........................................................................................25

*Employment Div. v. Smith*, 494 U.S. 872 (1990) ...........................................................................8

*Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005)........................................................9

*Garlic v. FDA*, 783 F. Supp. 4 (D.D.C. 1992) ..............................................................................13

*Griswold v. Connecticut*, 381 U.S. 479 (1965)..............................................................................10

*Hosanna-Tabor Evangelical Lutheran Church v. EEOC*,

     132 S. Ct. 694 (2012).............................................................................................................8

*Jacobellis v. Ohio*, 378 U.S. 184 (1964).......................................................................................20

*Lawrence v. Texas*, 539 U.S. 558 (2003).......................................................................................11

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ......................................................................................6

*Nally v. Grace Cmty. Church*, 47 Cal. 3d 278 (1988) .................................................................5, 6

*Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*,

     228 F.3d 1043 (9th Cir. 2000) .........................................................................................1, 16

*Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447 (1978)..................................................................19

*Okla. Chapter of the Amer. Acad. of Pediatrics v. Fogarty*,

    366 F. Supp. 2d 1050 (N.D. Okla. 2005) ........................................................13, 14

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) ..................................................13

*Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52 (1976) .......................................11

*Roe v. Wade*, 410 U.S. 113 (1973) .....................................................................2

*Rutherford v. United States*, 616 F.2d 455 (10th Cir. 1980) .....................................13

*San Jose Christian Coll. v. City of Morgan Hill*,

    360 F.3d 1024 (9th Cir. 2004) ........................................................16

*Shea v. Bd. of Med. Exam'rs*, 81 Cal. App. 3d 564 (Cal. Ct. App. 1978) ....................................18

*Sullivan v. Little Hunting Park*, 396 U.S. 229 (1969) ..................................................10

*United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002) (en banc) ............................5

*Whalen v. Roe*, 429 U.S. 589 (1977) ....................................................................11

*Williams v. Taylor*, 529 U.S. 420 (2000) ........................................................16


STATUTES

Cal. Bus. & Prof. Code § 2063 ...........................................................................4

Cal. Bus. & Prof. Code § 4980.01 ......................................................................4

Cal. Bus. & Prof. Code § 4996.13 ......................................................................4

Welf. & Inst. Code §§ 300 *et seq* ......................................................................23

Welf. & Inst. Code §§ 11365 *et seq* ....................................................................23


JOURNALS

Samuel Ericsson, *Clergyman Malpractice: Ramifications of a New Theory,*

    16 Val. U. L. Rev. 163, 176 (1981) ........................................................6

_____

# INTRODUCTION[1]

The Defendants'[2] Opposition to Plaintiff's Motion for a Preliminary Injunction offers a paradox, obfuscating the meaning and plain language of the statute in question while at the same time clarifying many of the core disputes between the parties.[3]  This Reply will seek to refocus attention on the text of SB 1172, which remains the only provision being challenged.

Additionally, Defendants appear to have copied and pasted large portions of their Opposition from Pickup v. Brown, as they have propositions to Plaintiffs that are not in the motion.  However, this Court had reviewed the facts and claims made in both cases and issued an order, and correctly concluded, that they are not related.

## I.   Fundamental Rights Demand Strict Scrutiny, and These Plaintiffs Offer An Appropriate Avenue to Weigh Those Rights.

The State's first jab at the Motion comes in the form of the well-recognized principle that legislative enactments are presumptively valid.  The "unless" in that equation, though, is here of prime importance.  That is, legislative enactments are presumptively valid *unless* fundamental rights are implicated by those enactments.  *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology,* 228 F.3d 1043, 1049-50 (9th Cir. 2000) ("*NAAP*").  As in *NAAP*, it is therefore necessary for the Court to assess the merits of the asserted fundamental rights before determining whether rational basis, strict scrutiny, or intermediate scrutiny is warranted.

---

[1] Counsel for Plaintiffs do not object to the Defendants' suggestion of twenty minutes per side for oral argument.  In the event that *Amicus* participates in oral argument, they can divide their time with the State.

[2] For ease of reference, the Defendants' will be collectively referred to as the "State."

[3] Because Equality California (EQCA) has adopted arguments by the State and has no disagreements with the state, and because it has included little or no original arguments in its amicus brief, plaintiffs will not file a separate response to EQCA's brief; any nuances in the amicus brief that need to be addressed will also be included herein.

---

**a.   The standard of review is strict scrutiny.**

In the present case, the State has based its argument on the presumption that the standard of review is rational basis.  Indeed, the declarations and exhibits submitted by the State focus on a rational basis standard.  Defs.' Opp'n to Pls.' Mot. Prelim. Inj. *passim.*  Contrary to their legal argument and evidence, the bill makes clear that the Legislature presumed that the standard of review is strict scrutiny.  This is set forth in the bill signed by the Governor.

> THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:… SECTION 1.  The Legislature finds and declares all of the following:… (n) California has a compelling interest in protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and in protecting its minors against exposure to serious harms caused by sexual orientation change efforts.

Pls.' Ex. 1, 1 & 3 (capitalization in original).

It is understandable why counsel for the State wants to present the much more defensible rational basis standard to the Court.  But the Legislature used the language of strict scrutiny when it used the term "compelling interest."  "Compelling interest" is a legal term that the Legislature would presumably be familiar with, particularly the Senate Judiciary Committee that considered the bill.  Pls.' Ex. 3, 3 ¶ 3.

This is as it should be.  As stated in the Complaint and the moving papers, fundamental rights are implicated by the bill.  "Where certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest,' and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake."  *Roe v. Wade*, 410 U.S. 113, 155 (1973).  Because it cannot be questioned that the rights as discussed in the Complaint are fundamental in nature, and because the State has presumed strict scrutiny in both the legislative history and in the bill's preamble, strict scrutiny is the standard of review that must be applied to SB 1172.

