1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10                        ----oo0oo----

11

12  DONALD WELCH, ANTHONY DUK,          NO. CIV. 2:12-2484 WBS KJN
    AARON BITZER,
13                                      MEMORANDUM AND ORDER RE:
              Plaintiffs,               MOTION FOR PRELIMINARY
14                                      INJUNCTION
         v.
15
    EDMUND G. BROWN, JR., Governor
16  of the State of California, In
    His Official Capacity, ANNA M.
17  CABALLERO, Secretary of
    California State and Consumer
18  Services Agency, In Her
    Official Capacity, DENISE
19  BROWN, Director of Consumer
    Affairs, In Her Official
20  Capacity, CHRISTINE
    WIETLISBACH, PATRICIA
21  LOCK-DAWSON, SAMARA ASHLEY,
    HARRY DOUGLAS, JULIA JOHNSON,
22  SARITA KOHLI, RENEE LONNER,
    KAREN PINES, CHRISTINA WONG,
23  In Their Official Capacities
    as Members of the California
24  Board of Behavioral Sciences,
    SHARON LEVINE, MICHAEL BISHOP,
25  SILVIA DIEGO, DEV GNANADEV,
    REGINALD LOW, DENISE PINES,
26  JANET SALOMONSON, GERRIE
    SCHIPSKE, DAVID SERRANO
27  SEWELL, BARBARA YAROSLAVSKY,
    In Their Official Capacities
28  as Members of the Medical

                            1

Board of California,

         Defendants.

_____/

----oo0oo----

      Plaintiffs Donald Welch, Anthony Duk, and Aaron Bitzer seek to enjoin enforcement of Senate Bill 1172 ("SB 1172"), which if it goes into effect on January 1, 2013, will prohibit mental health providers from engaging in sexual orientation change efforts ("SOCE") with minors.

      Because the court finds that SB 1172 is subject to strict scrutiny and is unlikely to satisfy this standard, the court finds that plaintiffs are likely to succeed on the merits of their 42 U.S.C. § 1983 claims based on violations of their rights to freedom of speech under the First Amendment.  Because plaintiffs have also shown that they are likely to suffer irreparable harm in the absence of an injunction, that the balance of equities tips in their favor, and that an injunction is in the public interest, the court grants plaintiffs' motion for a preliminary injunction.[1]

I.   <u>Factual and Procedural Background</u>

      On September 29, 2013, defendant Governor Edmund G. Brown, Jr., signed SB 1172.  SB 1172 prohibits a "mental health provider" from engaging in "sexual orientation change efforts with a patient under 18 years of age" under all circumstances.

---

     [1]   The court accordingly does not reach plaintiffs' remaining constitutional challenges, namely, that SB 1172 violates any rights to privacy, violates the First Amendment Free Exercise and Establishment Clauses, or is unconstitutionally vague and overbroad under the First Amendment.

Cal. Stats. 2012, ch. 835, at 91 ("SB 1172") (to be codified at Cal. Bus. & Prof. Code §§ 865(a), 865.1).  It further provides that "[a]ny sexual orientation change efforts attempted on a patient under 18 years of age by a mental health provider shall be considered unprofessional conduct and shall subject a mental health provider to discipline by the licensing entity for that mental health provider."  Id. (to be codified at Cal. Bus. & Prof. Code § 865.2).

SB 1172 defines "sexual orientation change efforts" as "any practices by mental health providers that seek to change an individual's sexual orientation.  This includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex."  Id. (to be codified at Cal. Bus. & Prof. Code § 865(b)(1)).  From this definition, SB 1172 excludes "psychotherapies that: (A) provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices; and (B) do not seek to change sexual orientation."  Id. (to be codified at Cal. Bus. & Prof. Code § 865(b)(2)).  The bill defines "mental health provider" as:

> a physician and surgeon specializing in the practice of psychiatry, a psychologist, a psychological assistant, intern, or trainee, a licensed marriage and family therapist, a registered marriage and family therapist, intern, or trainee, a licensed educational psychologist, a credentialed school psychologist, a licensed clinical social worker, an associate clinical social worker, a licensed professional clinical counselor, a registered clinical counselor, intern, or trainee, or any other

3

1   person designated as a mental health professional under
2   California law or regulation.

3   Id. (to be codified at Cal. Bus. & Prof. Code § 865(a)).

4       Plaintiff Donald Welch is a licensed marriage and
5   family therapist in California and an ordained minister.  (Welch
6   Decl. ¶ 1 (Docket No. 11).)  He is currently the president of a
7   non-profit professional counseling center, the owner and director
8   of a for-profit counseling center, and an adjunct professor at
9   two universities.  (Id. ¶ 4.)  Welch is also employed part-time
10  as a Counseling Pastor for Skyline Wesleyan Church, which teaches
11  that "human sexuality . . . is to be expressed only in a
12  monogamous lifelong relationship between one man and one woman
13  within the framework of marriage."  (Id. ¶ 5, Ex. A at 3.)  Welch
14  provides treatment that qualifies as SOCE under SB 1172 and his
15  "compliance with SB 1172 will jeopardize [his] employment" at
16  Skyline Wesleyan Church.  (Id. ¶¶ 5, 8-9, 11, 17.)

17      Plaintiff Anthony Duk is a medical doctor and board
18  certified psychiatrist in full-time private practice who works
19  with adults and children over the age of sixteen.  (Duk Decl. ¶ 1
20  (Docket No. 13).)  His current patients include minors
21  "struggling with" homosexuality and bisexuality.  (Id. ¶ 6.)  In
22  his practice, Duk utilizes treatment that qualifies as SOCE under
23  SB 1172.  (Id.)

24      Plaintiff Aaron Bitzer is an adult who has had same-sex
25  attractions beginning in his childhood and was "involved in
26  sexual orientation efforts commonly called 'SOCE'" as an adult in
27  2011 and 2012.  (Bitzer Decl. ¶¶ 1-11, 15 (Docket No. 12).)
28  Bitzer "had been planning on becoming a therapist specifically to

4

work" with individuals having same-sex attractions and to help
men like himself.  (Id. ¶ 26.)  He explains that, "[b]ecause of
SB 1172, [he has] had to reorder all of [his] career plans and
[is] trying to pursue a doctorate so as to also contribute
research to this field."[2]  (Id.)

On October 1, 2012, plaintiffs initiated this action
under 42 U.S.C. § 1983 against various state defendants to
challenge the constitutionality of SB 1172.  (See Docket No. 1.)
In their Complaint, plaintiffs seek declaratory relief and
preliminary and permanent injunctions.  Presently before the
court is plaintiffs' motion for a preliminary injunction in which
they seek to enjoin enforcement of SB 1172 before the new law
goes into effect on January 1, 2013.[3]  The court granted Equality
Justice permission to submit briefs and present oral argument as
an amicus curiae in this case.  (See Docket No. 30.)

II.  Analysis

To succeed on a motion for a preliminary injunction,
plaintiffs must establish that (1) they are likely to succeed on
the merits; (2) they are likely to suffer irreparable harm in the
absence of preliminary relief; (3) the balance of equities tips

---

[2]    Neither defendants nor amicus challenged whether Bitzer
has Article III standing.