In contrast to the intent articulated by the Legislature, the Attorney General's office is

_____

not on the same page.  The American Psychological Report ("APA Report" (Defs.' Opp'n Ex. 1)),[4] and the declarations in opposition to the motion, filed by both the State and *Amicus*, present opinions relevant only to a rational basis inquiry.  The arguments and evidence of the State can be summed up in the concluding paragraph of the Dr. Beckstead who declares: "*It is entirely reasonable for California* to prohibit these types of interventions, particularly for minors, and encourage those in distress to seek services that are based on current knowledge of the psychology of sexual orientation, the psychology of gender, and the psychology of religion." Beckstead Decl. ¶38 (emphasis added).  Rational basis arguments and evidence such as these do not rise to the level of narrowly tailored compelling interests, which are required here.

## II. Foremost Among the Fundamental Rights at Stake in this Motion Is Religious Freedom.

The State stakes out three primary positions regarding religious liberties.  It argues that SB 1172 provides an exception for mental health professionals who are clergy and counsel out of the church.  Second, the State asserts that the government will not be excessively entangled with religion.  Finally, the bill only poses an incidental burden on the practice of religion.  These will be discussed in turn.

### a. There is no exception for clergy who are mental health professionals.

The State raises an unusual defense regarding the lack of an exception for clergy who are licensed mental health professionals employed in a church.  "On its face, SB 1172 does not apply to duly ordained members of the clergy or other religious practitioners."  Defs.' Opp'n 14:10-11.  Not so.  If a member of the clergy is also a licensed mental health professional, such as Dr. Welch, then the minister falls under the provisions of the bill.  A plain reading of the text

---

[4] It is curious that the State has filed the APA Report.  The State complains in a footnote that perhaps the Legislative History should not be considered.  Yet in both its Brief and the declarations, Defendants cite extensively to the APA Report which was apparently relied upon by the Legislature as indicated in the Legislative History submitted by the Plaintiffs.

1    shows that there is no exception for a member of the clergy under any of the three sections of

2    the bill.

3         Despite this sharp dispute on how the language reads, ironically there is agreement

4    between the parties as to the interpretation to the bill.  The State writes that "as long as members

5    of the clergy and religious practitioners do not hold themselves out to the public as licensed

6    mental health providers. . . they do not fall within the ambit of SB 1172 and are free to offer

7    SOCE."  Defs.' Opp'n 14:25-27.  That is the primary problem.

8         The undisputed facts are that Dr. Welch does hold himself out as a state licensed LMFT,

9    and he is an ordained minister who heads the counseling ministry at his church.  Welch Decl. ¶¶

10    1, 5.  That is why a preliminary injunction is needed.  Dr. Welch is faced with irreparable harm.

11         Churches, such as Skyline Church, frequently have ministers on staff who hold degrees

12    and licensures both as clergy and as counselors or psychologists.[5]  Indeed, the statutes cited by

13    the State are reflective of that reality.  Cal. Bus. & Prof. Code §§2063, 4980.01, 4996.13.[6]

14    (*Amicus* discusses the remuneration elements of these statutes noting that the practice of

15    psychology or counseling involves charging a fee or receiving a donation and includes

16    "remuneration in any form."  Mem. Amicus Curiae & Proposed Intervenor Equality Cal. Opp'n

17    to Pls.' Mot. Prelim. Inj. 25-26 ("EQCA Opp'n").  Be that as it may, Dr. Welch receives

18    remuneration as an employee and the counseling ministry at Skyline Church does solicit

19    donations for its services.)[7]

20         The religious exemptions for clergy cited in the statutes, however, do not reach SB 1172.

21

22    _____

23    [5] Regrettably neither time nor space permits a discussion or submission of evidence
demonstrating that accredited seminaries typically offer degrees (MFT) in counseling. See, e.g.,
http://www.focusonthefamily.com/topicinfo/Schools_Christian_Counseling.pdf which has a

24    non-exhaustive list (27) of evangelical institutions providing such degrees.

25    [6] Unless otherwise noted, all statutes are from the Business and Professions Code.
[7] See the webpage from the Skyline website at: http://www.skylinechurch.org/#/get-

26    connected/marriedfamily

27    _____

28       PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

The sections cited are limited to the specific chapters of the Business and Professions Code in which they appear.[8]  Section 2063 reads in pertinent part, "Nothing **in this chapter** shall be construed so as to…regulate, prohibit…nor interfere in any way with the practice of religion." (Emphasis added).  Section 2063 is in Chapter 5 of Division 2 of the Code.  Similarly, section 4980.01(b) states:  "**This chapter** shall not apply to any priest, rabbi, or minister of the gospel of any religious denomination…."  (Emphasis added).  Section 4980.01 is found in Chapter 13. SB 1172 is in neither of those chapters.  It is in Chapter 1.  By their own terms, these sections apply only to the chapters in which they are found.

These religious exemption statutes demonstrate one other important thing.  The Legislature knows how to exempt the clergy from a statute if it wants to.  If anything, sections 2063 and 4980.01 demonstrate just what the language of exemption looks like.  Of course, a religious exemption cannot be read into the bill where the plain language shows that the Legislature did not want to provide such.  Moreover, a court cannot rewrite a statute in order to save it.  *United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002) (en banc).  Thus, the absence of a religious exemption requires that SB 1172 be enjoined.

Finally, the State and *Amicus* rely on *Nally v. Grace Community Church* for the view that ministers are exempt from the above statutes.  That is true but nonetheless irrelevant.  These sections refer to chapters of the Code found in a different location than where SB 1172 is chaptered.  Besides that, it is important to understand that the issue before the California Supreme Court was whether a duty should be imposed on pastoral counselors to refer a counselee, for whom the risk of suicide is foreseeable, to a licensed professional.  *Nally v. Grace Cmty. Church,* 47 Cal. 3d 278, 283 (1988).  In addition to finding clergy exempt from licensing statutes, California's high court found that "[i]n so doing, the Legislature has

---

[8] Unless otherwise indicated, all statutory references are to the California Business and Professions Code.

recognized that access to the clergy for counseling should be free from state imposed counseling standards, and that 'the secular state is not equipped to ascertain the competence of counseling when performed by those affiliated with religious organizations.' (Ericsson, *Clergyman Malpractice: Ramifications of a New Theory* (1981) 16 Val.U.L.Rev. 163, 176.)" *Id.* at 283. The Supreme Court ruling underscores why the failure to include a religious exemption is fatal to SB 1172. A counselor working out of a church, such as Dr. Welch, cannot live in fear of having to appear before a secular state board (i.e. the California State Board of Behavioral Sciences) and be second guessed about the propriety of church doctrine. This raises alarming separation of church and state issues.