[3]    Defendants submitted numerous evidentiary objections to
the declarations of Duk, Welch, and Bitzer "to the extent that
they are offered as scientific opinion evidence on the efficacy
or safety of [SOCE] generally, or on minors in particular, or on
the nature and/or causes of homosexuality, bisexuality, or
heterosexuality."  (See Docket No. 37.)  The court neither
considers nor relies on these declarations for such purposes and
discusses plaintiffs' statements in the declarations only to
provide background information and to identify how Duk and Welch
perform SOCE.  The court therefore need not resolve defendants'
evidentiary objections.

in their favor; and (4) an injunction is in the public interest.
Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008);
Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 979 (9th Cir.
2011).  The Supreme Court has repeatedly emphasized that
"injunctive relief [i]s an extraordinary remedy that may only be
awarded upon a clear showing that the plaintiff is entitled to
such relief."  Winter, 555 U.S. at 22.

          "The purpose of a preliminary injunction is merely to
preserve the relative positions of the parties until a trial on
the merits can be held."  Univ. of Tex. v. Camenisch, 451 U.S.
390, 395 (1981).  "'A preliminary injunction . . . is not a
preliminary adjudication on the merits but rather a device for
preserving the status quo and preventing the irreparable loss of
rights before judgment.'"  U.S. Philips Corp. v. KBC Bank N.V.,
590 F.3d 1091, 1094 (9th Cir. 2010) (quoting Sierra On-Line, Inc.
v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984))
(omission in original).

     A.   Plaintiffs May Not Assert the Rights of Parents and
          Minors

          "As a prudential matter, even when a plaintiff has
Article III standing, [federal courts] do not allow third parties
to litigate on the basis of the rights of others."  Planned
Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 917 (9th Cir.
2004).  The Supreme Court has "adhered to the rule that a party
'generally must assert his own legal rights and interests, and
cannot rest his claim to relief on the legal rights or interests
of third parties.'"  Kowalski v. Tesmer, 543 U.S. 125, 129 (2004)
(quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)).

                                6

This limitation on prudential standing is not "absolute," and the Court has recognized "that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." Id. at 129-30. Specifically, a litigant may bring an action on behalf of a third party if "three important criteria are satisfied": "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." Powers v. Ohio, 499 U.S. 400, 410-11 (1991); accord Coalition of Clergy, Lawyers, & Professors v. Bush, 310 F.3d 1153, 1163 (9th Cir. 2002).

Third-party standing for physicians asserting the rights of their patients first developed in the abortion context. For example, in Singleton v. Wulff, 428 U.S. 106 (1976), the Supreme Court concluded that "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision."[4]

---

[4] Only three justices joined in Justice Blackmun's rationale as to why the physicians could assert the rights of their patients. Singleton, 428 U.S. at 108 (plurality opinion). Justice Stevens, the fifth vote in the outcome, concluded that the doctors had standing because they "have a financial stake in the outcome of the litigation" and "claim that the statute impairs their own constitutional rights." Singleton, 428 U.S. at 121 (Stevens, J., concurring in part). Despite only three justices having joined Justice Blackmun's analysis, "[m]any cases nonetheless speak of the court in Singleton as having 'held' that the physician had third-party standing." Aid for Women v. Foulston, 441 F.3d 1101, 1113 n.13 (10th Cir. 2006); see also Singleton, 428 U.S. at 122 (Powell, J., dissenting) ("The Court further holds that . . . respondents may assert, in addition to their own rights, the constitutional rights of their patients . . . . I dissent from this holding.").

_Singleton_, 428 U.S. at 118 (plurality opinion); <u>see also</u> <u>Planned</u> <u>Parenthood of Idaho, Inc.</u>, 376 F.3d at 917 ("Since at least <u>Singleton v. Wulff</u>, [] it has been held repeatedly that physicians may acquire jus tertii standing to assert their patients' due process rights in facial challenges to abortion laws.").

Even assuming plaintiffs can satisfy the first two criteria, plaintiffs cannot credibly suggest that parents of minor children who seek SOCE and minors who desire SOCE face a hindrance in asserting their own rights.  Three days after plaintiffs initiated this action, a second case challenging SB 1172 was filed in this court.  The plaintiffs in that case include parents of minor children seeking SOCE for their minor children and minor children seeking SOCE, and the plaintiffs in that case have similarly sought a preliminary injunction.  (<u>See</u> <u>Pickup v. Brown</u>, Civ. No. 2:12-2497 KJM EFB (E.D. Cal.) Compl. ¶¶ 2-6 (Docket No. 1).)

Not only is it clear that parents and minors do not face a hindrance in challenging SB 1172 as it relates to their rights, determining whether the statute will violate their rights is more appropriately addressed in the case in which they are plaintiffs.  Accordingly, plaintiffs in this case may not assert the third-party rights of parents of minor children or minors and the court's analysis of SB 1172 will be limited to challenges

---

In <u>Singleton</u>, the physicians had alleged that the statute at issue violated their "constitutional rights to practice medicine." <u>Singleton</u>, 428 U.S. at 113 (internal quotation marks and citation omitted).  Justice Brennan stated that the Court had "no occasion to decide whether such a right exists." <u>Id.</u>

based on plaintiffs' own rights.   Cf. Smith v. Jefferson Cnty.
Bd. of Sch. Comm'rs, 641 F.3d 197, 208-09 (6th Cir. 2011)
(finding that teachers lacked prudential standing to assert the
rights of their students when, even though the teachers had a
sufficiently close relationship to their students, "[t]here is no
evidence that the students or their parents might be deterred
from suing," "that the claims of the students would be imminently
moot," or "that the students face systemic practical challenges
to filing suit").

      B.    Plaintiffs' Right of Free Speech under the First
           Amendment

      "The First Amendment applies to state laws and
regulations through the Due Process Clause of the Fourteenth
Amendment."   Nat'l Ass'n for the Advancement of Psychoanalysis v.
Cal. Bd. of Psychology, 228 F.3d 1043, 1053 (9th Cir. 2000)
(hereinafter "NAAP").   "The Supreme Court has recognized that
physician speech is entitled to First Amendment protection
because of the significance of the doctor-patient relationship."
Conant v. Walters, 309 F.3d 629, 636 (9th Cir. 2002) (citing
Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 884 (1992)
(plurality opinion); Rust v. Sullivan, 500 U.S. 173, 200 (1991)).
The Ninth Circuit has also "recognized that communication that
occurs during psychoanalysis is entitled to First Amendment
protection."   Conant, 309 F.3d at 637.

         1.    Because SB 1172 Would Restrict the Content of
                Speech and Prohibit the Expression of Particular
                Viewpoints It Is Subject to Strict Scrutiny Review

1            a.    <u>The Fact that SB 1172 Is a Professional</u>

2                 <u>Regulation Does Not Exempt It from</u>

3                 <u>Strict Scrutiny</u>

4         Defendants and amicus first argue that, even though

5 physician speech receives First Amendment protection, SB 1172 is

6 subject only to rational basis or a reasonableness level of

7 review because it is a regulation of professional conduct.  In a

8 concurring opinion in <u>Lowe v. SEC</u>, 472 U.S. 181 (1985), Justice

9 White, joined by two other justices, stated that "[r]egulations

10 on entry into a profession, as a general matter, are

11 constitutional if they 'have a rational connection with the

12 applicant's fitness or capacity to practice' the profession."