**b. SB 1172 invites excessive entanglement.**

The State claims that SB 1172 does not involve excessive entanglement with religion. Defs.' Opp'n 15-16. "So long as their clergy do not hold themselves out as licensed mental health professionals, churches remain free to determine what type of counseling, including SOCE, they will offer to congregants." Defs.' Opp'n 15:18-16:1. Therein lies the problem. Clergy who work as licensed counselors in a church, such as Dr. Welch, can find themselves standing before those Defendants sitting on the California Board of Behavioral Science because of therapy which was performed in a manner consistent with church orthodoxy relative to sexual orientation. Can a church staff member, who is an LMFT and has an M.Div. and who counsels a teenage congregant, raise his church tenets as an affirmative defense? Can the Board probe into the religious teachings of his employer, the church? This scenario raises excessive entanglement problems even more salient than the fact pattern found in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

Indeed, the matter of the separation of church and state become quite serious when considering what is recommended by the Defendants' expert, Dr. Beckstead and the APA Report. Dr. Beckstead argues for the therapist helping the minor to live **both** as a religious

_____

person (e.g. a Christian) and as a gay or lesbian.  Below is a sampling from his declaration.

> [O]ne major problem found in SOCE literature is reinforcement of the (false) assumption that resolving conflicts between religion and sexual orientation only allows for an "either-or" solution. Scholarly literature, however, describes various therapeutic ways of how one can transcend this bind by helping clients explore, evaluate, and possibly integrate these aspects of their lives and develop both their religious and sexual identities, and thus have the option of living positively being both same-sex attracted and religious/spiritual.

Beckstead Decl. ¶ 33.  (This is nearly verbatim to the APA Report at page five.)

As noted, the APA Report puts forward the same reasoning.  The APA Report further recognizes that there are competing views on homosexuality in the faith community.  APA Report 17-18 (citations omitted).  In a section entitled "Religious Strategies" the Report states that "connecting the client to core and overarching values and virtues, such as charity, hope, forgiveness, gratitude, kindness, and compassion, may refocus clients on the more accepting elements of their religion, which may provide more self-acceptance, direction, and peace, rather than on their religion's rejection of homosexuality."  APA Report 59.  Space does not permit a detailed review of the APA Report relative to religion and sexual orientation other than the representative samples above.

It is clear though, that the respective theological positions are irreconcilable.  Welch Decl. ¶5.  The conservative camp views the "gay affirming" camp as apostate.  Welch Decl. Exs. 13 & 14.  For the Behavioral Sciences Board to review the theological position of the church for whom a counselor is employed would invite a level of excessive entanglement which violates the doctrine of the separation of church and state.  Harm is further aggravated when state actors actually choose sides in a theological debate.  This is what the First Amendment's religion clauses are engineered to prevent.  To prevent such irreparable harm, the State should be enjoined.

_____

### c.  SB 1172 unlawfully burdens the free exercise of religion.

The State seeks to dispose of Plaintiffs' religious freedom claims by invoking *Employment Division v. Smith*, the Supreme Court's landmark decision that dramatically decreased the efficacy of Free Exercise arguments to many plaintiffs by declaring that, in most cases, neutral laws of general applicability will not be deemed to substantially burden religious practice.  *See generally Employment Div. v. Smith*, 494 U.S. 872 (1990).  Where the State misses the mark, though, is in its failure to distinguish religious employers from secular employers.  *Smith* involved plaintiffs who claimed that their religious obligations trumped their job duties *as employees of the government.  See id.* at 874-75.

By contrast, when the employer itself is religious, the Court does not utilize the *Smith* framework.  Rather, the Court takes pains to prevent government-imposed restrictions—even when neutral and generally applicable—from overriding church governance and doctrine.  Such was the case in *Hosanna-Tabor Evangelical Lutheran Church v. EEOC*, which concerned a parochial school teacher whose duties included secular subjects.  *See Hosanna-Tabor Evangelical Lutheran Church v. EEOC*, 132 S. Ct. 694, 700, 704-07 (2012).  Such is the case here, where Dr. Welch is an ordained minister employed by Skyline Church.  So strong is the Court's aversion to the imposition of statutes that would affect church doctrine and governance that some have noted the *Hosanna-Tabor* Court did not even suggest that a compelling interest could overcome the church's objections.

Although cases involving church autonomy and internal doctrine and employment issues do not utilize the Lemon Test, *see generally id.*, even under Lemon, SB 1172 presents fairly straightforward excessive entanglement problem with the state controlling speech of members for the clergy who are also licensed professionals, Welch Decl. ¶¶5, 17.

The Court need not decide here whether a compelling interest can save SB 1172 as to its impact on church-employed mental health professionals.  As discussed *infra,* the state's asserted

_____

1   interest does not rise to this level and is not narrowly tailored.

2           But Dr. Welch is not the only Plaintiff for which the free exercise of religion is

3   implicated.  As a psychiatrist, in addition to prescribing medications, Dr. Duk includes

4   "philosophical and Christian counseling and cognitive behavioral techniques"  Duk Decl. ¶3.

5   Dr. Duk, is a Roman Catholic and treats young people who share his Christian worldview.  *Id.*

6   ¶¶12-13.  Catholic parents may specifically seek help from him because of shared faith.  *Id.*  The

7   Church teaches that sexual activity, including homosexual sex, outside of marriage is sinful.

8   Roman Catholic families have a free exercise right to seek out a Christian psychiatrist to help a

9   teenager struggling with unwanted same-sex "erotic desires."  Beckstead Decl. ¶ 31.  SB 1172

10  interferes with that right.

11          Both the State and the *Amicus* protest, stating that religious families can still get SOCE

12  counseling from clergy within a church.  In doing so, they overlook that a priest lacks the

13  training and legal capacity to prescribe a medication.  Parents may perceive that there is

14  interplay between spiritual and psychological/medical factors in a moral failure by their teenage

15  child, e.g., becoming sexually active.  Just as the State and *Amicus* psychologist declarants may

16  believe that because they are homosexual they are better suited to counsel gay kids, likewise a

17  Catholic parent may feel that treatment from a Christian psychiatrist is in the best interest of

18  their child.  The State's reference to *Fields v. Palmdale School District* does not change this.