13 <u>Lowe</u>, 472 U.S. at 228 (White, J., concurring) (quoting <u>Schware v.</u>

14 <u>Bd. of Bar Examiners</u>, 353 U.S. 232, 239 (1957)).  Relying on

15 <u>Lowe</u>, the Fourth Circuit held that "[a] statute that governs the

16 practice of an occupation is not unconstitutional as an

17 abridgment of the right to free speech, so long as any inhibition

18 of that right is merely the incidental effect of observing an

19 otherwise legitimate regulation."  <u>Accountant's Soc. of Va. v.</u>

20 <u>Bowman</u>, 860 F.2d 602, 604 (4th Cir. 1988) (internal quotation

21 marks and citation omitted).[5]

22

23        [5]    In <u>Dittman v. California</u>, 191 F.3d 1020 (9th Cir.
1999), the Ninth Circuit rejected the plaintiff's substantive due

24 process challenge to a regulation requiring disclosure of his
social security number to renew his acupuncturist license.  In

25 doing so, the court quoted <u>Lowe</u> for "the fundamental principle
that '[r]egulations on entry into a profession, as a general

26 matter, are constitutional if they "have a rational connection
with the applicant's fitness or capacity to practice" the

27 profession.'"  <u>Dittman</u>, 191 F.3d at 1030 (quoting <u>Lowe</u>, 472 U.S.
at 228).  Unlike <u>Lowe</u> and <u>Dittman</u>, SB 1172 is not a regulation

28 "on entry into a profession," <u>Lowe</u>, 472 U.S. at 228.

1    In a brief paragraph of the plurality decision in
2  Casey, Justice O'Connor, with little analysis and joined by only
3  two justices, addressed plaintiffs' "asserted First Amendment
4  right of a physician not to provide information about the risks
5  of abortion, and childbirth, in a manner mandated by the State."
6  Casey, 505 U.S. at 884 (plurality opinion).  Justice O'Connor
7  rejected this claim, stating, "To be sure, the physician's First
8  Amendment rights not to speak are implicated, but only as part of
9  the practice of medicine, subject to reasonable licensing and
10 regulation by the State."  Id. (internal citation omitted).

11    In Lowe, Justice White recognized that, "[a]t some
12 point, a measure is no longer a regulation of a profession but a
13 regulation of speech or of the press; beyond that point, the
14 statute must survive the level of scrutiny demanded by the First
15 Amendment."  Lowe, 472 U.S. at 230 (White, J., concurring).  The
16 Ninth Circuit has also stated that the plurality opinion in Casey
17 "did not uphold restrictions on speech itself."  Conant, 309 F.3d
18 at 638.  The lower levels of review contemplated in Lowe and
19 Casey thus do not appear to apply if a law imposes restrictions
20 on a professional's speech.  Some courts have nonetheless applied
21 a lower level of review to professional regulations addressing
22 the speech of a professional.  See, e.g., Shultz v. Wells, Civ.
23 No. 2:09-646, 2010 WL 1141452, at *9-10 (M.D. Ala. Mar. 3, 2010)
24 (upholding discipline of licensed chiropractor who advised
25 patient to stop taking prescriptions as a reasonable regulation
26 of speech in the doctor-patient relationship); see generally
27 Wollschlaeger v. Farmer, --- F. Supp. 2d ----, 2012 WL 3064336,
28

11

at *9 (S.D. Fla. June 29, 2012).[6]

The Ninth Circuit, however, has explained that a content- or viewpoint-based professional regulation is subject to strict scrutiny.  In <u>NAAP</u>, the Ninth Circuit held that California's mental health licensing laws, which prohibited the plaintiffs from practicing psychoanalysis in California, did not violate the First Amendment.  <u>NAAP</u>, 228 F.3d at 1056.  Assuming that the licensing scheme implicated speech,[7] the Ninth Circuit

---

[6]    In <u>Wollschlaeger</u>, the Southern District of Florida cites <u>Conant</u> as requiring that professional regulations "must have the requisite 'narrow specificity.'"  <u>Wollschlaeger</u>, 2012 WL 3064336, at *9 (quoting <u>Conant</u>, 309 F.3d at 639).  The Ninth Circuit's reference to "narrow specificity" derives from Supreme Court jurisprudence addressing vagueness, and the court ultimately upheld the injunction against the federal policy because "the government has been unable to articulate exactly what speech is proscribed, describing it only in terms of speech the patient believes to be a recommendation of marijuana." <u>Conant</u>, 309 F.3d at 639.
      In <u>NAACP v. Button</u>, 371 U.S. 415, 433 (1963), which the Ninth Circuit cited as authority for the "narrow specificity" standard, the Supreme Court addressed an allegedly vague statute and concluded, "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."  <u>Button</u>, 371 U.S. at 433 (citing <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 311 (1940)); <u>see also</u> <u>Cantwell</u>, 310 U.S. at 311 ("[I]n the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question.").

[7]    The Ninth Circuit did not determine whether First Amendment rights to speech were in fact implicated by the challenged licensing scheme.  <u>See</u> <u>NAAP</u>, 228 F.3d at 1053 ("We conclude that, <u>even if a speech interest is implicated</u>, California's licensing scheme passes First Amendment scrutiny.") (emphasis added); <u>id.</u> at 1056 ("<u>Although some speech interest may be implicated</u>, California's content-neutral mental health licensing scheme is a valid exercise of its police power to protect the health and safety of its citizens and does not offend the First Amendment.") (emphasis added).  Two years later in <u>Conant</u>, however, the Ninth Circuit stated that, in <u>NAAP</u>, "we recognized that communication that occurs during psychoanalysis

1   rejected the plaintiffs' argument that psychoanalysis deserved

2   unique First Amendment protection because it is the "talking

3   cure."  Id. at 1054.  The court agreed with the district court's

4   conclusion that "the key component of psychoanalysis is the

5   treatment of emotional suffering and depression, not speech. . .

6   . That psychoanalysts employ speech to treat their clients does

7   not entitle them, or their profession, to special First Amendment

8   protection."  Id. (internal quotation marks omitted).  The Ninth

9   Circuit then explained that "[t]he communication that occurs

10  during psychoanalysis is entitled to constitutional protection,

11  but it is not immune from regulation."  Id. at 1054-55.

12       After concluding that "the licensing scheme is a valid

13  exercise of California's police power," the Ninth Circuit held

14  that it was not subject to strict scrutiny because it was

15  content- and viewpoint-neutral.  Id. at 1055.  The court

16  specifically stated, "We have held that '"[t]he appropriate level

17  of scrutiny is tied to whether the statute distinguishes between

18  prohibited and permitted speech on the basis of content."'"  Id.

19  (quoting Black v. Arthur, 201 F.3d 1120, 1123 (9th Cir. 2000))

20  (alteration in original).  The court neither suggested nor held

21  that a lower standard governed California's mental health

22  licensing laws regardless of content simply because they were

23  professional regulations.  See id. at 1055 (emphasizing that,

24  "[a]lthough the California laws and regulations may require

25  certain training, speech is not being suppressed based on its

26  message").  It therefore follows under NAAP that a professional

27  _____

28  is entitled to First Amendment protection."  Conant, 309 F.3d at
    637.

13

1  regulation would be subject to strict scrutiny if it is not

2  content- and viewpoint-neutral.

3         Since NAAP, the Ninth Circuit has continued to adhere

4  to the traditional standards governing content- or viewpoint-

5  based regulations.  In finding that a federal policy prohibiting

6  physicians from recommending marijuana to patients violated the

7  First Amendment, the Ninth Circuit recognized that "[b]eing a

8  member of a regulated profession does not, as the government

9  suggests, result in a surrender of First Amendment rights" and

10 found that the federal policy was content- and viewpoint-based.

11 Conant, 309 F.3d at 637.  The Conant court explained how the

12 constitutional regulations in NAAP were content-neutral, id. at

13 637, and emphasized that "content-based restrictions on speech

14 are 'presumptively invalid.'"  Id. at 637-38.  In 2008, the Ninth

15 Circuit cited NAAP as authority for the rule that "both

16 viewpoint-based and content-based speech restrictions trigger

17 strict scrutiny."  Jacobs v. Clark Cnty. Sch. Dist., 526 F.3d

18 419, 431 (9th Cir. 2008).  Accordingly, even if SB 1172 is viewed

19 as a professional regulation, it is subject to strict scrutiny if

20 it is content- or viewpoint-based.