19  Rather, it supports Plaintiffs' position.  Though parents cannot control public school curriculum,

20  they can choose *whether* to send their child to a public school.  *Fields v. Palmdale Sch. Dist*.,

21  427 F.3d 1197, 1206 (9th Cir. 2005).  As a parent can seek to control the influences and

22  authority figures in their children's lives by sending them to a parochial school, so too, they can

23  choose whether to send their child to a Catholic psychiatrist.

24          Unless enjoined, the religious liberty interests of parents and teenagers to receive

25  psychiatric care relative to unwanted same-sex "erotic desires" will be infringed.  (It should be

26

27  _____

28  PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

9

noted that Dr. Duk has the legal capacity to argue for the concomitant constitutional rights of parents and their children though not named as plaintiffs.  *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 (1977).  See the argument immediately below.).

## III.   The Fundamental Right to Privacy Further Demands Protection.

### a.   Plaintiffs can raise the concomitant rights of persons not before the Court.

The State complains that the Plaintiffs lack standing to assert the rights of minors of parents because no such persons are named as plaintiffs.  Defs.' Opp'n 9.  This issue need not detain the Court for long.

In *Carey v. Population Services International*, a mail order vendor of contraception challenged a law prohibiting the sale of birth control products to minors.  The vendor was found to have Art. III standing because the law restricted the business' market.  Further, the vendor was "entitled to assert those concomitant constitutional rights of third parties," i.e., minors affected by the law. *Id*. at 684.  *See also Sullivan v. Little Hunting Park*, 396 U.S. 229, 237 (1969) (a share holder of a community recreational corporation who was denied the right to assign his share "because the lessee was a Negro" had Art. III standing in his own right and also to serve as the "effective adversary" on behalf of the lessee); *Craig v. Boren*, 429 U.S. 190, 192-197 (1976) (a beer vendor had standing to challenge in its own right, and as advocate for the rights of third persons, the gender-based discrimination in a state statute that prohibited sale of beer to men between the ages of 18 and 21, but not to women in that age range); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (a physician, medical director, and executive director of Planned Parenthood had standing to assert the rights of married people who would want to obtain contraception).

### b.   SB 1172 violates the privacy rights of minors.

The state does not dispute Plaintiffs' proposition that there is a sphere of privacy which is protected by the Constitution.  Defs.' Opp'n 11:10.  The law has been long established that

_____

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

"the right to privacy in connection with decisions affecting procreation extends to minors as well as to adults." *Carey*, 431 U.S. at 693 (citing. *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 74 (1976)).  It cannot be subject to reasonable debate that the decision as to whether to be sexually active with persons of the same or opposite sex is a threshold choice relative to procreation.  This is a sphere of "decisional privacy," *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977), for which California cannot intrude absent a narrowly tailored government interest.  SB 1172 is such a governmental intrusion.  "If the right of privacy means anything, it is the right of the individual, married or single, to be free of unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."  *Eisenstadt v. Baird*, 405 US 438, 453 (1972).

Just as the State does not have constitutional authority to restrict a minor's access to an abortion, *Danforth*, 428 U.S. 52, or contraception, *Carey*, 431 U.S. at 693, so too it is powerless to interfere in the minor's autonomy on sexual issues.  This includes whether or not to seek counseling to pursue, extinguish, or otherwise explore, same-sex "erotic desires."  Beckstead Decl. ¶ 31.  Like abortion, which is a private choice between the minor and her doctor, deciding whether or not to engage in sexual activities with persons of the same sex is a private matter between the minor and a counselor or psychiatrist.

"[T]here are…spheres of our lives and existence, outside the home, where the State should not be a dominant presence… Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."  *Lawrence v. Texas*, 539 U.S. 558, 562, (2003).  The "certain intimate conduct" referred to by the *Lawrence* Court is sexual behaviors between persons of the same-sex.  The choice of whether or not a young person is going to engage in sodomy is an extremely personal decision for which the State intrusion is unconstitutional.

What may be easily overlooked in Justice Kennedy's statement is the liberty interest in

_____

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

11

"freedom of thought, belief, [and] expression."  Young people who are seeking out SOCE

typically have strong religious convictions, APA Report 50, Beckstead Decl. ¶6; they may well

feel that the gay lifestyle is irreconcilable with their faith, APA Report 5, 46, 58.  Under the

holding in *Lawrence*, they have the right to think and believe that and seek out likeminded

persons, including mental health professionals, who support their worldview.  Gay and lesbian

teenagers, like most people, have a worldview that is informed by their family, faith, and

culture.  Dr. Duk's experience with his patients is consistent with this reality.  Not surprisingly,

a teenager's objectives may be to bring his sexual behavior into conformity with his religious

traditions, cultural norms, and moral standards.  Duk Decl. ¶17.  The State and *Amicus*

declarants protest, asserting that true autonomy is to embrace one's "erotic desires"  Beckstead

Decl. ¶ 31.  The opposition declarants proffer that the counselor should not assist in the client's

goals, Haldeman Decl. ¶¶ 20-26; Beckstead Decl. ¶30, unless, of course, the goal is to pursue a

gay lifestyle.  The opposition declarants are entitled to their opinion, but those opinions, even

proffered by experts, cannot be memorialized into law whereby the government interjects itself

into highly private decisions involving sex.  As Dr. Duk states, [t]he law…inserts the

government into the doctor/patient relationship on the intensely personal issue of sexual

orientation.  This matter touches on the most personal issues in the human condition, including

sex, family relationships, religion, culture, and medical issues."  Duk Decl.¶ 15.  SB 1172 is

government interference with that "autonomy of self" described by the *Lawrence* Court.

    c.  **Parents have a right to privacy regarding decisions about their children.**

As discussed above, a child has certain privacy rights for which third parties, including

the State and even parents, cannot interfere.  Whether or not that is good public policy is of no

moment.  It is the current state of the law.