21              b.  SB 1172 Is Not Exempt from Strict Scrutiny

22                  Review as a Statute Regulating Conduct

23        Defendants and amicus next contend that 1) SB 1172 is

24 not subject to review under the First Amendment because it

25 regulates conduct, not speech; and 2) even if SB 1172 is subject

26 to First Amendment review, it is reviewed under intermediate

27 scrutiny.  Under Supreme Court First Amendment jurisprudence,

28 "'it has never been deemed an abridgment of freedom of speech or

press to make a course of conduct illegal merely because the
conduct was in part initiated, evidenced, or carried out by means
of language, either spoken, written, or printed.'"  Ohralik v.
Ohio State Bar Ass'n, 436 U.S. 447, 456 (1978) (quoting Giboney
v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949); see also
Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 604 (2001)
(Stevens, J., concurring) ("This Court has long recognized the
need to differentiate between legislation that targets expression
and legislation that targets conduct for legitimate
non-speech-related reasons but imposes an incidental burden on
expression.").

        SB 1172 defines SOCE as "any practices by mental health
providers that seek to change an individual's sexual orientation.
This includes efforts to change behaviors or gender expressions,
or to eliminate or reduce sexual or romantic attractions or
feelings toward individuals of the same sex." SB 1172 (to be
codified at Cal. Bus. & Prof. Code § 865(b)(1)).  A review of the
bill analyses leading up to the passage of SB 1172 illustrates
that there is not a single method of performing SOCE.  For
example, a Senate Judiciary Committee bill analysis explains that
"SOCE techniques may include aversive treatments such as electric
shock or nausea inducing drugs administered simultaneously with
the presentation of homoerotic stimuli.  Practitioners may also
try to alter a patient's sexuality with visualization, social
skills training, psychoanalytic therapy, and spiritual
interventions." S. Judiciary Comm., Comm. Analysis of SB 1172,
at 3 (May 8, 2012).  Joseph Nicolosi, "one of the founders of
modern reparative therapy," promotes SOCE intervention plans that

"involve conditioning a man to a traditional masculine gender role via participation in sports activities, avoidance of the other sex unless for romantic contact, avoiding contact with homosexuals, increasing time spent with heterosexuals, engaging in group therapy, marrying a person of the opposite sex and fathering children." S. Comm. on Bus., Professions & Econ. Dev., Comm. Analysis of SB 1172, at 8 (Apr. 19, 2012). "Others, particularly conservative Christian transformational ministries, use the term conversion therapy to refer to the utilization of prayer, religious conversion, individual and group counseling to change a person's sexual orientation." Id.

In the 2009 "Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation" ("2009 APA Report"), the array of treatments used in SOCE, many of which do not include speech, are described as follows:

> Behavior therapists tried a variety of aversion treatments, such as inducing nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when the individual became aroused to same-sex erotic images or thoughts. Other examples of aversive behavioral treatments included covert sensitization, shame aversion, systematic desensitization, orgasmic reconditioning, and satration therapy. Some nonaversive treatments used an educational process of dating skills, assertiveness, and affection training with physical and social reinforcement to increase other-sex sexual behaviors. Cognitive therapists attempted to change gay men's and lesbians' thought patterns by reframing desires, redirecting thoughts, or using hypnosis, with the goal of changing sexual arousal, behavior, and orientation.

(Stein Decl. Ex. 1 ("2009 APA Report") at 22 (Docket No. 34-1).)

From the myriad of explanations about the various SOCE treatments, it is clear that there is not a single method for a

16

mental health provider to engage in SOCE.  The Ninth Circuit has
also recognized that "the key component of psychoanalysis is the
treatment of emotional suffering and depression, not speech."
NAAP, 228 F.3d at 1054 (internal quotation marks omitted).
Nonetheless, at least some forms of SOCE, such as "talk therapy,"
involve speech and the Ninth Circuit has stated that the
"communication that occurs during psychoanalysis is entitled to
First Amendment protection."  Conant, 309 F.3d at 637.
Therefore, even if SB 1172 is characterized as primarily aimed at
regulating conduct, it also extends to forms of SOCE that utilize
speech and, at a minimum, regulates conduct that has an
incidental effect on speech.

        In United States v. O'Brien, 391 U.S. 367 (1968), the
Supreme Court explained that, "when 'speech' and 'nonspeech'
elements are combined in the same course of conduct, a
sufficiently important governmental interest in regulating the
nonspeech element can justify incidental limitations on First
Amendment freedoms."  O'Brien, 391 U.S. at 376.  In such
circumstances, "a government regulation is sufficiently justified
[1] if it is within the constitutional power of the Government;
[2] if it furthers an important or substantial governmental
interest; [3] if the governmental interest is unrelated to the
suppression of free expression; and [4] if the incidental
restriction on alleged First Amendment freedoms is no greater
than is essential to the furtherance of that interest."  Id. at
377.

        In O'Brien, the Court rejected a First Amendment free
speech challenge to a law criminalizing the knowing destruction

of draft registration certificates when O'Brien claimed he burned
his certificate as a demonstration against the war.  After
concluding that the law satisfied the four-part test, the Court
reasoned that "[t]he case at bar is therefore unlike one where
the alleged governmental interest in regulating conduct arises in
some measure because the communication allegedly integral to the
conduct is itself thought to be harmful."  Id. at 382.  The
intermediate scrutiny standard from O'Brien therefore "does not
provide the applicable standard for reviewing a content-based
regulation of speech."  Holder v. Humanitarian Law Project, ---
U.S. ----, 130 S. Ct. 2705, 2723 (2010).

          In Humanitarian Law Project, the Supreme Court
addressed a preenforcement challenge to the federal material-
support statute and held that it could not be assessed under the
O'Brien test.  The material-support statute "makes it a federal
crime to 'knowingly provid[e] material support or resources to a
foreign terrorist organization.'"  Id. at 2713 (quoting 18 U.S.C.
§ 2339B).  The Court recognized that the "material support" the
statute prohibited "most often does not take the form of speech
at all," but that the plaintiffs in the case intended to provide
material support through speech.  Id. at 2723.  After concluding
that the statute was content-based and therefore subject to
strict scrutiny, the Court rejected the government's argument
that it should nonetheless be subject to intermediate scrutiny
"because it generally functions as a regulation of conduct."  Id.
at 2724.  In rejecting the government's position, the Court
emphasized, "The law here may be described as directed at
conduct, . . . but as applied to plaintiffs the conduct

triggering coverage under the statute consists of communicating a message" because the plaintiffs intended to "provide material support to the PKK and LTTE in the form of speech." Id.