If a minor has the constitutional right to an abortion without parental notice or consent, it

follows *a fortiori* that the child has a right to an abortion with parental notice and consent.  In

_____

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

12

other words, should the minor want to bring her parents into the decision-making process with her doctor, there is surely a privacy right to do just that without State interference.  Likewise, if the parents are involved in the minor's life relative to important decisions about sex, the parents have a privacy interest in that sphere of their lives.  *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925).  That is a positive relationship with which the state cannot interfere.

If a high school student is sexually active, whether heterosexual or homosexual, and they are cooperative with their parents in going to counseling on this matter, the privacy interest extends to both the youngster and the parents.  Just as SB 1172 intrudes into the minor's zone of privacy, under circumstances where the parent is engaged and wanted by the minor, SB 1172 intrudes into fundamental parental rights.

### d.  The medical treatment cases are distinguishable.

To combat the unprecedented interference with the privacy rights of minors and their parents, the State marshals a parade of cases that largely concern claimed rights to drugs not approved by the FDA, and federally controlled substances.  There is a clear difference between a claim that there is a right to ingest unapproved chemical substances into one's body, or one's child's body and talk therapy.  The highly regulated sphere is based on scientific trials based upon the physical sciences.  With all due respect to the APA and the opposition declarants, mental health is a "soft science."  That fact alone distinguishes the cases presented by the State. *See Rutherford v. United States*, 616 F.2d 455 (10th Cir. 1980) (terminally ill cancer patients brought suit to enjoin the federal government from interfering with the shipment and sale of laetrile); *Cnty. of Santa Cruz v. Ashcroft*, 279 F. Supp. 2d 1192, 1204 (N.D. Cal. 2003) (terminally ill cancer patients have no fundamental right to obtain medical marijuana); *Garlic v. FDA*, 783 F. Supp. 4, 5 (D.D.C. 1992) (no right to unapproved medication for Alzheimer's disease); *Duncan v. United States*, 590 F. Supp. 39, 40-41 (W.D. Okla. 1984) (parents of a child with Down's Syndrome do not have right to treatment of 'U' Series drug); *Okla. Chapter of the*

1   *Amer. Acad. of Pediatrics v. Fogarty*, 366 F. Supp. 2d 1050, 1116-17 (N.D. Okla. 2005)

2   (parents have no fundamental right to obtain experimental asthma drug for their children).

3         Setting aside for a moment the obvious preemption problems, had SB 1172 taken a

4   similar approach, these cases would be apt.  The contrast between the FDA approval process, or

5   for that matter federal regulation of controlled substances, hardly seems analogous to a statute

6   that ventures blindly into the realm of "talk therapy" to arbitrarily ban some types of treatment.

7   If anything, the cases offered by the State are an important reminder that, when the government

8   seeks to ban treatments or drugs, it knows how to undertake serious scientific inquiry—and that

9   process bears no resemblance to the Legislature's approach in SB 1172.  *See, e.g., Carnohan v.*

10  *United States*, 616 F.2d 1120 (9th Cir. 1980) (explaining FDA approval process and rejecting

11  claimed constitutional right to participate in experimental drug trial).

12  **IV.**     **Freedom of Speech Does Not Fall Prey to Any and All Forms of Regulation.**

13        The State's response to Plaintiffs' significant free speech claims is expected and not

14  surprising.  In short, the State seeks to classify SB 1172 as a non-descript, content-neutral

15  regulation of the mental health profession, indistinct from many that have preceded it.  If the

16  State is correct, Plaintiffs' significant free speech arguments succumb to a low level of review.

17  It is thus crucial to put the statute—and professional regulation cases—under a microscope.

18        On its face, SB 1172 seems out of place among its neighbors in the Business &

19  Professions Code.  Whereas most of the regulations focus on neutral standards such as

20  minimum educational and certification requirements, SB 1172 singles out a particular form of

21  communication and declares it to be illegal.  Defendants claim that SB 1172 bans only conduct,

22  and that any limitation on speech is merely incidental.  Defs.' Opp'n 18.  They also claim that

23  the statute does not forbid mental health professionals from speaking about SOCE's existence,

24  telling their patients that same-sex attractions can be changed, or expressing any views

25  regarding "the (im)morality, (un)desirability, or (in)tractability of same-sex attractions or

26

27  _____

28  PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

homosexuality." Defs.' Opp'n 20. None of these claims are present in the text of the statute.

SB 1172 defines sexual orientation as "any practices by mental health providers that seek to change an individual's sexual orientation. This includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex." Pls.' Ex. 1, 3. "Any practices" is so broad as to include all of the above discussions that defendants claim are *not* prohibited. Discussions regarding the immorality of homosexuality, in particular, would seem to qualify as therapy that constitutes SOCE under the definition provided. The assertion by a psychologist that a client's behavior is "immoral or "undesirable" cannot be overlooked. The effect of this loaded language is calculated to convince someone that they should cease a behavior. Therefore, this is, in effect, an effort to change sexual orientation, and *any* effort to change someone's sexual orientation is banned by the statute. Even a referral to another therapist out-of-state could be deemed SOCE under the statute's definition for the same reason. The only assurance mental health professionals have that they will not be disciplined for committing SOCE if they conduct such conversations is the interpretation of the statute by the State's attorney; the text of the statute provides no such assurances.

Defendants also claim that an entire category of speech is not banned because the statute does not prohibit only SOCE aimed at gay minors, but that it prohibits *all* SOCE. Defs.' Opp'n 21. They misconstrue the word "include" in 865(b)(1). It is proffered that, while SOCE aimed at homosexuality is clearly indicated in the text of the statute, the word "include" prevents the statute from being limited to that type of SOCE. Defs.' Opp'n 21. In other words, because "include" indicates an inexhaustive list, an inclusion of SOCE aimed at heterosexuals as well as homosexuals is implied. Defs.' Opp'n 21. Defendants' interpretation is grammatically incorrect. "Include" in this sentence modifies the various types of "efforts" to change same sex attraction, not the sexuality at which it is aimed, as Defendants claim.

_____

1    Defendants are trying to say that, because they wrote the statute, they get to interpret it

2 however they want.  This is incorrect.  Ordinary canons of construction require looking to the

3 four corners of the text to determine meaning, and the text of the argument does not support

4 their argument.  *Williams v. Taylor*, 529 U.S. 420, 431 (2000).  Defendants and *Amicus* are

5 being disingenuous.  They point to nothing in the legislative history or the declarations which is

6 consistent with their unorthodox grammatical construction of the sentence.  Defs.' Opp'n 21.