Similar to Humanitarian Law Project, plaintiffs in this case have indicated that they wish to engage in SOCE through speech. Moreover, even if the court assumes that most SOCE is performed through conduct and that SOCE generally functions to regulate conduct, it is not automatically subject to review under the O'Brien test. As the Court made clear in O'Brien and has repeatedly confirmed since that decision, a law regulating conduct that incidentally affects speech is subject to strict scrutiny if it is content or viewpoint-based. Accordingly, even assuming SB 1172 is properly characterized as a statue regulating conduct, because it has at least an incidental effect on speech and plaintiffs intend to engage in SOCE through speech, intermediate scrutiny applies only if SB 1172 is content- and viewpoint-neutral.

c.   SB 1172 Lacks Content and Viewpoint Neutrality

Because SB 1172 cannot be reviewed under a lower level of review as a professional regulation or a regulation of conduct if it is content- or viewpoint-based, the court must assess its neutrality to determine the appropriate level of review. "The principal inquiry in determining whether a regulation is content-neutral or content-based is whether the government has adopted [the] regulation . . . because of [agreement or] disagreement with the message it conveys." NAAP, 228 F.3d at 1055 (internal quotation marks omitted) (alterations and omission

1   in original); accord Fla. Bar v. Went For It, Inc., 515 U.S. 618,

2   642 (1994); see also Berger v. City of Seattle, 569 F.3d 1029,

3   1051 (9th Cir. 2009) ("A regulation is content-based if either

4   the underlying purpose of the regulation is to suppress

5   particular ideas or if the regulation, by its very terms, singles

6   out particular content for differential treatment."). "Viewpoint

7   discrimination is [] an egregious form of content discrimination"

8   and occurs "when the specific motivating ideology or the opinion

9   or perspective of the speaker is the rationale for the

10  restriction." Rosenberger v. Rector & Visitors of Univ. of Va.,

11  515 U.S. 819, 829 (1995).

12          In Conant, the Ninth Circuit relied on the First

13  Amendment to uphold a permanent injunction enjoining the federal

14  government from revoking a physician's license to prescribe

15  controlled substances or initiating an investigation of the

16  physician on the sole ground that the physician recommended

17  medical marijuana to a patient. Conant, 309 F.3d at 631. The

18  Ninth Circuit emphasized that "[t]he government's policy . . .

19  seeks to punish physicians on the basis of the content of

20  doctor-patient communications" because "[o]nly doctor-patient

21  conversations that include discussions of the medical use of

22  marijuana trigger the policy." Id. at 637. The court further

23  explained that "the policy does not merely prohibit the

24  discussion of marijuana; it condemns expression of a particular

25  viewpoint, i.e., that medical marijuana would likely help a

26  specific patient." Id. at 639; cf. Rust, 500 U.S. at 200

27  (explaining that the challenged regulations "do not significantly

28  impinge upon the doctor-patient relationship" in violation of the

First Amendment because they do not "require[] a doctor to represent as his own any opinion that he does not in fact hold").

Defendants argue that SB 1172 is distinguishable from Conant because it does not extend as far as the challenged federal policy against a physician recommending marijuana for a patient. SB 1172's ban is limited to prohibiting mental health providers from engaging in SOCE with minor patients. SB 1172 (to be codified at Cal Bus. & Prof. Code § 865.1). The bill defines SOCE as "any practices by mental health providers that seek to change an individual's sexual orientation[, including] . . . efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex." Id. (to be codified at Cal. Bus. & Prof. Code § 865(b)(1)).

Based on SB 1172's definition of SOCE, defendants argue that the new law would not preclude a mental health provider from expressing his or her views to a minor patient that the minor's sexual orientation could be changed, informing a minor about SOCE, recommending that a minor pursue SOCE, providing a minor with contact information for an individual who could perform SOCE, or sharing his or her views about the morality of homosexuality.[8] Assuming defendants' interpretation is correct, SB 1172 would still allow mental health providers to exercise their medical judgment to recommend SOCE, see Conant, 309 F.3d at 638, and would preclude them only from providing a minor with

---

[8]    Plaintiffs disagree, arguing that such statements would come with SB 1172's prohibition because such statements could be viewed as seeking to change a patient's sexual orientation.

1    SOCE.

2              This distinction, however, addresses only whether SB

3    1172 is viewpoint-based.  The Ninth Circuit's analysis in NAAP

4    and Supreme Court precedent render it difficult to conclude that

5    SB 1172 is content-neutral simply because it is limited to

6    prohibiting SOCE.  In NAAP, the Ninth Circuit concluded that the

7    challenged licensing laws were content-neutral because "they do

8    not dictate what can be said between psychologists and patients

9    during treatment" or "the content of what is said in therapy" and

10   "[n]othing in the statutes prevents licensed therapists from

11   utilizing psychoanalytical methods."  NAAP, 228 F.3d at 1055-56.

12   The court emphasized that "speech is not being suppressed based

13   on its message" and that the scheme "was not adopted because of

14   any disagreement with psychoanalytical theories."  Id.

15             Humanitarian Law Project, in which the Supreme Court

16   held that the material support statute was content-based and

17   therefore subject to strict scrutiny, provides further guidance.

18   In that case, the Court recognized that the statute did not

19   "suppress ideas or opinions in the form of 'pure political

20   speech'" because plaintiffs could "say anything they wish on any

21   topic" and independently advocate for or join one of the

22   terrorists organizations.  Humanitarian Law Project, 130 S. Ct.

23   at 2722-23.  Nonetheless, the court concluded that the statute

24   "regulates speech on the basis of its content" because whether

25   the plaintiffs' speech to a foreign terrorist organization would

26   be barred by the statute depended on what the plaintiffs said.

27   See id. at 2723-24.

28             Under NAAP and Humanitarian Law Project, the fact that

22

SB 1172 may allow mental health providers to "say anything they wish" about the value or benefits of SOCE or advocate for it does not render SB 1172 content-neutral.  SB 1172 draws a line in the sand governing a therapy session and the moment that the mental health provider's speech "seek[s] to change an individual's sexual orientation," including a patient's behavior, gender expression, or sexual or romantic attractions or feelings toward individuals of the same sex, the mental health provider can no longer speak.  Regardless of the breathing room SB 1172 may leave for speech about SOCE, when applied to SOCE performed through "talk therapy," SB 1172 will give rise to disciplinary action solely on the basis of what the mental health provider says or the message he or she conveys.

There is also little question that the Legislature enacted SB 1172 at least in part because it found that SOCE was harmful to minors and disagreed with the practice.  For example, in SB 1172, the Legislature enacted findings and declarations based on the conclusions of numerous studies about the purported harmful effects and ineffectiveness of SOCE:

> The [American Psychological Association] task force concluded that sexual orientation change efforts can pose critical health risks to lesbian, gay, and bisexual people, including confusion, depression, guilt, helplessness, hopelessness, shame, social withdrawal, suicidality, substance abuse, stress, disappointment, self-blame, decreased self-esteem and authenticity to others, increased self-hatred, hostility and blame toward parents, feelings of anger and betrayal, loss of friends and potential romantic partners, problems in sexual and emotional intimacy, sexual dysfunction, high-risk sexual behaviors, a feeling of being dehumanized and untrue to self, a loss of faith, and a sense of having wasted time and resources. . . . The American Psychiatric Association published a position statement in March of 2000 in which it stated: "Psychotherapeutic modalities to convert or 'repair' homosexuality are based on developmental

theories whose scientific validity is questionable." . . . The National Association of Social Workers prepared a 1997 policy statement in which it stated: . . . "No data demonstrates that reparative or conversion therapies are effective, and, in fact, they may be harmful." . . . The American Academy of Child and Adolescent Psychiatry in 2012 published an article . . . stating: "Clinicians should be aware that there is no evidence that sexual orientation can be altered through therapy, and that attempts to do so may be harmful." . . . The Pan American Health Organization . . . noted that reparative therapies "lack medical justification and represent a serious threat to the health and well-being of affected people."