7    When there is ambiguity regarding the meaning of a piece of legislation under the Plain

8 Meaning Rule, the court can look beyond the four corners of the text to supporting evidence

9 such as the legislative history and the APA report.  *San Jose Christian Coll. v. City of Morgan*

10 *Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004).  Plaintiffs' argument, unlike Defendants', is

11 supported by the legislative history—which speaks to SOCE aimed at homosexuals only.  Pls.'

12 Ex. 11, 2 ("[SOCE] is an attempt to change the sexual orientation of a person from homosexual

13 or bisexual **to heterosexual**" (emphasis added)).  Defendants' "history of SOCE" argument also

14 supports this, as Defendants admit that all forms of SOCE seek to effect change in a

15 homosexually inclined person only; they admit that there has *never* been a heterosexual to

16 homosexual SOCE attempt.  Defs.' Opp'n 21, fn 11 (stating that "no statutory protections are

17 needed for minors other than gay, lesbian, bisexual, and transgender youth.... sexual minorities

18 are the only members of society to have been subjected to SOCE.... historically, only

19 homosexuals have been subjected to SOCE").  SB 1172 is thus limited to SOCE aimed at those

20 with homosexual or bisexual tendencies.  Speech is therefore not merely incidental to the

21 regulation, as Defendants claim, but is in fact the very thing that is regulated by the statute.

22    The controlling cases in this area are *NAAP* and *Conant v. Walters.*  In *NAAP,* the

23 plaintiffs pursued the questionable legal strategy of claiming that California's entire scheme of

24 regulating psychotherapy violated their substantive due process and free speech rights.  *NAAP,*

25 228 F.3d at 1049.  The Ninth Circuit noted well-established precedent permitted such a scheme,

26

27 _____

28 PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

particularly the educational and certification requirements.  *Id.* at 1051-52.  In doing so, the

*NAAP* court distinguished its holding from challenges, like the present, that involved greater

intrusions on speech, making clear that California, through its certification requirements, was

not telling psychotherapists what they could or could not say to their patients.  *Id.* at 1054-55.

This, of course, is the crux of the present case and motion.

Plaintiffs here, consistent with *NAAP,* do not claim any constitutional rights to be free of

all state interference in the practice of their professions.  The State's attempted

oversimplification of the speech interests implicated here is unpersuasive.  Plaintiffs instead

contend that the general police power to regulate their field is not unlimited, and it does not

trump every constitutional safeguard.  The instructive counterpart to *NAAP* is *Conant,* which

cannot be dismissed nearly as easily as the State might like.  In *Conant,* the Ninth Circuit

blocked the federal government from enforcing a policy that barred medical professionals from

recommending cannabis to their patients.  *See generally Conant v. Walters*, 309 F.3d 629 (9th

Cir. 2002)  The federal government could (and does) constitutionally prohibit doctors from

prescribing the actual controlled substance, but it could not go beyond that to control the

doctors' speech and recommendations on the subject.  *Id.* at 637-39.  The State seeks to skirt the

comparison to *Conant* by offering creative interpretations of SB 1172 not supported by its text.

The State insists that discussions between professionals and patients about SOCE are permitted,

as are professionals offering their views to patients on related moral issues.  The problems with

the State's approach are that, first, the statute itself offers no such limitations—this appears to

have been spun from whole cloth by the State in an effort to salvage the statute.  Second, the

State does not explain—and the Plaintiffs cannot determine—at what point talking *about*

changing sexual orientation, or offering a viewpoint that it could be changed, would be

interpreted by the State as "change efforts" in a manner that would lead to professional

discipline.  As will be further discussed in the subsequent vagueness section, expression is not

_____

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

free if it rests on fine lines that not even the disciplinary enforcer is able to explain.

The State's other cited authorities do not hold otherwise.  In *Shea,* California's Third District Court of Appeal rejected free speech defenses asserted by an osteopathic doctor to charges of unprofessional conduct.  *See generally Shea v. Bd. of Med. Exam'rs*, 81 Cal. App. 3d 564 (Cal. Ct. App. 1978).  The gaping hole in Dr. Shea's arguments was that the communications in question were completely different than what his patients (and undercover investigators) had requested, and therefore shocked and repulsed them.  *Id.* at 577-79.  When the patients presented Dr. Shea with symptoms such as back and hip pain, shoulder pain, and nervousness, instead of treating those issues, he attempted to hypnotize the patients and, upon wrongly believing they would not remember anything, proceeded to graphically describe sex acts to them.  *Id.* at 571-74.  The court's opinion did not suggest that such communications were never permissible or protected, but rather that free speech rights do not operate as a license for doctors to blindside patients with sexually explicit speech when the patients are seeking treatment that has nothing to do with their sexuality.  *Id.* at 577.

In *Daly v. Sprague,* the court rejected speech claims by a state-employed physician who believed his First Amendment rights were being infringed because he was ordered not to communicate with patients while he was under investigation.  *Daly v. Sprague*, 742 F.2d 896, 897, 899 (5th Cir.1984).  Aside from significant distinctions stemming from the state's role as employer in that situation, the restriction was not linked to particular content or viewpoints espoused by the doctor, but was incidental to the investigation.  *Id.* at 899.  Plaintiffs do not dispute that California could so constrain one of its own employees being investigated for other reasons.  However, such is indisputably not the situation faced by these Plaintiffs.

Decisions involving regulations of other professions are even less apt.  For instance, restrictions on attorney speech typically relate to advertising or in-person solicitations, and moreover, are guided by the sense that attorneys operate not as islands unto themselves but

---

within the judicial system to the extent that they are deemed "officers of the court."  *See Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 460 (1978).  The *Accountants Society of Virginia* case, on its face, is more promising for the State, upholding prohibitions on the use of specific words.  *Accountants Soc'y of Va. v. Bowman*, 860 F.2d 602, 605 (4th Cir. 1988).  Again, though, it stands largely for the unremarkable proposition that a state may determine designations for professions, i.e., certain educational and other qualifications may be required of those who hold themselves out as accountants, attorneys, or the like.  This basic premise is not disputed here.