SB 1172 (Findings & Decls. §§ 1(b), 1(d), 1(h), 1(k), 1(l)).[9]

The Legislature's findings and declarations convey a consistent and unequivocal message that the Legislature found that SOCE is ineffective and harmful.  Such findings bring SB 1172 within the content-based exception in O'Brien when intermediate scrutiny does not apply because "the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." O'Brien, 391 U.S. at 382; see NAAP, 228 F.3d at 1055-56 (explaining that the challenged regulations were content-neutral because they were "not adopted because of any disagreement with psychoanalytical theories").

Especially with plaintiffs in this case, it is also difficult to conclude that just because SOCE utilizing speech is a type of treatment, that the treatment can be separated from a

---

[9]   The court is relying only on findings and declarations that the Legislature enacted in SB 1172, not statements in the legislative history or bill analyses.  Cf. O'Brien, 391 U.S. at 383 ("[The] Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."); see generally Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (explaining why, in the context of Free Exercise claims, whether a court can consider legislative history is an "unsettled" area of law).

mental health provider's viewpoint or message.  Duk has explained that the SOCE treatment he provides to his minor patients includes counseling.  (Duk Decl. ¶ 6.)  Duk is a Catholic and, with patients that share his faith, he discusses tenants of the Catholic faith, including that "homosexuality is not a natural variant of human sexuality, it is changeable, and it is not predominantly determined by genetics."  (Id. ¶¶ 11-13.) Similarly, Welch has explained that he shares the views of his church that homosexual behavior is a sin and that SB 1172 will "disallow [his] clients from choosing to execute biblical truths as a foundation for their beliefs about their sexual orientation."  (Welch Decl. ¶¶ 5, 8, Ex. 14.)

        When a mental health provider's pursuit of SOCE is guided by the provider's or patient's views of homosexuality, it is difficult, if not impossible, to view the conduct of performing SOCE as anything but integrally intertwined with viewpoints, messages, and expression about homosexuality.  Expert declarations defendants submitted in opposition to plaintiffs' motion are consistent with this conclusion.  (See Haldeman Decl. ¶ 8 (Docket No. 40) ("A review of the literature relating to SOCE reflects that the premise underlying treatments designed to change homosexual orientation is that homosexuality is a mental disorder that needs to be 'cured.'"); Beckstead Decl. ¶ 8 (Docket No. 36) ("A review of the literature in the field of [SOCE] reveals that the premise underlying SOCE is that homosexuality is a mental disorder, and that it is counter to some practitioners' religious and/or personal beliefs.").)

        Although it does not appear that the Legislature

intended to suppress the spectrum of messages that may be
intertwined with SOCE, such as whether homosexuality is innate or
immutable, its enacted finding "that [b]eing lesbian, gay, or
bisexual is not a disease, disorder, illness, deficiency, or
shortcoming" strongly suggests that the Legislature at least
sought to suppress the performance of SOCE that contained a
message contrary to this finding.  SB 1172 (Findings & Decls. §
1(a)); see Rosenberger, 515 U.S. at 829 ("The government must
abstain from regulating speech when the specific motivating
ideology or the opinion or perspective of the speaker is the
rationale for the restriction.").  That messages about
homosexuality can be inextricably intertwined with SOCE renders
it likely that, along with SOCE treatment, SB 1172 bans a mental
health provider from expressing his or her viewpoints about
homosexuality as part of SOCE treatment.  Cf. City of Erie v.
Pap's A.M., 529 U.S. 277, 293 (2000) (plurality opinion)
("[T]here may be cases in which banning the means of expression
so interferes with the message that it essentially bans the
message.").

        Against the backdrop of NAAP, Conant, and Humanitarian
Law Project, this court would be hard-pressed to conclude that SB
1172 is content- and viewpoint-neutral.  Accordingly, because it
appears that SB 1172 lacks content and viewpoint neutrality, it
is likely that it must ultimately be assessed under strict
scrutiny.

        2.  SB 1172 Is Unlikely to Withstand Strict Scrutiny
        If a statute "imposes a restriction on the content of
protected speech, it is invalid unless California can demonstrate

that it passes strict scrutiny--that is, unless it is justified
by a compelling government interest and is narrowly drawn to
serve that interest." <u>Brown v. Entm't Merchants Ass'n</u>, --- U.S.
----, 131 S. Ct. 2729, 2738 (2011).  Strict scrutiny is a
"demanding standard" and "'[i]t is rare that a regulation
restricting speech because of its content will ever be
permissible.'"  <u>Id.</u> (quoting <u>United States v. Playboy Entm't
Grp., Inc.</u>, 529 U.S. 803, 818 (2000)).

        To overcome strict scrutiny, "[t]he State must
specifically identify an 'actual problem' in need of solving, and
the curtailment of free speech must be actually necessary to the
solution."  <u>Brown</u>, 131 S. Ct. at 2738.  The state's burden on
strict scrutiny is substantial, especially when contrasted to the
lowest level of review, which does "not require that the
government's action actually advance its stated purposes, but
merely look[s] to see whether the government <u>could</u> have had a
legitimate reason for acting as it did."  <u>Dittman v. California</u>,
191 F.3d 1020, 1031 (9th Cir. 1999).

        In <u>Brown</u>, the Supreme Court held that California's law
banning the sale of violent video games to minors without
parental consent did not pass strict scrutiny.  The state
recognized that it could not "show a direct causal link between
violent video games and harm to minors," but argued that strict
scrutiny could be satisfied based on the Legislature's
"predictive judgment that such a link exists, based on competing
psychological studies."  <u>Brown</u>, 131 S. Ct. at 2738-39.  The Court
rejected this argument, explaining that, under strict scrutiny,
the state "bears the risk of uncertainty" and "ambiguous proof

will not suffice." Id. at 2739.  Although the state submitted

studies of research psychologists "purport[ing] to show a

connection between exposure to violent video games and harmful

effects on children," the Court held that the studies did not

satisfy strict scrutiny because the studies had "been rejected by

every court to consider them" and did not "prove that violent

video games cause minors to act aggressively."  Id.[10]

The Court similarly criticized evidence of harm that

the government submitted in support of a regulation that sought

to prevent children from seeing "signal bleed" on sexually-

oriented programming in Playboy Entertainment Group, Inc.  In

that case, the Court explained,

> There is little hard evidence of how widespread or how
> serious the problem of signal bleed is.  Indeed, there is
> no proof as to how likely any child is to view a
> discernible explicit image, and no proof of the duration
> of the bleed or the quality of the pictures or sound.  To
> say that millions of children are subject to a risk of
> viewing signal bleed is one thing; to avoid articulating

---

[10]  For the first time at oral argument, counsel for amicus
cited three cases for the proposition that the court must defer
to the Legislature's determination in matters of "uncertain
science."  The Supreme Court, however, does not appear to have
been applying strict scrutiny in any of those cases.  See
Gonzales v. Carhart, 550 U.S. 124, 146, 161-64 (2007) ("[W]e must
determine whether the [challenged abortion] Act furthers the
legitimate interest of the Government in protecting the life of
the fetus that may become a child," which was resolved, in part,
by determining "whether the Act creates significant health risks
for women"); Kansas v. Hendricks, 521 U.S. 346, 357-60 (1997)
(upholding a civil commitment statute because it was not contrary
to "our understanding of ordered liberty"); Jones v. United
States, 463 U.S. 354, 364-66 (1983) (holding that a civil
commitment statute was not unconstitutional under the Due Process
Clause because Congress's determination was not "unreasonable").
Amicus's argument is also inconsistent with Brown, which applied
strict scrutiny, was decided after the three cited cases, and
specifically rejected the state's argument that strict scrutiny
could be satisfied based on the Legislature's "predictive
judgment . . . based on competing psychological studies."  Brown,
131 S. Ct. at 2738-39.

the true nature and extent of the risk is quite another.
Playboy Entm't Grp., Inc., 529 U.S. at 819.  The Court concluded
that the "First Amendment requires a more careful assessment and
characterization of an evil in order to justify a regulation as
sweeping" as the one at issue in the case.  Id. at 819, 822-23.
It further emphasized that the government was required to present
more than "anecdote and supposition" to prove an "actual
problem."  Id.