At bottom, the State's speech arguments rise and fall based on whether SB 1172 is indistinct from bland educational and certification requirements that may instruct but rarely, if ever, constrain practitioners as to specific modes of "talk therapy."  Plaintiffs submit that SB 1172 is manifestly of a different nature than any statute claimed to be its progenitor; this is demonstrated by the statute directly banning particular content and viewpoints communicated by mental health professionals to patients.  In light of the above, SB 1172 cannot be deemed content-neutral and is subject to heightened scrutiny.

## V.   Vagueness and Overbreadth Are Not Defeated By a "You Know it When You See it" Standard.

The State's problem in banning Plaintiffs' speech is not only that it has done so on the basis of content and viewpoint, but that it seems uncertain what, exactly, it has prohibited.  The statute is sweeping in its language, banning "sexual orientation change efforts" involving minors, and including SOCE as "efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex."  Pls.' Ex. 1, 3.

The State, in a rush to backpedal from the text of the statute, claims it does not prevent professionals from talking to patients *about* SOCE, or even offering their own moral views on the subject.  The State's narrow reading is not at all evident from the text, and even less so from

the legislative history, but rather appears to be an artful attempt to re-craft the statute in compliance with *Conant*.  More fundamentally, though, the State insists that Plaintiffs know what SOCE is—not unlike the late Justice Potter Stewart's famous "I know it when I see it" approach to obscenity.  *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

The State's position is not well taken.  To begin, SOCE does not, as defendants' imply, have a widely acknowledged definition.  *See* Defs.' Opp'n 25 (comparing SOCE to words of common understanding in teaching, like "curriculum").  The defendants do not seem to be able to define what constitutes SOCE is; they claim that SOCE consists of a "variety" of psychological treatments aimed at changing a patient's sexual orientation, but they cannot seem to narrow it down beyond this very broad definition.  Defs.' Opp'n 18.  The legislators who created and passed the statute do not seem to know either.  The legislative history suggests not uniformity but divergence as to what, exactly, the State seeks to punish.  For example, the final Floor Analysis states, consistently with Sen. Lieu's countless confirming statements, that SOCE is synonymous with "reparative therapy" or "conversion therapy."  Pls.' Ex. 12, 4-5.  The same analysis notes several different perspectives on reparative therapy, from Dr. Nicolosi's approach to "Christian transformational ministries" that utilize prayer.  Pls.' Ex. 12, 5.  Whatever the Defendants and the legislators respectively think SOCE to be, they clearly do not agree on a definition.  In the legislative history, SOCE is said to include Christian transformational ministries, which use "prayer, religious conversion, individual and group counseling to change a person's sexual orientation."  Pls.' Ex. 12, 5.  However, in arguing that there is a religious exception built into SB 1172, Defendants indicate in their Opposition that prayer and religious-based counseling is *not* prohibited.  Defs.' Opp'n 14.  Other than the State's bald assertions, there is no clear reason to believe that the Defendants would not be empowered by the statute to punish the type of reparative therapy described as involving prayer.

Defendants claim that Plaintiffs, at least, know the meaning of SOCE because they have

_____

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

20

admitted to practicing it, citing to the motion and to Aaron Bitzer's declaration.  Defs.' Opp'n

23.  *See also* Defs.' Opp'n 24 (stating that plaintiffs understand the meaning of SOCE because

they practice "reparative therapy").  This is false.  First, Aaron Bitzer is not a mental health

professional at all; he is a student who wants to practice in the field of reparative therapy *in the*

*future*, but he has never practiced, and never claims to have practiced, SOCE at any time.

Additionally, neither Welch nor Duk have claimed to practice SOCE.  In Plaintiffs' Motion for

preliminary Injunction, which defendants cite to in support of their claim that Plaintiffs have

admitted to practicing SOCE, the Plaintiffs state that "while the Plaintiffs agree that they

practice reparative therapy *in some sense*, they do not believe that they are 'seeking' to 'change'

anyone's sexual orientation.'  Mem. Supp. Prelim. Inj. 18 (emphasis added) ("Mot.").  Plaintiffs

further state that change must be sought by the patients, and that the Plaintiffs merely assist

patients who are already seeking this change; therefore, it is the patients who engage in efforts

to change their sexuality.  Mot. 18.  As Plaintiffs do not believe they are changing anyone's

sexual orientation, and state so, they cannot be said to have admitted to practicing SOCE.

Despite the State's claims to the contrary, there seems to be mostly confusion in regards

to the definition of SOCE rather than a widely accepted meaning.  That being the case, it is no

wonder that Plaintiffs are confused as to what qualifies as SOCE and what does not.

Defendants also have not dealt squarely with the issue of bisexuality and provide no

reasonable response to Plaintiffs' claims of vagueness regarding this issue.  *See* Mot. 17-18.  In

fact, rather than address the evidence in Plaintiffs' declarations regarding bisexuality relative to

a psychiatrist using prescriptions to dampen libido or a bisexual teen dealing with a

pornography addiction, Defendants completely dismiss these concerns as "hypotheticals."

Defs.' Opp'n 25.  However, the concerns related to bisexuality are quite real.  Dr. Duk's

"current clientele includes minors who are struggling with homosexuality and bisexuality."  Duk

Decl. ¶ 6.  Dr. Welch describes "the rather common issue of bisexual and questioning youth."

_____

1  Welch Decl. ¶16.

2          SB 1172 defines SOCE to include "efforts to change behaviors or gender expressions, or

3  to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same

4  sex." Pls.' Ex. 1, 3.  This applies to the situations discussed in Plaintiffs' Motion and

5  declarations regarding bisexuality.  Prescriptions given to dampen a bisexual teen's libido in

6  response to an addiction to heterosexual pornography definitely qualifies as an effort to reduce

7  sexual attraction to the opposite sex.  Therefore appears to fall within the purview of SB 1172's

8  prohibitions, as would internet filters and many other treatments.  Neither the State nor *Amicus*

9  provide a straightforward response as to why efforts at curbing pornography for the bisexual

10  teen does not run afoul of the statute, i.e., an effort to change behaviors or eliminate or reduce

11  sexual attractions to persons of the same sex.