In the findings and declarations of SB 1172, the
California Legislature found that "California has a compelling
interest in protecting the physical and psychological well-being
of minors, including lesbian, gay, bisexual, and transgender
youth, and in protecting its minors against exposure to serious
harms caused by sexual orientation change efforts."  SB 1172
(Findings & Decls. § 1(n)).  The court does not doubt that the
state has a compelling interest in "protecting the physical and
psychological well-being of minors."  See Nunez by Nunez v. City
of San Diego, 114 F.3d 935, 946 (9th Cir. 1997) ("The City's
interest in protecting the safety and welfare of its minors is []
a compelling interest.").  In its opposition brief, defendants
also identified a compelling interest in "protecting all of
society from harmful, risky, or unproven, medical health
treatments."  (Defs.' Opp'n at 28:14-15); cf. NAAP, 228 F.3d at
1054 ("Given the health and safety implications, California's
interest in regulating mental health is even more compelling than
a state's interest in regulating in-person solicitation by
attorneys."); see Nunez, 114 F.3d at 947 (recognizing the
"ostensible purposes of the ordinance identified by the City in

29

its brief" when determining whether it demonstrated a compelling

interest).

As the <u>Brown</u> Court explained, SB 1172 cannot withstand

strict scrutiny unless the state demonstrates an "'actual

problem' in need of solving" and "a direct causal link" between

SOCE and harm to minors. <u>Brown</u>, 131 S. Ct. at 2738-39. At most,

however, defendants have shown that SOCE may cause harm to

minors. For example in the 2009 APA Report, the APA states:

> We conclude that there is a dearth of scientifically
> sound research on the safety of SOCE. Early and recent
> research studies provide no clear indication of the
> prevalence of harmful outcomes among people who have
> undergone efforts to change their sexual orientation or
> the frequency of occurrence of harm because no study to
> date of adequate scientific rigor has been explicitly
> designed to do so. Thus, we cannot conclude how likely
> it is that harm will occur from SOCE. However, studies
> from both periods indicate that attempts to change sexual
> orientation may cause or exacerbate distress and poor
> mental health in some individuals, including depression
> and suicidal thoughts.

(2009 APA Report at 42.) The report further explains:

> A central issue in the debates regarding efforts to
> change same-sex sexual attractions concerns the risk of
> harm to people that may result from attempts to change
> their sexual orientation. . . . Although the recent
> studies do not provide valid causal evidence of the
> efficacy of SOCE or of its harm, some recent studies
> document that there are people who perceive that they
> have been harmed through SOCE.

(<u>Id.</u> at 41-42; <u>see also</u> Herek Decl. ¶¶ 39, 45 ("[E]vidence exists

that [SOCE] <u>may</u> cause harm . . . [and] such interventions <u>may</u> be

psychologically harmful in an unknown number of cases.")

(emphasis added).)

Additionally, the studies discussed and criticized as

incomplete in the 2009 APA Report do not appear to have focused

on harms to minors, and the 2009 APA Report indicates that

"[t]here is a lack of published research on SOCE among children."
(See 2009 APA Report at 41-43, 72.)  It is therefore unclear
whether the reports of harm referenced in the 2009 APA Report
were made exclusively by adults.  In Nunez, the Ninth Circuit
similarly criticized reliance on national statistics regarding a
rising juvenile crime rate to demonstrate that a juvenile curfew
was a narrowly tailored solution for a particular city.  Nunez,
114 F.3d at 947.

In expert declarations defendants and amicus submitted,
individuals opined that SOCE causes harm.[11]  (See Beckstead Decl.
¶ 16; Haldeman Decl. ¶ 7; Ryan Decl. ¶ 21 (Docket No. 41).)  None
of the experts, however, identify or rely on comprehensive
studies that adhere to scientific principles or address the
inadequacies of the studies discussed in the 2009 APA Report.
For example, Ryan's opinion primarily relies on analysis
performed of "LGBT young adults, ages 21-25" and her personal
interviews with LGTB youth who underwent SOCE.  (Ryan Decl. ¶¶
14-16.)  "Although the Constitution does not require the
government to produce 'scientifically certain criteria of
legislation,'" Nunez, 114 F.3d at 947 (quoting Ginsberg v. New
York, 390 U.S. 629, 642-43 (1968)), the Brown Court rejected
"research [] based on correlation, not evidence of causation"
that "suffer[ed] from significant, admitted flaws in
methodology," Brown, 131 S. Ct. at 2739 (internal quotation marks

_____

[11]    Plaintiffs submitted lengthy evidentiary objections to
the declarations defendants and amicus submitted.  (See Dockets
Nos. 50, 51.)  The court cites to these declarations only to
demonstrate the insufficiency of the evidence defendants
submitted and therefore need not resolve plaintiffs' evidentiary
objections.

1   omitted).  Here, evidence that SOCE "may" cause harm to minors

2   based on questionable and scientifically incomplete studies that

3   may not have included minors is unlikely to satisfy the demands

4   of strict scrutiny.

5          The <u>Brown</u> Court was also concerned with the state's

6   inability to prove that harm to minors was caused by video games

7   as opposed to other sources of media.  <u>See</u> <u>Brown</u>, 131 S. Ct. at

8   2739-40.  Here, defendants face a similar inability to

9   distinguish between harm caused by SOCE versus other factors.

10  For example, in his declaration, Herek details the harms

11  homosexual individuals experience as a result of societal

12  stigmas, harassment and bullying, discrimination, and

13  rejection.[12]  (<u>See</u> Herek Decl. ¶¶ 18-21; <u>see also</u> Ryan Decl. ¶¶

14  12-14, 20 (describing the harms that her research shows are

15  caused by parents' and caregivers' "rejecting behaviors" to LGBT

16  youth).)  The few and arguably incomplete studies addressing

17  harms of SOCE do not appear to have assessed whether the harms

18  reported after undergoing SOCE were caused by SOCE as opposed to

19  other internal or external factors and thus would have been

20  sustained regardless of SOCE.

21         Lastly, the <u>Brown</u> Court also explained that, even when

22  statutes pursue legitimate interests, "when they affect First

23  _____

24         [12]   In its findings and declarations, it appears that the
    California Legislature sought to help end some of that stigma,
25  finding, "Being lesbian, gay, or bisexual is not a disease,
    disorder, illness, deficiency, or shortcoming."  No matter how
26  worthy this effort may be, it cannot override First Amendment
    protections.  <u>Cf.</u> <u>Brown</u>, 131 S. Ct. at 2739 n.8 ("But there are
27  all sorts of 'problems'--some of them surely more serious than
    this one--that cannot be addressed by governmental restriction of
28  free expression: for example, the problem of encouraging
    anti-Semitism.").

1    Amendment rights they must be pursued by means that are neither
2    seriously underinclusive nor seriously overinclusive." Brown,
3    131 S. Ct. at 2741-42.   In Brown, the Court found California's
4    legislation to be "seriously underinclusive, not only because it
5    excludes portrayals other than video games, but also because it
6    permits a parental or avuncular veto." Id. at 2742.   At the same
7    time, "as a means of assisting concerned parents it is seriously
8    overinclusive because it abridges the First Amendment rights of
9    young people whose parents (and aunts and uncles) think violent
10   video games are a harmless pastime." Id.

11          Here, SB 1172 prohibits only mental health providers
12   from engaging in SOCE and, as defendants have pointed out,
13   unlicensed individuals who do not qualify as "mental health
14   providers" under the bill can engage in SOCE.   If SOCE is harmful
15   and ineffective, the harm minors will endure at the hands of
16   unlicensed individuals performing SOCE is equal, if not greater,
17   than the harm they would endure from mental health providers
18   performing SOCE.   In fact, the California Legislature has
19   previously "recognized the actual and potential consumer harm
20   that can result from the unlicensed, unqualified or incompetent
21   practice of psychology." NAAP, 228 F.3d at 1047.   The limited
22   scope of SB 1172 therefore suggests that it is likely
23   underinclusive in its application only to mental health
24   providers.

25          The Ninth Circuit has observed that regulations subject
26   to strict scrutiny "almost always violate the First Amendment."
27   DISH Network Corp. v. FCC, 653 F.3d 771, 778 (9th Cir. 2011).   In
28   light of the heavy burden strict scrutiny imposes on defendants,

the lack of evidence demonstrating "actual harm" and a causal
relationship between SOCE and harm to minors, and the
underinclusiveness of SB 1172, the court finds at this
preliminary stage that SB 1172 is not likely to withstand strict
scrutiny.  Accordingly, because it appears that SB 1172 is
content- and viewpoint-based and unlikely to withstand strict
scrutiny, plaintiffs have established that they are likely to
prevail on the merits of their claim that SB 1172 violates their
rights to freedom of speech under the First Amendment.

C.   Remaining Preliminary Injunction Considerations

The Ninth Circuit "and the Supreme Court have
repeatedly held that '[t]he loss of First Amendment freedoms, for
even minimal periods of time, unquestionably constitutes
irreparable injury.'" Klein v. City of San Clemente, 584 F.3d
1196, 1207-08 (9th Cir. 2009) (quoting Elrod v. Burns, 427 U.S.
347, 373 (1976)).  Plaintiffs have therefore shown that they are
likely to suffer irreparable harm in the absence of an
injunction.

In determining whether plaintiffs have shown that the
balance of equities tips in their favor, "the district court has
a 'duty . . . to balance the interests of all parties and weigh
the damage to each.'" Stormans, Inc. v. Selecky, 586 F.3d 1109,
1138 (9th Cir. 2009) (quoting L.A. Mem'l Coliseum Comm'n v. Nat'l
Football League, 634 F.2d 1197, 1203 (9th Cir. 1980)).  Having
proven that they are likely to succeed on their First Amendment
free speech challenge to SB 1172, the most significant hardship
to Welch and Duk is that SB 1172 will likely infringe on their
First Amendment rights because it will restrict them from

engaging in SOCE with their minor patients.  Any harm to Bitzer
is more remote and less significant because he is not currently a
"mental health provider" and thus his speech would not be
governed by SB 1172.  Although he has explained that SB 1172
would require him to change his career plans, even if SB 1172 is
not enjoined, he could engage in SOCE with the various religious
groups he has described because SB 1172 would not extend to him.

If defendants are enjoined from enforcing SB 1172
against plaintiffs, a law that the California Legislature enacted
would be, at least until this case is resolved on the merits,
unenforceable as against these three plaintiffs.[13]  The Supreme
Court has recognized that, "any time a State is enjoined by a
court from effectuating statutes enacted by representatives of
its people, it suffers a form of irreparable injury."  Maryland
v. King, --- U.S. ----, 133 S. Ct. 1, 3 (2012) (internal
quotation marks and citation omitted).  The state also has an
interest in protecting the health and welfare of minor children,
and the Legislature found that SOCE causes harm to minor
children.  Cf. Brown, 131 S. Ct. at 2736 ("No doubt a State
possesses legitimate power to protect children from harm, but
that does not include a free-floating power to restrict the ideas
to which children may be exposed.") (internal citation omitted).

The harm to the state in being unable to enforce SB

_____

[13]   A preliminary injunction in this case would be limited
to plaintiffs.  See generally Zepeda v. INS, 753 F.2d 719, 727-28
(9th Cir. 1984) ("A federal court may issue an injunction if it
has personal jurisdiction over the parties and subject matter
jurisdiction over the claim; it may not attempt to determine the
rights of persons not before the court. . . . The district court
must, therefore, tailor the injunction to affect only those
persons over which it has power.").

1172 against plaintiffs is not as substantial as it may initially
appear.  California has arguably survived 150 years without this
law and it would be a stretch of reason to conclude that it would
suffer significant harm having to wait a few more months to know
whether the law is enforceable as against the three plaintiffs in
this case.  When balanced against the risk of infringing on
plaintiffs' First Amendment rights, forcing the state to preserve
the long-standing status quo so that the case can be resolved on
the merits and through the appellate process confirms that any
harm the state faces is de minimis.

        The final consideration in determining whether to grant
a preliminary injunction is the public interest.  Although the
Ninth Circuit has "at times subsumed this inquiry into the
balancing of the hardships, it is better seen as an element that
deserves separate attention in cases where the public interest
may be affected."  Sammartano v. First Judicial Dist. Ct., in &
for Cnty. of Carson, 303 F.3d 959, 974 (9th Cir. 2002) (internal
citation omitted).  "The public interest inquiry primarily
addresses impact on non-parties rather than parties" and
"[c]ourts considering requests for preliminary injunctions have
consistently recognized the significant public interest in
upholding First Amendment principles."  Id.; see, e.g., Homans v.
Albuquerque, 264 F.3d 1240, 1244 (10th Cir. 2001) ("[W]e believe
that the public interest is better served by following binding
Supreme Court precedent and protecting the core First Amendment
right of political expression.").  "The public interest in
maintaining a free exchange of ideas, though great, has in some
cases been found to be overcome by a strong showing of other

competing public interests, especially where the First Amendment
activities of the public are only limited, rather than entirely
eliminated."  Sammartano, 303 F.3d at 974.

Here, the public has an interest in the protection and
mental well-being of minors, and the court does not take lightly
the possible harm SOCE may cause minors, especially when forced
on minors who did not choose to undergo SOCE.  See Stormans,
Inc., 586 F.3d at 1139 ("The 'general public has an interest in
the health' of state residents.").  Countered against this is the
public's interest in preserving First Amendment rights.  Given
the limited scope and duration of a preliminary injunction in
this case, the court has no difficulty in concluding that
protecting an individual's First Amendment rights outweighs the
public's interest in rushing to enforce an unprecedented law.

That public perception in favor of this law may be
heightened because "it appears that homosexuality has gained
greater societal acceptance . . . is scarcely an argument for
denying First Amendment protection to those who refuse to accept
these views.  The First Amendment protects expression, be it of
the popular variety or not."  Boy Scouts of Am. v. Dale, 530 U.S.
640, 660 (2000).  Accordingly, because plaintiffs have made an
adequate showing under each of the four factors discussed in
Winter, the court will grant their motion for a preliminary
injunction.

IT IS THEREFORE ORDERED that plaintiffs' motion for a
preliminary injunction be, and the same hereby is, GRANTED.
Pending final resolution of this action, defendants are hereby
enjoined from enforcing the provisions of SB 1172 (to be codified

37

1 at Cal. Bus. & Prof. Code §§ 865-865.2) as against plaintiffs

2 Donald Welch, Anthony Duk, and Aaron Bitzer.

3 DATED:   December 3, 2012

4

5

WILLIAM B. SHUBB

6 UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28