12          The significant penalties of professional discipline associated with SB 1172 do not

13  permit the State this lack of clarity as to what speech, conduct, or communication is prohibited.

14  Plaintiffs do not seek "perfect clarity," but they must be given more than buzzwords.

15  **VI.     The State's Asserted Interests Simply Do Not Trump Religious Freedom, Privacy,**

16          **and Speech.**

17          Application of strict scrutiny versus rational basis review is, to be sure, pivotal to this

18  Motion and the case at large.  The State seems to realize that application of strict scrutiny would

19  make it nearly impossible to defeat the Motion.  Thus, the State concentrates on arguments

20  geared toward rational basis.

21          First, the State's claimed compelling interest is overly broad.  While the State

22  undoubtedly has strong interests in protecting the physical and psychological health of its

23  citizens and youth, the interest cannot be "compelling" in all respects.  To this end, California's

24  complex web of child abuse statutes provide the state with compelling interests to intervene in

25  abusive homes, but not to substitute its judgment for that of parents in infinite situations where

26

27  _____

28

the well-being of children may suffer.  *See generally,* Welf. & Inst. Code §§ 300 et seq., 11365 et seq.  SB 1172 diverges sharply from this path, claiming a broad compelling interest to protect the health and safety of lesbian, gay, and bisexual youth, and reciting a laundry list of "critical health risks" that range from suicide to loss of faith to relationship problems and even a sense of having wasted time and resources.  Surely, the State's asserted compelling interest in protecting the "health" of its youth cannot extend to protecting them from the "critical health risk[]" of wasting time—but the State's claim is so overblown that it is impossible to separate strong from silly interests without judicial re-writing of the statute.

Even if the Court was inclined to overlook the oddities of the statute's asserted interests and pick the strongest one—prevention of suicide (which Plaintiffs will assume *arguendo* to be compelling in at least some settings)—the State cannot show that the law is narrowly tailored to achieve such an objective.

Most strikingly, the statute presents numerous statements claiming harm from SOCE, but never offer data to explain what type of harm will be eliminated.  Stated another way, there is no reason to believe that SB 1172 will prevent a single suicide.  Neither legislative history nor the *post hoc* evidence submitted by the Defendants provide statistics on the number of 1) suicides committed by youth in California or 2) suicides by lesbian, gay, or bisexual persons that are committed because they are lesbian, gay, or bisexual.  Furthermore, there is not one scintilla of verifiable studies that minors who have undergone SOCE therapy are committing suicide because of the therapy.   In fact, one of the State's experts admits that the data regarding this subject comes from "questionnaire studies, clinical case studies, and anecdotal reports rather than controlled experiments."  Hereck Decl. ¶ 40.  Defendants admit, as they must, that they have provided no scientific evidence of the anecdotal and questionnaire evidence that they have provided.  Said "evidence" also does not indicate that it involves minors.  The APA Report provides this admission: "No investigations are of children and adolescents exclusively,

_____

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1    although adolescents are included in a very few samples."  APA Report 33.

2          It is more likely that the "harms" SB 1172 may eliminate are of the "sense of having

3    wasted time and resources" variety.  The statute's vagueness does not help its narrow tailoring

4    problem, either.  If the State cannot identify a concrete, non-speculative link between youth

5    suicide statistics and SOCE, and for that matter the scope and definition of SOCE are in doubt,

6    it can hardly be said that the ban is narrowly tailored to achieve a compelling state interest.

7          The state relies on "major professional organizations in the mental health field," which it

8    claims support SB 1172.  Defs.' Opp'n 1.  This reliance is misplaced, however, as many

9    professional organizations in the mental health field actually opposed SB 1172 through much of

10    the legislative process.  *See* Pls.' Ex. 7,5.  *See also*, Pls. Ex. 3, 7.  Nor do the State's proffered

11    Declarations change the equation.  Beyond the numerous evidentiary problems with the

12    Declarations, identified in Plaintiffs' Objections filed concurrently herewith, the cited studies

13    make few distinctions between youth, who are covered by the statute, and adults, who are not.

14    Thus, to the extent the studies speak to SOCE generally, they offer no insight that is youth-

15    specific.  One of the key studies cited in the statute itself, that of Caitlin Ryan, et al., focuses not

16    on SOCE but on "family rejection," which is not prohibited by SB 1172.  For these reasons, the

17    State has not presented, and cannot present without re-writing the statute, a narrowly tailored

18    compelling interest sufficient to trump Plaintiffs' religious freedom, privacy and speech claims.

19    **VII.  The Injury to Fundamental Rights Occasioned by SB 1172 is Imminent,**

20         **Irreparable, and Inescapable.**

21          In light of the weighty issues presented in the Motion, the State's dismissal of irreparable

22    harm is astounding.  The State posits that, as of January 1, 2013, implementation of SB 1172

23    would create no irreparable harm because the Plaintiffs would presumably comply with the

24    statute.  The State seems to completely miss the point.  Foregoing one's constitutional freedoms

25    in order to avoid punishment by the government is the archetype of irreparable harm.  Thus,

26

27                           _____

28               PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1  *Elrod v. Burns* famously intones that "the loss of First Amendment freedoms, for even minimal

2  periods of time, unquestionably constitutes irreparable harm."  *Elrod v. Burns*, 427 U.S. 347,

3  373-74 (1976).  If the statute unconstitutionally suppresses speech, it would be odd indeed to

4  require willful violation of the law in order to claim irreparable harm.  Not surprisingly, this is

5  not the law.

6  **CONCLUSION**

7  For the reasons articulated above and in the Motion, Plaintiffs are likely to succeed on

8  each and all of their religious freedom, privacy, and speech claims.  Implementation of SB 1172

9  should therefore be enjoined during the pendency of this action to avoid the irreparable injury to

10  the Plaintiffs' constitutional liberties that is scheduled to commence on January 1, 2013.

13  Dated:  November 26, 2012

15  s/ Matt B. McReynolds
   Kevin T. Snider

16  Michael J. Peffer
   Matthew B. McReynolds

17  Attorneys for Plaintiffs

_____

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION